UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

|  |  |  |
|---|---|---|
| | ) | Case No. 6:12-bk-00408-KSJ |
| | ) | Chapter 7 |
| DONALD PIERCE BARBER, | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**RESPONSE IN SUPPORT OF INTERESTED PARTIES R. J. REYNOLDS TOBACCO COMPANY AND PHILIP MORRIS USA, INC. TO THE TRUSTEES' JOINT MOTION TO APPROVE COMPROMISE OF CONTROVERSY**

R. J. Reynolds Tobacco Company and Philip Morris USA, Inc. (the "Interested Parties") respectfully file this pleading in support of Chapter 7 Trustees Richard B. Webber II and Gene Chambers' Joint Motion to Approve Compromise of Controversy,[1] and in response to the June 3, 2016 objection by debtors Suzanne J. Barber and the Estate of Donald Pierce Barber (collectively, the "Debtors") (the "Debtors' Objection").

1.      R. J. Reynolds Tobacco Company and Philip Morris USA, Inc. are interested parties because they have a sufficient stake in these proceedings.  Given the Interested Parties' stake in the compromise, they have reviewed the Debtors' Objection.  That review revealed that the Debtors' objections are premised upon material misstatements of the factual record and misleading omissions of material facts.  These fatal flaws are demonstrated below through citation to documentary evidence, including court filings, deposition testimony, and hearing transcripts.

---

[1] Docket #39 in Case No. 6:12-bk-00408-KSJ, and Docket #43 in Case No. 6:10-bk-14338-KSJ.

2.      The Debtors' Objection argues that the compromise provides the bankruptcy estates with inadequate value in exchange for foregoing the right to proceed to trial on the Debtors' wrongful death claims and punitive damages demands in the state court personal injury lawsuit (the "State Court Action").  But the undisputed facts demonstrate that **<u>never</u>** in the eight (8) years in which their State Court Action has been pending have the Debtors asserted wrongful death claims or had the required leave of court to request a punitive damages award.  Far from a mere pleading oversight, in open court on April 5, 2016 the Debtors (after conferring with counsel, but not the Trustees) expressly and voluntarily chose to forgo such claims in favor of a May 9, 2016 trial date.

3.      While the Debtors' Objection concludes the $65,000 settlement consideration is grossly insufficient, the Debtor herself recently wrote a letter to this Court claiming that the State Court Action has "no value" and is essentially a "lottery ticket."

4.      Further, the Debtors fail to inform this Court of their own prior settlement of these claims with the primary defendant, for a secret amount Debtor Suzanne Barber testified was "very little."

5.      When the full facts are examined, there can be little doubt that the Debtors' arguments are without merit.

**A.    There Have Never Been Wrongful Death Claims or a Punitive
Damages Request in the State Court Action, and in April 2016
<u>Mrs. Barber Opted to Go to Trial Without Them</u>**

6.    Not only were there no wrongful death claims or requests for punitive damages in the State Court Action at the time of the settlement (May 3, 2016), but none of the Debtors' three (3) operative complaints in the State Court Action have ever contained any such pleading.[2]

7.    Had the Trustees not settled the State Court Action, trial was scheduled to proceed a week later **<u>without</u>** wrongful death claims or a request for a punitive damages award.  *See* Ex. C, Second Amended Complaint.

8.    The decision **<u>not to pursue</u>** wrongful death claims or punitive damages lies squarely at the feet of the Debtors and their counsel – not the Trustees.  On April 5, 2016, Mrs. Barber voluntarily elected to withdraw a Motion to Amend her complaint to assert wrongful death claims and seek punitive damages, and instead opted to proceed to trial on May 9, 2016 asserting only survival claims limited to seeking compensatory damages.  Mrs. Barber's decision was announced by her counsel in open court on April 5, 2016, and made after she had the benefit of consulting with her counsel.[3]

9.    At a deposition three days later, on April 8, 2016, the Debtors' State Court Action counsel, Christopher Chestnut, Esq., after conferring with another of the Debtors' attorneys, Glenn Crickenberger, Esq., confirmed the Debtors' commitment to pursuing survival, rather than wrongful death, claims.

---

[2] Attached hereto as Exhibits "A", "B" and "C" are the Complaint, First Amended Complaint and Second Amended (operative) Complaint in the State Court Action.

[3] *See* Ex. "D", April 5, 2016 Hearing Transcript at 22-24 & 39-40.

> MR. FIORTA:   Mr. Chestnut, you were able to talk to Mr. Crickenberger on the break; is that right?
>
> MR: CHESTNUT:   Yes.   For the record, Christopher Chestnut. And it is – I now have an understanding and concur with counsel's statement of fact that there was a withdrawal – an oral withdrawal at the most recent hearing which the amended – the amendment to add a claim for wrongful death under the Florida wrongful death statute, so.

*See* Ex. E, April 8, 2016 Deposition Transcript of Jennifer Carson, at 30-31.

10.     At no time between April 5, 2016 and the announcement of the Trustee's settlement did Mrs. Barber change her strategic decision to forgo wrongful death claims and punitive damages.

11.     There are, of course, unique requirements for, and defenses to, both survival and wrongful death claims which may have influenced Mrs. Barber's April 5th election.   By way of example, in a wrongful death product liability action, a plaintiff must prove that product was a substantial cause of the decedent's death.   Here, Mr. Barber's death certificate affirmatively states that his death was not caused by cigarettes.   The death certificate reads:   "Did Tobacco contribute to Death? No."   The death certificate identifies the cause of death as "END-STAGE DEMENTIA" starting five months before his death.   *See* Ex. F, Death Certificate.

12.     Regardless of whether Mrs. Barber disputes that her husband died from end stage dementia, the point is that Mr. Barber's 2012 death did not result in the claims automatically converting from survival to wrongful death.   Debtors' Objection is simply wrong.   Instead, Debtors, like any plaintiff, had a strategic choice to make in how to plead their claims.   At bottom, whatever the reason, there is no denying that Mrs. Barber made the choice to pursue survival claims for four straight years (2012, 2013, 2014, 2015) after her husband's death, and

then doubled-down on that position in open court in April 2016.[4]  Attorney Chestnut's statement

at the April 8th deposition confirms the Debtors' choice.

13.     Perhaps the most compelling evidence rebutting the Debtors' argument that when

Mr. Barber passed away on March 30, 2012 his survival claims automatically converted to

wrongful death claims is Circuit Court Judge Craig's April 5, 2016 invitation to Mrs. Barber to

withdraw her motion to amend.   The choice provided by Circuit Judge Craig demonstrates that

there is no automatic conversion of the survival claim upon death – instead it is a plaintiff's

election as to how to proceed.  See Ex. D, April 5, 2016 Hearing Transcript, at 11-14, 21-23, *see

also*, Ex. G, proposed Third Amended Complaint (containing wrongful death claims that were

part of motion to amend voluntarily withdrawn by Debtors).   Here, Mrs. Barber elected the

survival claims.

14.     Similarly, statements in the Debtors' opposition that the State Court Action was

intended to serve as a basis to "punish the wrongdoer for actions in causing a wrongful death"

(Debtor's Objection, at ¶7) and that defendants "avoid[] the liability for his wrongful death and

escape[] punishment" (Debtor's Objection at ¶ 8) are intended to inflame passions.   But, these

inflammatory statements simply cannot be reconciled with the Debtor's deliberate decision to

forgo pursuing punitive damages.

---

[4] It is undisputed that upon the filing of the bankruptcies the claims belonged to the Trustees as
real parties in interest.  Therefore, the decision on whether to seek amendment that would result
in the claims changing from survival to wrongful death rests with the Trustees, not Mrs. Barber
(or her seventy (70) year old adult son Tim Barber).  The Trustees have made that decision, and
ironically enough given Debtors' Objection, it was the same decision Mrs. Barber made.  This
case was, and is, and has only ever been, a survival claim without a claim for punitive damages.

15.     There simply is no fair basis for Debtors to fairly object to the compromise based upon the value or importance of the purported—but entirely nonexistent—wrongful death claims or punitive damages.

**B.     The Debtors' Argument Regarding the Sufficiency of
The Settlement Amount Is Belied By Their Own Settlement
With the Primary Defendant For "Very Little"**

16.     The Debtors also urge that the settlement amount -- $65,000 – "defies decency and depraves justice."  Debtors' Opposition, at 5.  The Debtors argue that the Trustees "propose a quick payoff" that "leaves hundreds of thousands, if not millions, of dollars at the bargaining table . . . "  *Id.,* at 4.

17.     The Debtors current valuation of the claim stands in stark contrast to a letter Mrs. Barber sent to this very Court on April 29, 2016.  Mrs. Barber wrote in relevant part, "[the State Court Action] had no value then, and to this day still has no value any more than a lottery ticket might have."  *See* Ex. H Suzanne Barber April 29, 2016 letter to the Court, at 1.

18.     On May 2, 2016, the Debtors expressed the same opinion regarding the lack of value of the State Court Action, this time to Circuit Court Judge Craig.  Mrs. Barber wrote:  "We had no idea that [the State Court Action] might ever amount to anything and considered it null of value, then, and it still is."  *See* Ex. I, May 2, 2016 Fax from Suzanne Barber to Judge Dennis Craig, at 1.

19.     Beyond these letters, the Debtors conduct demonstrates the lack of value she placed on the State Court Action.  Debtors' Objections fails to disclose to the Court that sometime after April 2012 they accepted (what they would call) a "quick payoff" when they entered into a secret settlement with the primary defendant in the State Court Action, Liggett & Myers ("Liggett").

6

20.    Liggett was the manufacturer of Mr. Barber's primary cigarette brand, Chesterfield.  *See* Ex. J, Jan. 4, 2012 Interrogatory Responses, Rog. 18 (admitting Chesterfield smoking from 1946 through 1969); *see also* Suzanne Barber deposition transcript, at 95 (admitting that Mr. Barber hosted a radio show sponsored by Liggett, the manufacturer of Chesterfield cigarettes) (Ex. K).  As part of the settlement between the Debtors and Liggett, the Debtors voluntarily dismissed Liggett with prejudice from the State Court Action.  In her 2016 deposition in the State Court Action, Mrs. Barber refused to disclose the amount of that settlement, offering only that it was "very little."  *See* Ex. K, Suzanne Barber Deposition Transcript, at 255-56, 259-60.

21.    The Liggett settlement is relevant for a number of reasons.  First it undercuts the Debtors' hyperbolic arguments couched in the supposed indecency of settlements that do not punish the wrongdoer.  When the settlement proceeds were directed to the Debtors, rather than the bankruptcy estates, no such concerns were evident.[5]

22.    Second, the "very little" Liggett settlement undermines the Debtors' assertions regarding the sufficiency of the consideration in the compromise now before the Court.  The settlement with Liggett was, after all, a settlement with the primary defendant in the State Court Action.

---

[5] That is not to suggest that the Debtors acted properly in settling with Liggett.  They did not. The claims against Liggett were property of the bankruptcy estates that had never been disclosed to the Trustees, as are the Liggett settlement proceeds.  However, that reality does not change this evidence regarding the Debtors' valuation of their claims.

If a portion of the Liggett settlement proceeds were retained by the Debtors' attorneys, the Gary, Williams, Parenti, Watson & Gary, P.L. law firm (the "Gary Williams Law Firm"), as a contingency fee, the Trustees may have claims against the Gary Williams Law Firm.

23.     In passing, the Debtors acknowledge that "each case is unique."  *See* Debtors'

Objection, at fn1.   While Debtors' Objection recites three (3) large verdicts against tobacco

companies, at no point does it discuss the "unique" facts in the State Court Action, or those three

(3) cases.  For example:

* There is substantial reason to doubt that Debtors could prove that Mr. Barber was addicted to nicotine, or that any such addiction proximately caused his injuries and death.  Mr. Barber successfully quit smoking "cold turkey" in 1972, the first time he ever tried to quit, and never smoked another cigarette the rest of his life (forty years).  *See* Ex. J, Jan. 4, 2012 Interrogatory Responses, Rog. 18 (listing no smoking after 1972); *see also,* Ex. K, Suzanne Barber Deposition Transcript, at 76, 80 (admitting that Mr. Barber quit smoking in 1972 and never smoked again).[6]

* There is no evidence that Mr. Barber started smoking before he was in his twenties making documentary evidence of, and expert testimony regarding, alleged tobacco industry youth marketing and teen smoking legally irrelevant.[7]

* Mr. Barber lived until he was ninety-one (91) years old.[8]

* Significant statute of limitations defense.

* There is a pending summary judgment motion based upon judicial estoppel arising from the Debtors' failure to disclose the claims in their bankruptcies.[9]

---

[6] By comparison, none of the three (3) verdicts Debtors' Opposition cites involved plaintiff smokers who had successfully quit "cold turkey" for four (4) decades.  *See Dion* (smoker quit within a few years of death by using nicotine replacement therapy), *Nally* (plaintiff claimed smoker had multiple unsuccessful quit attempts, including with nicotine replacement therapy, and smoked until his death from lung cancer), and *McCabe* (smoker quit 3 years before death with use of nicotine replacement therapy).  *See* Exs. L, M, and N (closing argument excerpts).

[7] *Compare Dion* (alleged to have started smoking at age 15 and a regular daily smoker at 17), *McCabe* (alleged to have started smoking at age 11 and became a regular daily smoker at 14), and *Nally* (alleged to have started smoking at age 12 and became a regular smoker at 16).  *See* Exs. L, N, M (closing argument excerpts).

[8] *Compare Dion* (smoker deceased at age 61), *McCabe* (smoker deceased at age 67), *Nally* (smoker deceased at age 74).  See Ex. O (death certificates).

[9] Ex. P (Defendants' pending Motion for Summary Judgment, without exhibits thereto).

24.     Indeed, the two most recent verdicts in *Engle* progeny trials demonstrate that each case must be evaluated on its individual merits, or lack thereof.  In *Sermons v. Philip Morris*, (4th Cir. Fl.) (July 6, 2016), the jury awarded the plaintiff just $13,000 in compensatory damages, and $68,300 in punitive damages.  In *Lesia Mooney v. Philip Morris,* (11th Cir. Fl.) (June 21, 2016), the jury returned a complete defense verdict.  *See* Ex. Q (Verdict Forms).

25.     Similarly, the last *Engle* progeny trial held in the Seventh Judicial Circuit, where Debtors' State Court Action is pending, *Janice Rounds v. R.J. Reynolds*, resulted in a complete defense verdict.  *See* Ex. R (January 26, 2016 Executed Verdict Form).

**C.     The Circumstances Surrounding the Negotiation Of,
       and Entry Into, the Compromise Were Appropriate**

26.     The Debtors also argue that the Trustees and counsel for the Interested Parties engaged in questionable conduct when negotiating and entering into the settlement.  Debtors' Objection, at ¶¶25-26.   The lynch pin for this argument seems to be the contention that the Trustees and counsel for the Interested Parties were prohibited from communicating with each other because the Trustees were purportedly represented by the Gary Williams Law Firm.  That argument fails on the facts.  There is abundant evidence that the Trustees never retained the Gary Williams Law Firm.

27.     First, no motion was submitted to this Court seeking an Order authorizing the Trustees to retain the Gary Williams Law Firm, or any other counsel, under 11 U.S.C. § 327(e).  Counsel for the Interested Parties routinely checked the dockets in both Debtors' bankruptcy proceedings for any such filings before each communication with the Trustees.  Moreover, had any such motion been filed, the potential receipt by the Gary Williams Law Firm of Liggett

settlement proceeds would likely have required more than passing consideration by this Court as to the propriety of the representation. *See supra*, at fn 5.

28.    Second, there is no retainer agreement between the Trustees and the Gary Williams Law Firm.

29.    Third, counsel for the Interested Parties routinely took care to confirm both that the Trustees had not retained counsel and were comfortable speaking with them prior to any substantive discussions. See Ex. S, April 29, 2016 Hearing Transcript, at 12-14, and Ex. T, May 9, 2016 Hearing Transcript, at 17-21. The Court is likely well aware of the professional credentials of each of the Trustees. There is no question that the Trustees are both sophisticated and experienced professionals (indeed, both are attorneys), and that it was reasonable for counsel to rely upon their representations as to whether they had retained counsel.

30.    Fourth, the Debtors seem to suggest that once the Trustees formed an intent to retain the Gary Williams Law Firm the Trustees were duty bound to follow through and could not retreat from that intention. The Interested Parties are simply at a loss to understand where such a duty – the duty of a prospective client to hire a specific law firm -- would arise from. We suspect the adoption of such a rule would have a chilling effect upon the ability of Chapter 7 Trustees to cost efficiently resolve claims.

31.    Fifth, the Debtors' Objection references Circuit Judge Dennis Craig's disapproval on May 9, 2016 of the circumstances surrounding the negotiation of the settlement. The Debtors fail to advise this Court that a few days later, on his own motion, Circuit Judge Craig recused himself from the State Court Action. *See* Ex. U, May 12, 2016 Order of Recusal.

WHEREFORE, The Interested Parties respectfully urge the Court to grant the Joint Motion to Approve Compromise of Controversy and approve the settlement between the Trustee and R.J. Reynolds Tobacco Company and Philip Morris USA, Inc.

Dated:  July 18, 2016

s/ R. Travis Santos
R. Travis Santos
Florida Bar No. 0077075
Troy A. Fuhrman
Florida Bar No. 985211
HILL WARD HENDERSON
101 East Kennedy Boulevard, Suite 3700
Post Office Box 2231
Tampa, FL  33601
(813) 221-3900
FAX:  (813) 221-2900
troy.fuhrman@hwhlaw.com
reynolds@hwhlaw.com

Stephanie E. Parker
Florida Bar No. 0688355
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA  30309-3053
(404) 521-3939
FAX:  (404) 581-8330
sberesheim@jonesday.com

**Attorneys for Interested Parties,**
**R.J. Reynolds Tobacco Company and**
**Philip Morris USA, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Response in Support of Interested Parties R.J. Reynolds Tobacco Company and Philip Morris USA, Inc. to The Trustees' Joint Motion to Approve Compromise of Controversy has been sent electronically to all interested parties pursuant to Local Rule 2002-4 by CM/ECF system on this 18th day of July, 2016.

s/ R. Travis Santos
Attorney for Interested Parties,
R.J. Reynolds Tobacco Company and
Philip Morris USA, Inc.

8829644v1

# Exhibit A

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE NO.: 2008. 30102. CICI
                      DIV 32

DONALD BARBER and
SUZANNE BARBER, his wife,

       Plaintiffs,

v.

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to
Brown & Williamson Tobacco
Corporation (a/k/a Brown & Williamson USA, Inc.),
individually and as successor by
merger to The American Tobacco Company
(f/k/a The American Tobacco Company, Inc.),
a foreign corporation; LORILLARD TOBACCO
COMPANY (f/k/a Lorillard, Inc.), a foreign
corporation; ALTRIA GROUP, INC., (f/k/a Philip
Morris Inc., f/k/a Philip Morris U.S.A.), a
foreign corporation; VECTOR GROUP LTD, INC.
(f/k/a Brooke Group Ltd., Inc., f/k/a Brooke Group Holding Inc.),
individually and as successor to the Liggett Group Inc.
(f/k/a Liggett Group, LLC, f/k/a Liggett Group, Inc.,
f/k/a Liggett & Myers Tobacco Company),
a foreign corporation; THE COUNCIL
FOR TOBACCO RESEARCH, U.S.A., a
foreign corporation; THE TOBACCO INSTITUTE,
INC., a foreign corporation; and JOHN DOE
CORPORATION, unknown at this time,

       Defendants.
_____/

STATE OF FLORIDA, VOLUSIA COUNTY
I HEREBY CERTIFY the foregoing is a true copy
of the original filed in this office. This
_10_ day of _____, A.D. _08_
Clerk of Circuit and County Court
By: _____
        Deputy Clerk

## COMPLAINT

The Plaintiffs, DONALD BARBER and SUZANNE BARBER, sue the Defendants R.J.

REYNOLDS TOBACCO COMPANY, individually and as a successor by merger to Brown &

Williamson Tobacco Corporation, a/k/a Brown & Williamson USA, Inc., individually and as

successor by merger to The American Tobacco Company (f/k/a The American Tobacco

Company, Inc.), a foreign corporation; LORILLARD TOBACCO COMPANY f/k/a Lorillard,

Inc., a foreign corporation; ALTRIA GROUP, INC., f/k/a Philip Morris Inc., f/k/a Philip Morris

U.S.A., a foreign corporation; VECTOR GROUP LTD, INC. (f/k/a Brooke Group Ltd., Inc.,

f/k/a Brooke Group Holding Inc.), individually and successor to the Liggett Group Inc. (f/k/a

Liggett Group, LLC, f/k/a Liggett Group, Inc., f/k/a Liggett & Myers Tobacco Company), a

foreign corporation; THE COUNCIL FOR TOBACCO RESEARCH, U.S.A., a foreign

corporation; THE TOBACCO INSTITUTE, INC., a foreign corporation; and JOHN DOE

CORPORATION, unknown at this time and allege as follows:

1.      This is a claim for damages in excess of the jurisdictional limits of the court.

2.      At all times material hereto, the Plaintiffs, DONALD BARBER and SUZANNE

        BARBER, his spouse, were residents of Volusia County, and suffered personal

        injuries in Volusia County as a result of the Defendants.

3.      At all times material hereto, the Plaintiffs, DONALD BARBER and SUZANNE

        BARBER, his spouse, were and are members of the class certified in *Engle v.*

        *Philip Morris et al.*, Case No. 94-08273 CA22, described more particularly as all

        Florida residents, and their survivors, who have suffered, presently suffer or have

        died from diseases and medical conditions caused by their addiction to cigarettes

        that contain nicotine. See Exhibit "A" attached.

4.      At all times material to this action, Plaintiff, SUZANNE BARBER, was the

        spouse of Plaintiff, DONALD BARBER, and shall also be referred to herein as

        "Smoker's Spouse".

5.      Defendant, R.J. REYNOLDS TOBACCO COMPANY individually and as

        successor by merger to Brown & Williamson Tobacco Corporation (a/k/a Brown

-2-

& Williamson USA, Inc.), individually and as successor to The American Tobacco Company (f/k/a The American Tobacco Company, Inc.), is a North Carolina corporation doing business throughout the State of Florida, including Volusia County during all times material herein.

6.      Defendant, LORILLARD TOBACCO COMPANY, (f/k/a Lorillard, Inc.), is a Delaware corporation, doing business throughout the State of Florida including Volusia County during all times material herein.

7.      Defendant, ALTRIA GROUP, INC. is a Virginia corporation, doing business throughout the State of Florida including Volusia County, and is a successor company to Philip Morris, Inc., f/k/a Philip Morris U.S.A.

8.      Defendant, VECTOR GROUP LTD, INC. (f/k/a Brooke Group Ltd., Inc., f/k/a Brooke Group Holding Inc.), individually and as successor to the Liggett Group Inc. (f/k/a Liggett Group, LLC, f/k/a Liggett Group, Inc., f/k/a Liggett & Myers Tobacco Company) is a Delaware corporation with its principal place of business in Miami, Florida, making it a Florida citizen. VECTOR GROUP LTD, INC. is also the holding company for Liggett Group, LLC , f/k/a Liggett Group, Inc., f/k/a Liggett & Myers Tobacco Company.

9.      Defendants, THE COUNCIL FOR TOBACCO RESEARCH U.S.A.    (The "Council") and THE TOBACCO INSTITUTE, INC. (The "Institute"), at all times relevant to this action, were involved in promotion, lobbying, medical research, legislative and political activities or related ventures throughout Florida and the

United States both in connection with and on behalf of the Defendants. Both The Council and The Institute are foreign corporations.

10.    Defendant, JOHN DOE CORPORATION, is a corporation duly authorized to do business in the United States and has conducted business throughout the State of Florida including Volusia County.

11.    At all times material, the Defendants R.J. REYNOLDS TOBACCO COMPANY individually and as a successor by merger to Brown & Williamson Tobacco Corporation (a/k/a Brown & Williamson USA, Inc.), individually and as successor to The American Company (f/k/a The American Tobacco Company, Inc.); LORILLARD TOBACCO COMPANY (f/k/a Lorillard, Inc.); ALTRIA GROUP, INC., individually and as a successor to Philip Morris Inc. and Philip Morris U.S.A.; VECTOR GROUP LTD, INC. (f/k/a Brooke Group Ltd., Inc., f/k/a Brooke Group Holding Inc.), individually and as successor to the Liggett Group Inc. (f/k/a Liggett Group, LLC, f/k/a Liggett Group, Inc., f/k/a Liggett & Myers Tobacco Company), a foreign corporation; THE COUNCIL FOR TOBACCO RESEARCH, USA; THE TOBACCO INSTITUTE, INC., and JOHN DOE CORPORATION were and are manufacturers and distributors of tobacco products throughout Florida and the United States. The Plaintiff DONALD BARBER smoked cigarettes manufactured by one or more of the Defendants, which resulted in his injuries and damages described below.

12.     The Plaintiff, DONALD BARBER's injuries and damages were proximately caused by actions of the Defendants as determined by the *Engle* jury in their verdict rendered on July 7, 1999, and attached as Exhibit "B".

13.     At all times relevant to the action, the Plaintiff, DONALD BARBER, was a Florida resident and citizen who was addicted to, purchased and smoked cigarettes containing nicotine that were designed, manufactured, advertised, and marketed by one or more of the Defendants, and who did so in sufficient quantities and for sufficient time period to cause injury in the form of diseases and medical conditions, which has been determined by the *Engle* jury in its verdict.

14.     The Florida Supreme Court prospectively decertified the *Engle* class because class-wide treatment of causation and damages was not feasible. The Florida Supreme Court expressly reserved to class members, including Plaintiffs, the right to bring individual actions against Defendants for smoking-related injuries and damages, including punitive damages.

15.     Less than one year has elapsed since the Supreme Court's mandate issued. The action is, therefore, timely.

16.     Because Plaintiff, DONALD BARBER, is an *Engle* class member, Plaintiff is entitled to the benefit of the Phase I findings and asserts and alleges those findings as conclusively established herein as follows. See Exhibit "A" attached.

    a. Smoking cigarettes causes aortic aneurysm, bladder cancer, cerebrovascular disease, cervical cancer, chronic obstructive pulmonary disease, coronary heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma),

-5-

complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer.

b. Nicotine in cigarettes is addictive.

c. Defendants placed cigarettes on the market that were defective and unreasonably dangerous.

d. Defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose material fact concerning the health effects or addictive nature of smoking cigarettes or both.

e. Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on the information to their detriment.

f. Defendants sold or supplied cigarettes that were defective.

g. Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.

h. All of the Defendants were negligent.

17. As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries are permanent in nature.

18.     As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, interest allowable by law and a trial by jury in all issues so triable.

## COUNT I: STRICT LIABILITY

19.     Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

20.     The *Engle* Phase I findings conclusively establish that the cigarettes sold and placed on the market by the Defendants were defective and unreasonably dangerous.

21.     As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries are permanent in nature.

22.    As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, interest allowable by law, and a trial by jury in all issues so triable.

## COUNT II: FRAUD

23.    Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

24.    The Engle Phase I findings conclusively established that Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

25.    Plaintiffs allege that they are entitled, thereby to an award of punitive damages for which a Motion shall be timely filed.

26.    As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a

shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries are permanent in nature.

27.     As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest allowable by law and a trial by jury in all issues so triable.

### COUNT III: CONSPIRACY TO COMMIT FRAUD

28.     Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

29.     The *Engle* Phase I findings conclusively established that Defendants including The Council, and The Institute, agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on their information to their detriment.

30.     The concealed and omitted information described in the preceding paragraph was material information.

31.     Plaintiff, DONALD BARBER, relied to his detriment upon the concealment and omission of such information.

32.     The Defendants' actions, and those of The Council and The Institute constitute a successful conspiracy to commit fraud.

33.    Plaintiffs allege that they are entitled, thereby, to any award of punitive damages for which a Motion shall be timely filed.

34.    As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages, and the aggravation of pre-existing injuries. These injuries are permanent in nature.

35.    As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest allowable by law, and a trial by jury in all issues so triable.

## COUNT IV: NEGLIGENCE/GROSS NEGLIGENCE

36.    Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

37.   The *Engle* Phase I findings conclusively established that all of the Defendants
were negligent. Indeed, Defendants had a duty to provide the public with a
product (cigarettes) that was reasonably safe and did not endanger the health and
lives of all members of the public, including the Plaintiffs herein. Defendants
breached their duty to the general public, including the Plaintiffs herein by
negligently designing, manufacturing, producing, distributing, selling wholesale
or retail, advertising and marketing their product (cigarettes, which endangered
the health and lives of the public, including the Plaintiffs), determined by the jury
and court in *Engle* and set forth in the jury verdict form incorporated herein as
Exhibit "B".

38.   As a direct and proximate result of smoking cigarettes manufactured, sold by one
or more of the Defendants, as well as the negligent and willful acts or omissions
of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily
injury; pain and suffering; disability; disfigurement; loss of capacity for
enjoyment of life, medical care and expenses (including expenses for physicians'
care, hospital care, medications, medical apparatus, custodial care and nursing
care); lost wages, earnings capacity; mental anguish (including a fear of a
shortened and/or diminished life expectancy, and fear of contracting cancer in the
future); psychological and psychiatric damages, and the aggravation of pre-
existing injuries. These injuries are permanent in nature.

39.   As a proximate result of the defective cigarettes sold and placed on the market by
one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the

-11-

past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest allowable by law and a trial by jury in all issues so triable.

DATED the _____, day of _____, 20___.

PAUL D. MARK LUCAS for all
FBN#219835
Willie E. Gary
Fla. Bar No. 187843
Tricia P. Hoffler
Fla. Bar No. 0188646
Donald Watson
Fla. Bar. No. 324442
GARY, WILLIAMS, FINNEY,
LEWIS, WATSON & SPERANDO, P. L.
221 E. Osceola Street
Stuart, Florida 34994
Ph: (772) 283-8260
Fax: (772) 220-3343
Attorneys for Plaintiffs


ALL CORRESPONDENCE AND PLEADINGS SHOULD BE ADDRESSED TO: PAUL D. MARK LUCAS, ESQ.

# Exhibit B



IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE NO.: 2008 30102 CICI

DONALD BARBER and
SUZANNE BARBER, his wife,

      Plaintiffs,

v.

.R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to
Brown & Williamson Tobacco Corporation
(a/k/a Brown & Williamson USA, Inc.), individually
and as successor by merger to The American Tobacco
Company (f/k/a The American Tobacco Company, Inc.),
a foreign corporation; LORILLARD TOBACCO COMPANY,
a foreign corporation; LORILLARD, INC.,
a foreign corporation; ALTRIA GROUP, INC., a foreign
corporation and PHILIP MORRIS, U.S.A., INC.,
(f/k/a Philip Morris Inc.), a foreign corporation;
VECTOR GROUP LTD, INC., (f/k/a Brooke Group Ltd., Inc.,
f/k/a Brooke Group Holding Inc.), and holding company
for LIGGETT GROUP, LLC, individually and successor by
merger to the Liggett Group Inc., (f/k/a Liggett & Myers
Tobacco Company), a foreign corporation;
LIGGETT GROUP, LLC., a foreign corporation;
THE COUNCIL FOR TOBACCO RESEARCH U.S.A.,
a foreign corporation; THE TOBACCO INSTITUTE, INC.,
a foreign corporation and JOHN DOE CORPORATION,
unknown at this time,



      Defendants.

_____ _____ /

## AMENDED COMPLAINT

The Plaintiffs DONALD BARBER and SUZANNE BARBER sue the Defendants R.J.

REYNOLDS TOBACCO COMPANY, individually and as successor by merger to Brown &

Williamson Tobacco Corporation (a/k/a Brown & Williamson USA, Inc.), individually and as

successor by merger to The American Tobacco Company, (f/k/a The American Tobacco

Company, Inc.), a foreign corporation; LORILLARD TOBACCO COMPANY, a foreign

corporation; LORILLARD, INC., a foreign corporation; ALTRIA GROUP, INC., a foreign corporation and PHILIP MORRIS, U.S.A., INC., (f/k/a Philip Morris Inc.), a foreign corporation; VECTOR GROUP LTD, INC., (f/k/a Brooke Group Ltd., Inc., f/k/a Brooke Group Holding Inc.), and holding company for LIGGETT GROUP, LLC, individually and successor by merger to the Liggett Group Inc., (f/k/a Liggett & Myers Tobacco Company), a foreign corporation; LIGGETT GROUP, LLC, a foreign corporation; THE COUNCIL FOR TOBACCO RESEARCH U.S.A., a foreign corporation; THE TOBACCO INSTITUTE, INC., a foreign corporation and JOHN DOE CORPORATION, unknown at this time and allege as follows:

1.    This is a claim for damages in excess of the jurisdictional limits of the court.

2.    At all times material hereto, the Plaintiffs, DONALD BARBER and SUZANNE BARBER, his spouse, were residents of Volusia County, and suffered personal injuries in Volusia County as a result of the Defendants.

3.    At all times material hereto, the Plaintiffs, DONALD BARBER and SUZANNE BARBER, his spouse, were and are members of the class certified in *Engle v. Philip Morris et al.*, Case No. 94-08273 CA22, described more particularly as all Florida residents, and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine. See Exhibit "A" attached.

4.    At all times material to this action, Plaintiff, SUZANNE BARBER, was the spouse of Plaintiff, DONALD BARBER, and shall also be referred to herein as "Smoker's Spouse".

5.    Defendant R.J. REYNOLDS TOBACCO COMPANY individually and as
successor by merger to Brown & Williamson Tobacco Corporation (a/k/a Brown
& Williamson USA, Inc.), individually and as successor by merger to The
American Tobacco Company (f/k/a The American Tobacco Company, Inc.), is a
North Carolina corporation doing business throughout the State of Florida,
including Volusia County during all times material herein.    Defendant R.J.
REYNOLDS TOBACCO COMPANY is being sued for the actions of its
predecessor corporation Brown & Williamson Tobacco Corporation (a/k/a Brown
& Williamson USA, Inc.) and individually and as successor by merger to The
American Tobacco Company (f/k/a The American Tobacco Company, Inc.).

6.    Defendant LORILLARD TOBACCO COMPANY, is a Delaware corporation,
doing business throughout the State of Florida including  Volusia County during
all times material herein.    Defendant LORILLARD, INC., is a Delaware
corporation, doing business throughout the State of Florida including Volusia
County during all times material herein.

7.    Defendant ALTRIA GROUP, INC., a holding corporation for Defendant PHILIP
MORRIS USA, INC., is a Virginia corporation, doing business throughout the
State of Florida including Volusia County.    Defendant PHILIP MORRIS USA,
INC. (f/k/a Philip Morris, Inc.) is a Virginia Corporation doing business
throughout the State of Florida including Volusia County.

8.    Defendant VECTOR GROUP LTD, INC. (f/k/a Brooke Group Ltd., Inc., f/k/a
Brooke Group Holding Inc.) is a Delaware corporation that conducts business

throughout the State of Florida and has its principal place of business in Miami, Florida, making it a Florida citizen for the purposes of jurisdiction. VECTOR GROUP LTD., INC. is also the holding company for Defendant LIGGETT GROUP, LLC., individually and successor by merger to the Liggett Group, Inc., (f/k/a Liggett & Myers Tobacco Company) and is being sued for the actions of Defendant LIGGETT GROUP, LLC. Defendant, LIGGETT GROUP, LLC. is a North Carolina corporation that conducts business throughout the state of Florida including Volusia County. Defendant LIGGETT GROUP, LLC., is also a subsidiary of VECTOR GROUP LTD, INC.

9.   Defendants The Council for Tobacco Research U.S.A. (The "Council") and The Tobacco Institute, Inc. (The "Institute"), at all times relevant to this action, were involved in promotion, lobbying, medical research, legislative and political activities or related ventures throughout Florida and the United States both in connection with and on behalf of the Defendants. Both The Institute and The Council are foreign corporations.

10.   Defendant JOHN DOE CORPORATION is a corporation duly authorized to do business in the United States and has conducted business throughout the State of Florida including Volusia County.

11.   At all times material, the Defendants R.J. REYNOLDS TOBACCO COMPANY individually and as a successor by merger to Brown & Williamson Tobacco Corporation (a/k/a Brown & Williamson USA, Inc.), individually and as successor by merger to The American Company (f/k/a The American Tobacco

-4-

Company, Inc.), a foreign corporation; LORILLARD TOBACCO COMPANY, a foreign corporation; LORILLARD, INC., a foreign corporation ; ALTRIA GROUP, INC., a foreign corporation and PHILIP MORRIS U.S.A., INC., (f/k/a Philip Morris Inc.), a foreign corporation; VECTOR GROUP LTD, INC. (f/k/a Brooke Group Ltd., Inc., f/k/a Brooke Group Holding Inc.), and holding company for LIGGETT GROUP, LLC, individually and successor by merger to  Liggett Group, Inc., (f/k/a Liggett & Myers Tobacco Company), a foreign corporation; LIGGETT GROUP, LLC, a foreign corporation and JOHN DOE CORPORATION were and are manufacturers and distributors of tobacco products throughout Florida and the United States.  The Plaintiff DONALD BARBER smoked cigarettes manufactured by the Defendants which resulted in his injuries and damages described below.

12.    The Plaintiff, DONALD BARBER's injuries and damages were proximately caused by actions of the Defendants as determined by the *Engle* jury in their verdict rendered on July 7, 1999, and attached as Exhibit "B".  Plaintiff smoker may bear some measure of fault, but substantially less than 100% of the applicable fault, for causing his or her respective smoking-related injuries.  Such acts or omissions relating to the frequency and duration of their efforts to quit smoking may have been a partial proximate cause, in combination with the acts and omissions of Defendants, of their injuries. Plaintiff smoker recognizes that there may be an apportionment of fault and damages.

13.    At all times relevant to the action, the Plaintiff, DONALD BARBER, was a
Florida resident and citizen who was addicted to, purchased and smoked
cigarettes containing nicotine that were designed, manufactured, advertised, and
marketed by one or more of the Defendants, and who did so in sufficient
quantities and for sufficient time period to cause injury in the form of diseases and
medical conditions, which has been determined by the *Engle* jury in its verdict.

14.    The Florida Supreme Court prospectively decertified the *Engle* class because
class-wide treatment of causation and damages was not feasible. The Florida
Supreme Court expressly reserved to class members, including Plaintiffs, the right
to bring individual actions against Defendants for smoking-related injuries and
damages, including punitive damages.

15.    Less than one year has elapsed since the Supreme Court's mandate issued. The
action is, therefore, timely.

16.    Because Plaintiff, DONALD BARBER, is an *Engle* class member, Plaintiff is
entitled to the benefit of the Phase I findings and asserts and alleges those findings
as conclusively established herein as follows. See Exhibit "A" attached.

    a.    Smoking    cigarettes    causes    aortic    aneurysm,    bladder    cancer,
        cerebrovascular disease, cervical cancer, chronic obstructive pulmonary
        disease, coronary heart disease, esophageal cancer, kidney cancer,
        laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell
        carcinoma, small cell carcinoma, and squamous cell carcinoma),
        complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer,
        peripheral vascular disease, pharyngeal cancer, and stomach cancer.

    b.    Nicotine in cigarettes is addictive.

-6-

c. Defendants placed cigarettes on the market that were defective and unreasonably dangerous.

d. Defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose material facts concerning the health effects or the addictive nature of smoking cigarettes or both.

e. Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on the information to their detriment.

f. Defendants sold or supplied cigarettes that were defective.

g. Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.

h. All of the Defendants were negligent.

17. As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries are permanent in nature.

18. As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the

past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, interest allowable by law and a trial by jury in all issues so triable.

<strong><u>COUNT I: STRICT LIABILITY</u></strong>

19.    Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

20.    The *Engle* Phase I findings conclusively establish that the cigarettes sold and placed on the market by the Defendants were defective and unreasonably dangerous.

21.    As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries are permanent in nature.

22.    As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the

-8-

past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest allowable by law, and a trial by jury in all issues so triable.

## COUNT II: FRAUD

23.    Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

24.    The Engle Phase I findings conclusively established that Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

25.    Plaintiffs allege that they are entitled, thereby to an award of punitive damages for which a Motion shall be timely filed.

26.    As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the

future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries are permanent in nature.

27. As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest allowable by law and a trial by jury in all issues so triable.

## COUNT III: CONSPIRACY TO COMMIT FRAUD

28. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

29. The *Engle* Phase I findings conclusively established that Defendants including The Council, and The Institute, agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on their information to their detriment.

30. The concealed and omitted information described in the preceding paragraph was material information.

31. Plaintiff, DONALD BARBER, relied to his detriment upon the concealment and omission of such information.

32. The Defendants' actions, and those of The Council and The Institute constitute a successful conspiracy to commit fraud.

-10-

33.     Plaintiffs allege that they are entitled, thereby, to any award of punitive damages for which a Motion shall be timely filed.

34.     As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages, and the aggravation of pre-existing injuries. These injuries are permanent in nature.

35.     As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained and will in the future sustain damages resulting from the injuries to her spouse, including damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest allowable by law, and a trial by jury in all issues so triable.

### COUNT IV: NEGLIGENCE/GROSS NEGLIGENCE

36.     Plaintiffs re-allege and incorporate the allegations in paragraphs 1-18.

37.    The *Engle* Phase I findings conclusively established that all of the Defendants were negligent. Indeed, Defendants had a duty to provide the public with a product (cigarettes) that was reasonably safe and did not endanger the health and lives of all members of the public, including the Plaintiffs herein. Defendants breached their duty to the general public, including the Plaintiffs herein by negligently designing, manufacturing, producing, distributing, selling wholesale or retail, advertising and marketing their product (cigarettes, which endangered the health and lives of the public, including the Plaintiffs), determined by the jury and court in *Engle* and set forth in the jury verdict form incorporated herein as Exhibit "B".

38.    As a direct and proximate result of smoking cigarettes manufactured, sold by one or more of the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages, and the aggravation of pre-existing injuries. These injuries are permanent in nature.

38.    As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the

-12-

past sustained and will in the future sustain damages resulting from the injuries to
her spouse, including damages for the loss of his comfort, companionship,
society, support and services.

WHEREFORE, Plaintiffs pray for compensatory and punitive damages, costs, interest
allowable by law and a trial by jury in all issues so triable.

DATED the ___29th___, day of ___February___, 20_____.

PAUL D. MARK LUCAS for all
FBN#219835
Willie E. Gary
Fla. Bar No. 187843
Tricia P. Hoffler
Fla. Bar No. 0188646
Donald Watson
Fla. Bar. No. 324442
GARY, WILLIAMS, FINNEY,
LEWIS, WATSON & SPERANDO, P. L.
221 E. Osceola Street
Stuart, Florida 34994
Ph: (772) 283-8260
Fax: (772) 220-3343
Attorneys for Plaintiffs


ALL CORRESPONDENCE AND PLEADINGS SHOULD BE ADDRESSED TO: PAUL D.
MARK LUCAS, ESQ.

-13-

# Exhibit C

IN THE CIRCUIT COURT OF THE SEVENTH
JUDICIAL CIRCUIT IN AND FOR VOLUSIA COUNTY

DONALD BARBER and
SUZANNE BARBER, his wife,

Plaintiffs,

CASE NO.: 2008-30102-CICI

R.J. REYNOLDS TOBACCO
COMPANY, INC., et al.,

Defendants.

_____/

### SECOND AMENDED COMPLAINT

The Plaintiff, SUZANNE BARBER, as Personal Representative of the Estate of

DONALD BARBER, hereby files this, her Second Amended Complaint, complaining

against the Defendants, R.J. REYNOLDS TOBACCO COMPANY, INC., et al., and each

of them, as follows:

### PARTIES, JURISDICTION & VENUE

1. This is a claim for damages in excess of the jurisdictional limits of the court.

2. At all times material hereto, SUZANNE BARBER, Personal Representative of The

   Estate of DONALD BARBER, Plaintiff and Plaintiff's Decedent, DONALD

   BARBER have been residents of Volusia County and have suffered personal injuries

   in Volusia County as a result of actions of the Defendants.

3. At all times material hereto, the Plaintiffs, were and are members of the class certified

   in *Engle v. Philip Morris et al.*, Case No. 94-08273 CA22, described more

   particularly as all Florida residents, and their survivors, who have suffered, presently

suffer or have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine. See Exhibit "A" previously attached to the complaint and incorporated herein by reference.

4.  Defendant, R.J. REYNOLDS TOBACCO COMPANY, INC., individually and as successor by merger to Brown & Williamson Tobacco Corporation (a/k/a Brown & Williamson USA, Inc.), individually and as successor by merger to The American Tobacco Company (f/k/a The American Tobacco Company, Inc.), is a North Carolina corporation doing business throughout the State of Florida, including Hillsborough County during all times material herein. Defendant, R.J. REYNOLDS TOBACCO COMPANY, INC., is being sued for the actions of its predecessor corporation Brown & Williamson Tobacco Corporation (a/k/a Brown & Williamson USA, Inc.) and individually and as successor by merger to The American Tobacco Company (f/k/a The American Tobacco Company, Inc.).

5.  LORILLARD TOBACCO COMPANY is a Delaware corporation doing business throughout the State of Florida including Hillsborough County during all times material herein.

6.  PHILIP MORRIS USA, INC. (f/k/a Philip Morris, Inc.) is a Virginia corporation, doing business throughout the State of Florida including Palm Beach County.

7.  The Council for Tobacco Research U.S.A. (The "Council") and The Tobacco Institute, Inc. (The "Institute"), at all times relevant to this action, were involved in promotion, lobbying, medical research, legislative and political activities or related ventures throughout Florida and the United States both in connection with and on behalf of the Defendant, R.J. REYNOLDS TOBACCO COMPANY, INC., and other tobacco-

selling businesses named at paragraphs 5 - 7 (collectively, entities described at

paragraphs 5 - 7 are referred to as "tobacco-selling businesses"). Both the Institute

and The Council are or were foreign corporations.

8. Defendant, JOHN DOE CORPORATION, is a corporation duly authorized to do

business in the United States and has conducted business throughout the State of

Florida including Hillsborough County.

9. At all times material, the Defendant, R.J. REYNOLDS TOBACCO COMPANY,

INC., individually and as a successor by merger to Brown & Williamson Tobacco

Corporation (a/k/a Brown & Williamson USA, Inc.), individually and as successor by

merger to The American Company (f/k/a The American Tobacco Company, Inc.), a

foreign corporation; LORILLARD TOBACCO COMPANY, a foreign corporation;

PHILIP MORRIS U.S.A., INC., (f/k/a Philip Morris Inc.), a foreign corporation; and

JOHN DOE CORPORATION have been manufacturers and distributors of tobacco

products throughout Florida and the United States. The Plaintiffs' Decedent,

DONALD BARBER, smoked Salem cigarettes manufactured by the Defendant, R.J.

REYNOLDS TOBACCO COMPANY, INC., which resulted in his injuries and

damages described below.

10. The Plaintiffs' Decedent, DONALD BARBER'S injuries and damages were

proximately caused by actions of the Defendant as determined by the *Engle* jury in

their verdict rendered on July 7, 1999, previously attached to the complaint as Exhibit

"B" and incorporated herein by reference.

11. At all times relevant to the action, the Plaintiffs' Decedent, DONALD BARBER, was

a Florida resident and citizen who was addicted to, purchased and smoked cigarettes

containing nicotine, which cigarettes were designed, manufactured, advertised, and

marketed by Defendant, R. J. REYNOLDS TOBACCO COMPANY, INC.,

Defendant, PHILIP MORRIS, U. S. A., INC., LORILLARD TOBACCO

COMPANY and one or more of the other tobacco-selling businesses, and who did so

in sufficient quantities and for sufficient time period to cause injury in the form of

diseases and medical conditions, which has been determined by the *Engle* jury in its

verdict. Those cigarettes included, but were not limited to: Salem.

12. The Florida Supreme Court prospectively decertified the *Engle* class because class-

wide treatment of causation and damages was not feasible. The Florida Supreme

Court expressly reserved to class members, including Plaintiffs, the right to bring

individual actions against Defendants, R.J. REYNOLDS TOBACCO COMPANY,

INC., PHILIP MORRIS U. S. A, INC., LORILLARD TOBACCO COMPANY, and

the other tobacco-selling businesses named above for smoking-related injuries and

damages.

13. Less than one year elapsed between the date of the Supreme Court's mandate issued

and the filing of this action. The action is, therefore, timely. On March 30, 2012,

DONALD BARBER died of "natural causes". SUZANNE BARBER has been

appointed Personal Representative of the Estate of DONALD BARBER.

14. Because Plaintiff's Decedent, DONALD BARBER is an *Engle* class member,

Plaintiffs are entitled to the benefit of the Phase I findings and asserts and alleges

those findings as conclusively established and set forth in Exhibit "A" attached to the

original complaint and incorporated herein by reference:

    a. Smoking cigarettes causes aortic aneurysm, bladder cancer, cerebrovascular
       disease, cervical cancer, chronic obstructive pulmonary disease, coronary

heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma), complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer.

b.  Nicotine in cigarettes is addictive.

c.  Defendants placed cigarettes on the market that were defective and unreasonably dangerous.

d.  Defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose material facts concerning the health effects or addictive nature of smoking cigarettes or both.

e.  Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on the information to their detriment.

f.  Defendants sold or supplied cigarettes that were defective.

g.  Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.

h.  All of the Defendants were negligent.

15. As a direct and proximate result of his addiction to and smoking of defective and unreasonably dangerous cigarettes manufactured and sold by Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiffs' Decedent, DONALD BARBER, suffered several smoking-related illnesses, including but not limited to, COPD. Therefore, the Plaintiff hereby makes claims for all damages recoverable under the Florida law, including, but not limited to, the following:

16. The Plaintiff, DONALD BARBER was addicted to Salem Cigarettes manufactured by Defendants R.J. Reynolds and as a direct legal and proximate result of his addiction to cigarettes containing nicotine manufactured and sold by one or more of the Defendants, the inherently defective nature of the cigarettes and the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has

suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of

capacity for enjoyment of life, medical care and expenses (including expenses for

physicians' care, hospital care, medications, medical apparatus, custodial care and

nursing care); lost wages, earnings capacity; mental anguish (including a fear of a

shortened and/or diminished life expectancy, and fear of contracting cancer in the

future); psychological and psychiatric damages and the aggravation of pre-existing

injuries. These injuries were permanent in nature and plagued DONALD BARBER

until his death.

17. As a proximate result of the defective cigarettes sold and placed on the market by one

or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past

sustained damages resulting from the injuries to her spouse, including but not limited

to, damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, and interest

allowable by law and a trial by jury in all issues so triable.

## COUNT I: STRICT LIABILITY

18. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-17.

19. The *Engle* Phase I findings conclusively establish that the cigarettes sold and placed

on the market by the Defendants were defective and unreasonably dangerous.

20. The Defendants' cigarettes' contained carcinogens, nitrosamines, and carbon dioxide,

among other ingredients harmful to health which, when combined with the nicotine

cigarettes also contain, make the product defective and unreasonably dangerous.

21. The Defendants had actual knowledge that the cigarettes were defective and
unreasonably dangerous. In spite of such knowledge, the Defendants intentionally
delayed in warning the public, including the Plaintiffs. The Defendants were and are
personally and corporately guilty of intentional misconduct in that the Defendants
intentionally, willfully and wantonly placed on the market cigarettes that were
defective and unreasonably dangerous. At all times pertinent hereto, the Defendants
had actual knowledge of the wrongfulness of the conduct and the high probability that
injury, damage and/or death to the Plaintiff's Decedent would result and, despite that
knowledge, Defendants intentionally pursued that course of conduct, to wit:
intentionally placing cigarettes on the market that were defective and unreasonably
dangerous, while delaying to warn the public, thus resulting in injuries and death to
Plaintiff's Decedent and damages to Plaintiff.

22. To the extent that employees or agents of the Defendants committed such conduct;
the officers, directors, and/or managers of the Defendants knowingly and actively
participated in such conduct and furthermore condoned, ratified and consented to
such conduct.

23. As a direct and proximate result of her addiction and smoking of defective and
unreasonably dangerous cigarettes manufactured and sold by Defendants, as well as
the negligent and willful acts or omissions of the Defendants, Plaintiffs' Decedent
suffered several smoking-related illnesses, including but not limited to, COPD.
Therefore, the Plaintiffs hereby make claims for all damages recoverable under the
Survival Statute and other Florida law including, but not limited to, the following:

24. The Plaintiff, DONALD BARBER was addicted to Salem Cigarettes manufactured by Defendants R.J. Reynolds and as a direct legal and proximate result of his addiction to cigarettes containing nicotine manufactured and sold by one or more of the Defendants, the inherently defective nature of the cigarettes and the negligent and willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, earnings capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries were permanent in nature and plagued DONALD BARBER until his death.

25. As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past sustained damages resulting from the injuries to her spouse, including but not limited to, damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, interest allowable by law, and a trial by jury in all issues so triable.

## COUNT II: FRAUD

26. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-17.

27. The *Engle* Phase I findings conclusively established that Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

28. The Defendants and their co-conspirators agreed to conceal their own scientific research results revealing that cigarettes cause cancer and other diseases and that nicotine in tobacco is addictive.

29. The Defendants had taken on the duty to disclose by promising to share their research results with the public.

30. Not only did the Defendants conceal information about the dangers of smoking, but they also enticed people, including DONALD BARBER, to keep smoking by creating a controversy over whether smoking indeed had deleterious health effects.

31. The Defendants even actively opposed an effort to have placed on cigarette packages the fact that nicotine in cigarettes is addictive.

32. The concealed and omitted information described in the preceding paragraphs was material information.

33. The Plaintiff's Decedent, DONALD BARBER, relied to his detriment upon the concealment and omission of such material information.

34. The fraud committed by the Defendants was a legal, direct, and proximate cause of the Plaintiff's Decedent, DONALD BARBER's addiction to cigarettes containing nicotine and all illnesses, death and damages resulting therefrom.

35. As a direct and proximate result of smoking defective and unreasonably dangerous cigarettes manufactured and sold by Defendants, as well as the negligent and willful

acts or omissions of the Defendants; Plaintiff's Decedent, DONALD BARBER,

suffered, during his lifetime, from several smoking-related illnesses, including but not

limited to, COPD. Therefore, the Plaintiff hereby makes claims for all damages

recoverable under the Florida Survival Act and other Florida law, including, but not

limited to:

36. The Plaintiff, DONALD BARBER was addicted to Salem Cigarettes manufactured

by Defendants R.J. Reynolds and as a direct legal and proximate result of his

addiction to cigarettes containing nicotine manufactured and sold by one or more of

the Defendants, the inherently defective nature of the cigarettes and the negligent and

willful acts or omissions of the Defendants, Plaintiff, DONALD BARBER, has

suffered: COPD, bodily injury; pain and suffering; disability; disfigurement; loss of

capacity for enjoyment of life, medical care and expenses (including expenses for

physicians' care, hospital care, medications, medical apparatus, custodial care and

nursing care); lost wages, earnings capacity; mental anguish (including a fear of a

shortened and/or diminished life expectancy, and fear of contracting cancer in the

future); psychological and psychiatric damages and the aggravation of pre-existing

injuries. These injuries were permanent in nature and plagued DONALD BARBER

until his death.

37. As a proximate result of the defective cigarettes sold and placed on the market by one

or more Defendants, the Smoker's Spouse, SUZANNE BARBER, has in the past

sustained damages resulting from the injuries to her spouse, including but not limited

to, damages for the loss of his comfort, companionship, society, support and services.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, and interest allowable by law and a trial by jury in all issues so triable.

## COUNT III: CONSPIRACY TO COMMIT FRAUD

38. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-17 and 26 - 37.

39. The *Engle* Phase I findings conclusively established that the Defendants, other cigarette-manufacturing businesses, The Council and the Institute agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on the information, or lack thereof, to their detriment.

40. The concealed and omitted information described in the preceding paragraphs was material information.

41. The Plaintiff's Decedent, DONALD BARBER, relied to his detriment upon the concealment and omission of such information.

42. The actions of Defendants, PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, INC., LORILLARD TOBACCO COMPANY, other tobacco-selling businesses and the actions of The Council and The Institute constitute a successful conspiracy to commit fraud.

43. As a legal, direct, and proximate result of the Defendants' and co-conspirators' conspiracy to commit fraud, Plaintiff 's Decedent, DONALD BARBER, became addicted to cigarettes containing nicotine and suffered smoking-related illnesses, including, but not limited to COPD, from which DONALD BARBER suffered during his lifetime.

44. As a direct and proximate result of his addiction to, dependence upon and actual

    smoking of defective and unreasonably dangerous cigarettes manufactured and sold

    by Defendants, as well as the negligent and willful acts or omissions of the

    Defendants; Plaintiff's Decedent, DONALD BARBER suffered, during his lifetime,

    several smoking-related illnesses, including but not limited to, COPD. Therefore, the

    Plaintiff hereby makes claims for all damages recoverable under the Florida Survival

    Statute and other Florida law.

    WHEREFORE, Plaintiffs pray for compensatory damages, costs, interest

allowable by law, and a trial by jury in all issues so triable.

## COUNT IV: NEGLIGENCE/GROSS NEGLIGENCE

45. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-17.

46. The *Engle* Phase I findings conclusively established that all of the Defendants were

    negligent. Indeed, Defendants had a duty to provide the public with a product

    (cigarettes) that was reasonably safe and did not endanger the health and lives of all

    members of the public, including the Plaintiffs herein. Defendants breached their duty

    to the general public, including the Plaintiffs herein, by negligently designing,

    manufacturing, producing, distributing, selling wholesale or retail, advertising and

    marketing their product (cigarettes, which endangered the health and lives of the

    public, including the Plaintiffs), determined by the jury and court in *Engle* and set

    forth in the jury verdict form previously filed as Exhibit "B."

47. The Defendants owed all class members a duty to prevent injury from cigarettes the

    Defendants knew to be harmful.

48. The Defendants breached their duty by selling cigarettes dangerous to health, without taking reasonable measures to prevent injury to smokers. The Defendants had actual knowledge that their cigarettes contained carcinogens, nitrosamines, and carbon dioxide, among other ingredients harmful to health, which, when combined with the nicotine cigarettes also contain, make the product defective and unreasonably dangerous. Plaintiffs realize that the Decedent, DONALD BARBER, may bear some degree, though substantially less than half, of the operative negligence and therefore responsibility as to the compensatory damages on this Count only. Therefore, an apportionment of the liability as to Count IV as to the compensatory damages only may be in order. However, there is to be no apportionment as to any other Count, as the Defendants are one-hundred percent (100%) liable for those damages.

49. Furthermore, the Defendants were personally and corporately guilty of gross negligence.

50. The Defendants' conduct was so reckless and/or wanting in care that it constituted a conscious disregard and /or indifference to the life, safety, and/or rights of persons exposed to such conduct, including but not limited to the Plaintiffs herein.

51. To the extent that employees and/or agents of the Defendants committed these acts of gross negligence; the officers, directors and/or managers of the Defendants actively and knowingly participated in such conduct and furthermore knowingly condoned, ratified and consented to such conduct.

52. The Defendants' employers, principals, corporations or other legal entities actively, fraudulently, willfully and wantonly engaged in the conduct that constituted gross negligence and gross misconduct that caused injury so gross and fragrant as to show a

reckless disregard for human life or safety of persons exposed to the effects of such conduct, including the Plaintiffs herein, and further engaged in conduct that substantially contributed to the gross losses, injuries and damages suffered by the Plaintiffs.

53. As a legal, direct and proximate result of addiction to cigarettes manufactured, sold by the Defendants as well and the negligent, grossly negligent, willful, wanton, and malicious acts of the Defendants, the Plaintiff's Decedent suffered one or more smoking-related illnesses, including, but not limited to, COPD, thereby causing DONALD BARBER to suffer during his lifetime.

54. Therefore, the Plaintiffs hereby make claims for all damages recoverable under the Florida Survival Statute and other Florida law.

WHEREFORE, Plaintiffs pray for compensatory damages, costs, interest allowable by law and a trial by jury as to all issues so triable.

Respectfully Submitted,

Donald N. Watson, Esq.
Florida Bar No. 324442
dnw@williegary.com
Willie E. Gary, Esq.
Florida Bar No. 187843
weg@williegary.com
**GARY, WILLIAMS, PARENTI & WATSON, P. L.L.C.**
221 East Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Fax: (772) 220-3343
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic mail and the electronic Florida ePortal to all parties on the attached Service List, this 2 1 day of _____October_____ 2014.

Respectfully submitted,

Donald N. Watson, Esq.
Florida Bar No. 324442
dnw@williegary.com
Willie E. Gary, Esq.
Florida Bar No. 187843
weg@williegary.com
**GARY, WILLIAMS, PARENTI
& WATSON, P. L.L.C.**
221 East Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Fax: (772) 220-3343
**Attorneys for Plaintiffs**

## SERVICE LIST

*Attorneys for Defendant Lorillard Tobacco Company:*
John A. DeVault III, Esq.
Patrick P. Coll, Esq.
**BEDELL, DITTMAR, DEVAULT PILANS & COXE, P.A.**
The Bedell Building
101 East Adams Street
Jacksonville, FL 32202
Telephone: (904) 353-0211
Fax: (904) 353-9307
jad@bedellfirm.com
ppc@bedellfirm.com

*Attorneys for Defendant Lorillard Tobacco Company:*
Dawn Giebler-Millner, Esq.
Michelle L. Johnson, Esq.
Michael G. Murphy, Esq.
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, Florida 32801
Telephone: (407) 420-1000
Fax: (407) 841-1295
gieblerd@gtlaw.com
DGMAssistant@gtlaw.com
johnsonm@gtlaw.com
MLJAssistant@gtlaw.com
murphymg@gtlaw.com
FLService@gtlaw.com

*Attorneys for Defendant R.J. Reynolds*
*Tobacco Company:*
Stephanie E. Parker, Esq.
John F. Yarber, Esq.
John M. Walker, Esq.
**JONES DAY**
1420 Peachtree St., N.E. Ste. 1800
Atlanta, GA 30309-3053
Telephone: (404) 521-3939
Fax: (404) 581-8330
separker@jonesday.com
jyarber@jonesday.com
jmwalker@jonesday.com
sberesheim@jonesday.com

*Attorneys for Defendant R.J. Reynolds*
*Tobacco Company:*
Troy A. Fuhrman, Esq.
R. Craig Mayfield
**HILL, WARD, & HENDERSON, P.A.**
101 East Kennedy Boulevard, Suite 3700
P.O. Box 2231
Tampa, FL 33601
Telephone: (813) 221-3900
Fax: (813) 221-2900
tfuhrman@hwhlaw.com
reynolds@hwhlaw.com

*Attorneys for Defendant R.J. Reynolds*
*Tobacco Company:*
J.W. Prichard, Esq.
Robert B. Parrish, Esq.
**MOSELEY, PRICHARD, PARRISH,**
**KNIGHT & JONES**
501 West Bay Street
Jacksonville, Florida 32201
Telephone: (904) 356-1306
Fax: (904) 354-0194
jwprichard@mppkj.com
bparrish@mppkj.com

*Attorneys for Defendant Philip*
*Morris USA, Inc.:*
William P. Geraghty, Esq.
Frank Cruz-Alvarez, Esq.
Victoria B. Kush, Esq.
**SHOOK, HARDY & BACON, L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, Florida 33602
Telephone: (813) 202-7100
Fax: (813) 221-8837
wgeraghty@shb.com
falvarez@shb.com
vkush@shb.com
SHBPMattyVolusia@shb.com

Donald N. Watson, Esq.
Attorney for Plaintiff

# Exhibit D

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR VOLUSIA COUNTY
CIVIL DIVISION


Suzanne Barber, Individually
and as Personal representative
of the Estate of DONALD
BARBER,

      Plaintiffs,               Case No. 2008-30102-CICI

vs.

R. J. REYNOLDS TOBACCO
COMPANY, et al,

      Defendants.
_____/


HEARING BEFORE THE HONORABLE DENNIS CRAIG


DATE:                   April 5, 2016

TIME:                   1:34 p.m. to 2:27 p.m.

PLACE:                  Volusia County Courthouse
                        125 East Orange Avenue
                        Courtroom 7
                        Daytona Beach, Florida

BEFORE:                 Nathan F. Perkins, RDR
                        Notary Public, State of
                        Florida at Large

                        Pages 1 to 46

2

```
1    APPEARANCES:

2        WILLIE E. GARY, ESQUIRE
         GLENN CRICKENBERGER, ESQUIRE
3        Gary, Williams, Parenti, Watson & Gary, P.L.L.C.
         Waterside Professional Building
4        221 S.E. Osceola Street
         Stuart, Florida 34994
5            Attorney for Plaintiffs

6        STEPHANIE E. PARKER, ESQUIRE
         Jones Day
7        1420 Peachtree Street, N.E., Suite 800
         Atlanta, Georgia  30309-3053
8    and
         TROY A. FURHMAN, ESQUIRE
9        Hill Ward Henderson
         101 East Kennedy Boulevard, Suite 3700
10       Tampa, Florida  33602
     and
11       TIMOTHY J. FIORTA, ESQUIRE
         Jones Day
12       North Point
         901 Lakeside Avenue
13       Cleveland, Ohio  44114-1190
             Attorneys for Defendant R. J. Reynolds, et al
14
         JENNIFER M. VOSS, ESQUIRE
15       Shook, Hardy & Bacon, L.L.P.
         100 North Tampa Street
16       Suite 2900
         Tampa, Florida 33602
17           Attorney for Defendant Philip Morris USA Inc.

18
     ALSO PRESENT:    SUZANNE BARBER
19                    MARK R. SEIDEN, ESQUIRE
                      ANITRA F. RAIFORA
20
                          INDEX
21                                                    PAGE
     PROCEEDINGS                                        3
22
     REPORTER'S CERTIFICATE                            46
23
24                   (No exhibits marked)

25
```

**Riesdorph Reporting Group, Inc. (813) 222-8963**

1    THE COURT:  All right.  Throw the bankruptcy
2    out.  Would the case be at issue?
3        MS. PARKER:  No.
4        THE COURT:  Why?
5        MS. PARKER:  Four reasons.  One, we've never
6    answered.
7        THE COURT:  You haven't filed an answer?
8        MS. PARKER:  No, Your Honor.  Okay?
9        Number 2, last night they filed an amended
10   motion to amend their complaint to add punitives.
11       THE COURT:  Why didn't you tell me that when
12   we scheduled this case for trial in May?
13       MS. PARKER:  We didn't know then.  Your Honor
14   may recall that this was short set.  Your Honor may
15   recall we came into that hearing, and we actually
16   had some other cases we were proposing.  We first
17   found out about this at this hearing.  We started
18   working --
19       THE COURT:  Why did it take two months to find
20   out about it?
21       MS. PARKER:  Well, the plaintiffs filed a
22   motion to amend.  Okay.  So the plaintiffs filed a
23   motion to amend which has been pending.  This is
24   their -- we have not answered because of them.
25       THE COURT:  Let's assume for argument's sake

1    that that's going to get denied.

2        MS. PARKER:  That what's going to get denied?

3    I'm sorry.

4        THE COURT:  Their motion to amend gets denied.

5        MS. PARKER:  Well, there are three other

6    reasons why it's not at issue.

7        THE COURT:  All right.  So, there has been an

8    answer to the second amended complaint at this

9    point, right?

10        MS. PARKER:  No, Your Honor.

11        THE COURT:  Why is that?

12        MS. PARKER:  Because they have a motion

13    pending.  They filed a motion -- their motion to

14    amend is pending.

15        THE COURT:  Now, we are talking about -- this

16    would be for the third amended complaint.  They

17    filed a second amended complaint more than a year

18    ago, right?

19        MR. FURHMAN:  Your Honor, may I address that?

20        THE COURT:  You've never answered that?

21        MR. FURHMAN:  No, Your Honor.  We actually

22    filed a motion to dismiss the second amended

23    complaint, and they responded by filing a new

24    motion to amend, which essentially superceded --

25        THE COURT:  I'm not talking about the third

1    amended complaint.  The last complaint that was

2    filed, did you answer it?

3        MR. FURHMAN:  No, Your Honor.  There's a

4    motion to dismiss still pending as to that.

5        THE COURT:  And why was that never set?

6        MR. FURHMAN:  Because plaintiffs then turned

7    around and filed another motion to amend to change

8    the complaint yet again, so it superceded

9    everything.  And they never had that motion set for

10    hearing.

11        THE COURT:  You know, this isn't rocket

12    science.  It's a simple case.  Why we're the eight

13    years down the road and this is where we are at

14    doesn't reflect well on the judicial system.

15        MS. PARKER:  There are some other reasons

16    separate from that as to why the case is not at

17    issue, if Your Honor would like me to go over

18    those.

19        THE COURT:  Sure.  Make your record.

20        MS. PARKER:  Okay.  Last night, the plaintiff

21    filed an amended motion to amend to add punitive

22    damages.  I mean, we have 20 days to respond to

23    that.  Okay?

24        THE COURT:  There was one filed last year.

25        MS. PARKER:  This is an amended motion,

1   though, they filed last night.

2        THE COURT:  Right.  We won't be going forward

3   on that one today.  We would be going forward on

4   the one they filed last year in June.

5        MS. PARKER:  If they are trying to -- if they

6   are trying to go forward under --

7        THE COURT:  That would be for punitive damages

8   under the counts related to intentional conduct.

9        MS. PARKER:  If they want to pursue that

10  amended motion that they filed last night, the case

11  would not be at issue.

12       The case is also not at issue --

13       THE COURT:  Well, what if I denied it?

14       MS. PARKER:  If you denied their motion for

15  punitive damages?

16       THE COURT:  Right.

17       MS. PARKER:  There are two other reasons why

18  it's not at issue.  Okay?

19       THE COURT:  So I'll ask you the same thing I

20  asked you back in the case you got continued for

21  April.  And that is this.  Do you still want the

22  case continued, even if I make them go to trial

23  without their punitive damages?

24       MS. PARKER:  Yes, Your Honor.

25       THE COURT:  You'd rather go to trial with

1    The fact of the matter is, this was a

2    bankruptcy -- both of these bankruptcies were filed

3    pro se.  She was dealing as a 24/7 care giver for

4    her husband that was dying at the hands of tobacco

5    while this was going on.  And the simple truth is

6    she did the best that she could.

7        And we have -- I mean, and the timing here is

8    very interesting.  I mean, here we are, as they

9    point out, four weeks before trial.  I mean, we

10   know and I'm sure Your Honor is aware, once

11   these --

12       THE COURT:  Here is what your problem is going

13   to be.  Okay?  And you need to tell me what to do,

14   what your position is.  And I want you to talk to

15   Ms. Barber about it.  Okay?  And this is going to

16   be your problem.

17       Let's assume for argument sake that these

18   trustees get orders quickly and I get you in here

19   on a motion to substitute party plaintiff on an

20   expedited basis, and for argument's sake, it gets

21   granted.  Okay?  In order to proceed with the trial

22   in May, there simply is not going to be time to

23   have heard your motion to amend.  And even if there

24   was time to hear the motion to amend, the problem

25   would be they are going to have a certain amount of

1   time to answer.  And, of course, I can't foreclose

2   them from filing a motion to dismiss, which just

3   blows past the trial date in May.  Okay?

4        So as a timeliness issue, there's no way that

5   I can let you have the punitive damages go forward

6   in May.  There's just no time to do that.  I mean,

7   do you understand the dilemma?

8        MR. CRICKENBERGER:  I absolutely understand.

9        THE COURT:  The other problem is this, though.

10   The case gets continued.  I mean, I'm booked out --

11   okay? -- through the end of this year, and you are

12   probably going to lose your priority for next year.

13        So the way I put it to you is this:  Would you

14   prefer trying to keep your trial day in May without

15   punitive damages, or do you want to join with the

16   defendant and move to continue the case?

17        MR. CRICKENBERGER:  May I have a second to

18   talk to the boss about that.

19        THE COURT:  I tell you what.  And I don't know

20   if Ms. Barber understands that dilemma either.  So

21   what I am going to do is I'm going to recess for 15

22   minutes, and you guys can maybe use that room if

23   you want to talk to your client about that.

24        MR. CRICKENBERGER:  Thank you, Your Honor.

25        THE COURT:  Okay?

1    MR. GARY:  Thank you, Your Honor.  I

2  appreciate it.

3        (A recess was taken at 1:55 p.m.)

4        (Proceedings resumed at 2:09 p.m.)

5    THE COURT:  All right.  What are we going to

6  do?

7    MR. GARY:  Your Honor, we had a chance to talk

8  to Ms. Barber.

9    THE COURT:  What happened to Ms. Barber?

10    MR. GARY:  She went to the bathroom.

11    THE COURT:  Do you want to wait for her?

12  Maybe we should wait for her.

13    MR. GARY:  Okay.

14    THE COURT:  All right.

15        (A pause was had in the proceedings.)

16        (Ms. Barber entered the courtroom.)

17    THE COURT:  All right.  So what did we decide

18  we wanted to do?  I'm not telling you you have to

19  waive your punitive damages.  I'm just saying if

20  we're going to try this case in May, there's just

21  no way we can get that done with punitive damages.

22    MR. GARY:  Please the Court.  Your Honor, we

23  talked to Ms. Barber, and because of her 80-plus

24  years of age, she has been going -- this case has

25  been hanging around for almost 10 years, it's time

1    to get it done.  And the possibility of her having

2    to wait for God knows how long.

3        THE COURT:  And I can't --

4        And, Ms. Barber, I don't know what it would

5    be.  I mean, because you were there at my last case

6    management conference, and you know what my

7    schedule looks like.

8        MS. BARBER:  Yes, sir.

9        MR. GARY:  She fully understands, Your Honor.

10    And we want to go forward and have our trial.

11        THE COURT:  Okay.

12        MR. GARY:  We want our day in court.

13        THE COURT:  All right.  Very good.  Okay.  All

14    right.  So, Ms. Parker, let's talk back with you

15    again.  I'm not sure standing is the issue.  I

16    mean, if she's got standing when the case is filed,

17    I mean, we're just at a point where somebody else

18    basically -- it would be if I was in a foreclosure

19    case and, say, for example, the mortgage and note

20    was assigned to a different bank and at some point

21    they just needed to be substituted as a party

22    plaintiff.  Why isn't that analogues to what we

23    have here?

24        MS. PARKER:  Your Honor, we have had this

25    situation come up in a handful of these Engle

1    presume, the infirmities of their second amended
2    complaint, they got another motion on file, and
3    that was never heard.
4         THE COURT:  And when did you file your motion
5    to dismiss?
6         MR. FURHMAN:  It was with us, Your Honor.
7         MS. VOSS:  Yeah.  We had the same deadlines,
8    so I presume we filed it at the same time.
9         But I do want to be very clear that by no
10   means do we voluntarily waive our right to be heard
11   on our motion to dismiss or waive our right to have
12   the trial set without notice or after the case is
13   at issue.
14        THE COURT:  No, no.  That's fine.  What I'm
15   telling you, you be ready to, on very short notice,
16   to have that motion to dismiss heard.
17        MS. VOSS:  Absolutely.
18        THE COURT:  I'm talking 24 hours or less.
19        MS. VOSS:  Yes, Your Honor.
20        THE COURT:  All right.  So be prepared.
21        MR. CRICKENBERGER:  And, Your Honor, just so
22   it's clear for the record.  The plaintiff at this
23   point will withdraw its motion to amend to include
24   punitive damages that was set for later this
25   afternoon, but would reserve the right, if we don't

1    go to trial in May, to be able to refile that and

2    have it heard.

3        THE COURT:  All right.  Well, I tell you what.

4    If the case is successfully put off from my May

5    trial docket, I'll give you expedited hearing time

6    to bring in your motions to add the punitive

7    damages.

8        I think what we would do at that point is the

9    Court is going to schedule the motion to dismiss,

10   and we're going to get this case placed at issue.

11   Because if the case is not going to trial in May,

12   this case is not going to sit.  I may not have time

13   to try it, but I'm going to get it at issue.  Your

14   motions to dismiss, I'll schedule them.  And I'm

15   not going to give you a lot of time.  So be

16   prepared now for those.  And then one way or the

17   other, if you are successful in your motion to

18   dismiss, then we'll, you know, move forward from

19   there.  If it's denied, I'll probably, you know,

20   give you time to file an answer.  And then from

21   that point on, assuming giving you the 50 days

22   beyond that, if I don't consider them waived, we'll

23   go ahead and get you -- get you on track.

24       And I want to go back to, you know, Ms.

25   Barber's letter that she sent in that we discussed

# Exhibit E

1

IN THE CIRCUIT COURT

OF THE SEVENTH JUDICIAL CIRCUIT

IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE NO. 2008-30102-CICI

SUZANNE BARBER, Individually and
as Personal Representative of the
Estate of DONALD BARBER,

        Plaintiff,

-vs-

R.J. REYNOLDS TOBACCO COMPANY,
et al.,

        Defendants.

_____/

DEPOSITION OF:      JENNIFER CARSON

DATE TAKEN:         FRIDAY, APRIL 8, 2016

TIME:               9:13 A.M. - 12:18 P.M.

PLACE:              6767 NORTH WICKHAM ROAD, SUITE 400
                    MELBOURNE, FLORIDA

REPORTED BY:        CARMEN THOMAS, REGISTERED
                    PROFESSIONAL REPORTER AND
                    NOTARY PUBLIC

2

1    APPEARANCES:
2         Appearing on Behalf of the Plaintiff:
          GLENN CRICKENBERGER, ESQUIRE
3         and
          NATASHA HARRISON, ESQUIRE (By Phone)
4         Gary, Williams, Parenti, Watson & Gary, P.L.
          221 East Osceola Street
5         Stuart, Florida 34994
          (772) 283-8260
6         Glenn@williegary.com
          and
7         CHRISTOPHER CHESTNUT, ESQUIRE
          Chestnut Law Firm
8         303 Peachtree Street NE, Suite 4150
          Atlanta, Georgia 30308
9         (888) 374-4448
          (By Phone)
10
          Appearing on Behalf of the Defendant,
11        R.J. Reynolds Tobacco Company:
          TIMOTHY FIORTA, ESQUIRE
12        Jones Day
          901 Lakeside Avenue
13        Cleveland, Ohio 44114
          (216) 586-3939
14        tjfiorta@jonesday.com
15
          Appearing on Behalf of the Defendant,
16        Philip Morris USA, Inc.:
          JENNIFER M. VOSS, ESQUIRE
17        Shook, Hardy & Bacon, LLP
          100 North Tampa Street, Suite 2900
18        Tampa, Florida 33602
          (813) 202-7100
19        jvoss@shb.com
          (By Phone)
20
     ALSO PRESENT:
21        Charles Scott
22
23
24
25

30

1        For the record, counsel, I reviewed the

2    document.  I don't see a filing of a withdrawal of

3    the wrongful death claim.  So it's Plaintiff's

4    position that there are two claims pending,

5    therefore, counsel have the right, entitlement and

6    obligation to object.

7        MS. VOSS:  We can take that up during a

8    break.  If you read the transcript from the

9    hearing, it was withdrawn.

10       MR. CRICKENBERGER:  Let's take a break.

11   Chris, I'm going to call you on your cell phone.

12       MR. FIORTA:  Let's take a couple minute

13   break.

14       (A recess was taken.)

15   BY MR. FIORTA:

16   Q    You all set to continue, ma'am?

17   A    Yes.

18       MR. FIORTA:  Mr. Chestnut, you were able to

19   talk to Mr. Crickenberger on the break; is that

20   right?

21       MR. CHESTNUT:  Yes.  For the record,

22   Christopher Chestnut.  And it is -- I now have an

23   understanding and concur with counsel's statement

24   of fact that there was a withdrawal -- an oral

25   withdrawal at the most recent hearing which the

31

1          amended -- or the amendment to add a claim for

2          wrongful death under the Florida wrongful death

3          statute, so.

4                  MR. FIORTA:  Thank you.

5     BY MR. FIORTA:

6          Q     So we were talking about when you first

7     learned about this lawsuit, just to sort of reorient

8     you.  Okay?

9          A     Okay.

10         Q     You said that Ms. Barber told you she didn't

11    know when it would go to trial but she had filed it.  Is

12    that sort of where we got, just to --

13         A     Uh-huh.

14         Q     Okay.  What else, if anything, did she tell

15    you about the lawsuit?  Did she tell you what she was

16    hoping to accomplish or did she talk about how much in

17    damages she was seeking --

18         A     Nothing.

19         Q     -- anything?

20                MR. CRICKENBERGER:  Object to the form.

21                THE WITNESS:  I never had any --

22    BY MR. FIORTA:

23         Q     Has she ever talked to you about what she's

24    hoping to accomplish in this lawsuit?

25         A     No.

# Exhibit F

OFFICE of VITAL STATISTICS

CERTIFIED COPY

## CERTIFICATION OF DEATH

STATE FILE NUMBER: 2012 07885

DATE ISSUED: April 3, 2012

STATE FILE DATE: April 2, 2012

**DECEDENT INFORMATION**

NAME: DONALD PIERCE BARBER

DATE OF DEATH: 2012

DATE OF BIRTH: 1920

SEX: MALE   SS#:   AGE: 091 YEARS

BIRTHPLACE: EDERTON, GEORGIA

PLACE OF DEATH: HOSPICE

FACILITY NAME OR STREET ADDRESS: HALIFAX HEALTH HOSPICE OF VOLUSIA/FLAGLER

LOCATION OF DEATH: NEW SMYRNA BEACH, VOLUSIA COUNTY

**SURVIVING SPOUSE, RESIDENCE, AND DECEDENT HISTORY INFORMATION**

MARITAL STATUS: MARRIED

SPOUSE: SUZANNE TURNER

RESIDENCE: 765 ANNETTE ROAD, NEW SMYRNA BEACH, FLORIDA 32168

OCCUPATION/INDUSTRY: BROADCASTER-BROADCASTING

RACE: White / Black or African American / American Indian or Alaska Native (Tribe) / Asian Indian / Chinese / Filipino / Japanese / Native Hawaiian / Other Asian / Guamanian or Chamorro / Samoan / Other Pacific Isl. / Vietnamese / Korean / Other / Unknown

HISPANIC OR HAITIAN ORIGIN? NO, NOT OF HISPANIC/HAITIAN ORIGIN

EDUCATION: SOME COLLEGE, BUT NO DEGREE

EVER IN U.S. ARMED FORCES? YES

**PARENTS AND INFORMANT INFORMATION**

FATHER: DAVE BARBER

MOTHER: MINNIE STOCKTON

INFORMANT: SUZANNE BARBER

RELATIONSHIP TO DECEDENT: WIFE

INFORMANT'S ADDRESS: 765 ANNETTE ROAD, NEW SMYRNA BEACH, FLORIDA 32168

**PLACE OF DISPOSITION AND FUNERAL FACILITY INFORMATION**

PLACE OF DISPOSITION: ABACOS CREMATORIUM, LLC
NEW SMYRNA BEACH, FLORIDA

METHOD OF DISPOSITION: CREMATION

FUNERAL DIRECTOR/LICENSE NUMBER: PAULA M. PEZZIMENTI, F061894

FUNERAL FACILITY: ALAVON DIRECT CREMATION SERVICES F043393
561 BEVILLE ROAD SUITE 110, SOUTH DAYTONA, FLORIDA 32119

**CERTIFIER INFORMATION**

TYPE OF CERTIFIER: CERTIFYING PHYSICIAN

MEDICAL EXAMINER CASE NUMBER: NOT APPLICABLE

TIME OF DEATH (24 hr): 0015

CERTIFIER'S NAME: ARLEN R STAUFFER

CERTIFIER'S LICENSE NUMBER: ME38640

NAME OF ATTENDING PHYSICIAN (If other than Certifier): NOT APPLICABLE

**CAUSE OF DEATH AND INJURY INFORMATION**

PROBABLE MANNER OF DEATH: NATURAL

CAUSE OF DEATH - PART I - and Approximate Interval: Onset to Death:

a END-STAGE DEMENTIA                6 MONTHS

b

c

PART II - Other significant conditions contributing to death but not resulting in the underlying cause given in PART I:

COPD

AUTOPSY PERFORMED? NO

AUTOPSY FINDINGS AVAILABLE TO COMPLETE CAUSE OF DEATH?

DATE OF SURGERY:

DID TOBACCO USE CONTRIBUTE TO DEATH? NO

REASON FOR SURGERY:

IF FEMALE, WAS SHE PREGNANT WITHIN THE PAST YEAR? NOT APPLICABLE

DATE OF INJURY: NOT APPLICABLE

TIME OF INJURY (24 hr):   INJURY AT WORK?

LOCATION OF INJURY:

DESCRIBE HOW INJURY OCCURRED:

PLACE OF INJURY:

IF TRANSPORTATION INJURY, Status of Decedent:   Type of Vehicle:

State Registrar

REG: 2012521979

WARNING: THIS DOCUMENT IS PRINTED OR PHOTOCOPIED ON SECURITY PAPER WITH WATERMARK OF THE GREAT SEAL OF THE STATE OF FLORIDA. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK. THE DOCUMENT FACE CONTAINS A MULTI-COLORED BACKGROUND. THE BACK CONTAINS SPECIAL LINES WITH TEXT AND SEALS IN THE INK.

DH FORM 1947 (08/04)

52108156   CERTIFICATION OF VITAL RECORD   * 5 2 1 0 8 1 5 6 *

VOID IF ALTERED OR ERASED

1.103441.305.   000002

# Exhibit G



EXHIBIT

A

IN THE CIRCUIT COURT OF THE SEVENTH
JUDICIAL CIRCUIT IN AND FOR VOLUSIA COUNTY

SUZANNE BARBER, Individually
and as Personal Representative of the
Estate of DONALD BARBER, deceased,

       Plaintiff,                              CASE NO.: 2008-30102-CICI

v.

R.J. REYNOLDS TOBACCO
COMPANY, INC., et al.,

       Defendants.

_____/

## PLAINTIFF'S THIRD AMENDED COMPLAINT

The Plaintiff, SUZANNE BARBER, Individually and as Personal Representative of the

Estate of DONALD BARBER, hereby files this, her Third Amended Complaint, and sues the

Defendants, R.J. REYNOLDS TOBACCO COMPANY, INC., et al., and alleges as follows:

1. This is a claim for damages in excess of the jurisdictional limits of the court.

2. At all times material hereto Plaintiff, SUZANNE BARBER and Plaintiff's Decedent,

    DONALD BARBER, were residents of Volusia County and have suffered personal injuries

    and/or damages in Volusia County as a result of actions of the Defendants. DONALD

    BARBER died March 30, 2012. On April 25, 2013, SUZANNE BARBER was appointed

    personal representative of his estate (Letters of Administration are attached hereto as **Exhibit**

    **AA**).

3. The potential beneficiaries of a recovery for wrongful death of DONALD BARBER are as

    follows:

    a. SUZANNE BARBER, surviving spouse;

    b. Timothy Barber, surviving son; and

c.  THE ESTATE OF DONALD BARBER.

4.  At all times material hereto, the Plaintiff's Decedent, DONALD BARBER, and SUZANNE
    BARBER, his widow, were and are members of the class certified in *Engle v. Philip Morris et
    al.*, Case No. 94-08273 CA22, described more particularly as all Florida residents, and their
    survivors, who have suffered, presently suffer or have died from diseases and medical
    conditions caused by their addiction to cigarettes that contain nicotine. See Exhibit "A" of
    original complaint and incorporated herein by reference.

5.  At all times material to this action; the Plaintiff, SUZANNE BARBER, was the spouse of
    Plaintiff's Decedent, DONALD BARBER, and shall also be referred to herein as "Smoker's
    Surviving Spouse."

6.  At all times material herein; Defendant, R.J. REYNOLDS TOBACCO COMPANY, INC.,
    individually and as successor by merger to Brown & Williamson Tobacco Corporation (a/k/a
    Brown & Williamson USA, Inc.), individually and as successor by merger to The American
    Tobacco Company (f/k/a The American Tobacco Company, Inc.), has been a North Carolina
    corporation doing business throughout the State of Florida, including Volusia County.
    Defendant R.J. REYNOLDS TOBACCO COMPANY, INC. is being sued for the actions of
    its predecessor corporation Brown & Williamson Tobacco Corporation (a/k/a Brown &
    Williamson USA, Inc.) and individually and as successor by merger to The American Tobacco
    Company (f/k/a The American Tobacco Company, Inc.).

7.  At all times material herein; Defendant, LORILLARD TOBACCO COMPANY, has been a
    Delaware corporation, doing business throughout the State of Florida including Volusia
    County.

8. At all times material herein; Defendant, PHILIP MORRIS USA, INC. (f/k/a Philip Morris, Inc.) has been a Virginia corporation, doing business throughout the State of Florida including Volusia County.

9. At all times material; the Defendant, R.J. REYNOLDS TOBACCO COMPANY, INC., individually and as a successor by merger to Brown & Williamson Tobacco Corporation (a/k/a Brown & Williamson USA, Inc.), individually and as successor by merger to The American Company (f/k/a The American Tobacco Company, Inc.), a foreign corporation; LORILLARD TOBACCO COMPANY, a foreign corporation; and PHILIP MORRIS U.S.A., INC., (f/k/a Philip Morris Inc.), a foreign corporation, have been manufacturers and distributors of tobacco products throughout Florida and the United States. The Plaintiff's Decedent, DONALD BARBER, smoked cigarettes manufactured by the Defendants, which resulted in his injuries, damages and/or his death described below.

10. The Plaintiff's Decedent, DONALD BARBER'S, injuries, damages and/or death were proximately caused by actions of the Defendants as determined by the *Engle* jury in its verdict, rendered on July 7, 1999 and previously attached as Exhibit "B" to the original complaint and incorporated herein by reference.

11. At all times relevant to the action; Plaintiff's Decedent, DONALD BARBER, was a Florida resident and citizen who was addicted to, used, purchased and smoked cigarettes containing nicotine that were designed, manufactured, advertised, and marketed by one or more of the Defendants. Said Defendants did so in sufficient quantities and for a sufficient period of time as to cause injury and death in the form of diseases and medical conditions, as was determined by the *Engle* jury in its verdict. Theses cigarette brands include but are not limited to, Old Gold, Chesterfield and Salem.

12. The Florida Supreme Court prospectively decertified the *Engle* class because class-wide treatment of causation and damages was not feasible. The Florida Supreme Court expressly reserved to class members, including Plaintiff, the right to bring individual actions against Defendants for smoking-related injuries, damages, and death, including punitive damages.

13. The original action was filed less than one year after the Supreme Court's mandate was issued. The action is, therefore, timely.

14. Because DONALD BARBER is/was an *Engle* class member and SUZANNE BARBER is an *Engle* class member, Plaintiff is entitled to the benefit of the Phase I findings and asserts and alleges those findings as conclusively established herein as follows (See Exhibit "A" of the original complaint):

   a. Smoking cigarettes causes aortic aneurysm, bladder cancer, cerebrovascular disease, cervical cancer, chronic obstructive pulmonary disease, coronary heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma), complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer.
   b. Nicotine in cigarettes is addictive.
   c. Defendants placed cigarettes on the market that were defective and unreasonably dangerous.
   d. Defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose material facts concerning the health effects or addictive nature of smoking cigarettes or both.
   e. Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on the information to their detriment.
   f. Defendants sold or supplied cigarettes that were defective.
   g. Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.
   h. All of the Defendants were negligent.

15. As a direct and proximate result of the conspiracy and fraud perpetrated by each Defendant; Plaintiff's Decedent, DONALD BARBER, was addicted to cigarettes, containing nicotine,

manufactured and sold by one or more of the Defendants. As a direct and proximate result of his addiction, the inherently defective nature of the cigarettes and the negligent and willful acts or omissions of the Defendants, Plaintiff's Decedent, DONALD BARBER, suffered: COPD, Emphysema, other bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, loss of earning capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries were permanent in nature and plagued Mr. Barber until his untimely death. Also, the addiction to cigarettes containing nicotine was a legal, direct, and proximate cause of the death of DONALD BARBER.

16. As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants, the Smoker's Surviving Spouse, SUZANNE BARBER, has sustained damages resulting from the injuries to her spouse, including but not limited to, damages for the loss of his comfort, companionship, society, support and services, and mental pain and suffering from the date of the initial injury and disease of DONALD BARBER.

WHEREFORE, Plaintiff prays for compensatory and punitive damages, costs, interest allowable by law and a trial by jury as to all issues so triable.

## COUNT I: STRICT LIABILITY

17. Plaintiff re-alleges and incorporates the allegations in paragraphs 1-16.

18. The *Engle* Phase 1 findings conclusively establish that the cigarettes sold and placed on the market by the Defendants were defective and unreasonably dangerous.

19. The Defendants' cigarettes' contained carcinogens, nitrosamines, and carbon dioxide, among
    other ingredients harmful to health which, when combined with the nicotine cigarettes also
    contain, make the product defective and unreasonably dangerous.

20. The Defendants had actual knowledge that the cigarettes were defective and unreasonably
    dangerous. In spite of such knowledge, the Defendants intentionally delayed in warning the
    public, including the Plaintiff's Decedent and Smoker's Surviving Spouse. The Defendants
    were and are personally and corporately guilty of intentional misconduct in that the Defendants
    intentionally, willfully and wantonly placed on the market cigarettes that were defective and
    unreasonably dangerous. At all times pertinent hereto, the Defendants had actual knowledge
    of the wrongfulness of the conduct and the high probability that injury, damage and/or death
    to the Plaintiff's Decedent would result and, despite that knowledge, the Defendants
    intentionally pursued that course of conduct, to wit: intentionally placing cigarettes on the
    market that were defective and unreasonably dangerous, while delaying to warn the public,
    thus resulting in injuries and damages to Plaintiff and her now deceased husband and resulting
    in the ultimate death of DONALD BARBER.

21. To the extent that such conduct was committed by employees or agents of the Defendants; the
    officers, directors, and/or managers of the Defendants knowingly and actively participated in
    such conduct and furthermore condoned, ratified and consented to such conduct.

22. As a direct and proximate result of DONALD BARBER's addiction to cigarettes containing
    nicotine and his smoking of defective and unreasonably dangerous cigarettes manufactured
    and sold by Defendants, as well as the negligent and willful acts or omissions of the Defendants,
    Plaintiffs' Decedent suffered several smoking-related illnesses, including, but not limited to,
    COPD and Emphysema. Therefore, Plaintiff hereby makes claims for all damages recoverable

under the Survival Statute and any other Florida law including, but not limited to, the damages listed in the following paragraphs. Also as a legal, direct and proximate result of the Decedent's addiction to the Defendants' inherently dangerous and defective product containing nicotine, DONALD BARBER suffered an untimely death. Accordingly, Plaintiff hereby makes claims for all damages recoverable under the Florida Wrongful Death Statute, including, but not limited to: (A) For the Smoker's Surviving Spouse, the loss of companionship, protection, guidance, support and services, and past and future mental pain and suffering from the date of the initial injury and disease. (B) For the Estate, for the loss of net accumulations and for all medical expenses and funeral expenses that have become a charge against the Estate.

23. As a direct and proximate result of the conspiracy and fraud perpetrated by each Defendant, DONALD BARBER was addicted to cigarettes, containing nicotine, manufactured and sold by one or more of said Defendants. As a direct and proximate result of his addiction, the inherently defective nature of the cigarettes and the negligent and willful acts or omissions of the Defendants, Plaintiff's Decedent, DONALD BARBER, suffered: COPD, Emphysema, other bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, loss of earning capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries were permanent in nature and plagued Mr. Barber until his untimely death.

24. As a proximate result of the defective cigarettes sold and placed on the market by one or more of the Defendants, the Smoker's Surviving Spouse, SUZANNE BARBER, has sustained

damages resulting from the injuries to her spouse, including, but not limited to, damages for the loss of his comfort, companionship, society, support and services, and mental pain and suffering from the date of the initial smoking-related illness and injury.

WHEREFORE, Plaintiff prays for all wrongful death, Survivor, and loss of consortium compensatory damages, prays for punitive damages, and prays for costs, interest allowable by law and a trial by jury as to all pertinent issues.

## COUNT II: FRAUD

25. Plaintiff re-alleges and incorporates the allegations in paragraphs 1-16.

26. The *Engle* Phase I findings conclusively established that Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

27. The Defendants and their co-conspirators agreed to conceal their own scientific research results that revealed that cigarettes cause cancer and other diseases and that nicotine in tobacco is addictive.

28. The Defendants had taken on the duty to disclose by promising to share their research results with the public.

29. Not only did the Defendants conceal information about the dangers of smoking, but they also enticed people, including DONALD BARBER, to keep smoking by creating a controversy over whether smoking indeed had deleterious health effects.

30. The Defendants even actively opposed an effort to have the fact that nicotine in cigarettes is addictive placed on cigarette packages.

31. The concealed and omitted information described in the preceding paragraphs was material information.

32. The Plaintiff's Decedent, DONALD BARBER, relied to his detriment upon the concealment and omission of such material information.

33. The fraud committed by the Defendants was a legal, direct, and proximate cause of DONALD BARBER's addiction to cigarettes containing nicotine and all illnesses and damages resulting therefrom including the wrongful death of DONALD BARBER. Accordingly, the Plaintiff hereby makes claims for all damages recoverable under the Florida Wrongful Death Act, including, but not limited to, the following: (A) For the Smoker's Surviving Spouse, the loss of companionship, protection, guidance, support, and services and the survivor's past and future mental pain and suffering from the date of initial injury and disease. (B) For the Estate, for the loss of net accumulations and for all medical expenses and funeral expenses that have become a charge against the Estate.

34. As a direct and proximate result of smoking defective and unreasonably dangerous cigarettes manufactured and sold by the Defendants, as well as the negligent and willful acts or omissions of the Defendants; Plaintiff's Decedent, DONALD BARBER, suffered, during his lifetime, from several smoking-related illnesses, including but not limited to, COPD and Emphysema. Therefore, the Plaintiff hereby makes claims for all damages recoverable under the Florida Survival Act and any other Florida law.

35. As a direct and proximate result of the fraud perpetuated by each Defendant, DONALD BARBER was addicted to cigarettes, containing nicotine, manufactured and sold by one or more of said Defendants. As a direct and proximate result of his addiction, the inherently defective nature of the cigarettes and the negligent and willful acts or omissions of the

Defendants; Plaintiff's Decedent, DONALD BARBER, suffered: COPD, Emphysema, other bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, loss of earning capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries were permanent in nature and plagued Mr. Barber until his untimely death.

36. As a proximate result of the defective cigarettes sold and placed on the market by one or more Defendants; the Smoker's Surviving Spouse, SUZANNE BARBER, has sustained damages resulting from the injuries to her spouse, including, but not limited to, damages for the loss of his comfort, companionship, society, support and services, and mental pain and suffering from the date of the initial smoking-related illness and injury.

WHEREFORE, Plaintiff prays for all compensatory damage recoverable under the Florida Wrongful Death Act, all compensatory damages recoverable under the Florida Survival Statute, for punitive damages, and for all costs, interest allowable by law and a trial by jury as to all pertinent issues.

## COUNT III: CONSPIRACY TO COMMIT FRAUD

37. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-16 and 26 - 36.

38. The *Engle* Phase I findings conclusively established that the Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the

intention that smokers and the public would rely on the information, or lack thereof, to their detriment.

39. The concealed and omitted information described in the preceding paragraphs was material information.

40. The Plaintiff's Decedent, DONALD BARBER, relied to his detriment upon the concealment and omission of such information.

41. The Defendants' actions constitute a successful conspiracy to commit fraud.

42. As a legal, direct and proximate result of the Defendants' and its co-conspirators' conspiracy to commit fraud, Plaintiff's Decedent, DONALD BARBER, became addicted to cigarettes containing nicotine and suffered smoking-related illnesses, including, but not limited to COPD and Emphysema. These illnesses were permanent in nature and plagued Mr. Barber until his untimely death. Also, as a legal, direct, and proximate result of the Defendants' Conspiracy to Commit Fraud, DONALD BARBER suffered an untimely death. Accordingly, the Plaintiff hereby makes claim for all damages recoverable under the Florida Wrongful Death Act; including, but not limited to, the following: (A) For the Smoker's Surviving Spouse, the loss of companionship, protection, guidance, support and services and past and future mental pain and suffering from the date of initial injury or disease. (B) For the Estate, the loss of net accumulations, and for Medical Expenses and Funeral Expenses that have become a charge against the Estate.

43. As a direct and proximate result of his addiction to, dependence upon and actual smoking of the defective and unreasonably dangerous cigarettes manufactured and sold by the Defendants, as well as the negligent and willful acts or omissions of the Defendants, Plaintiff's Decedent, DONALD BARBER, suffered, during his lifetime, several smoking-related illnesses,

including but not limited to, COPD and Emphysema. Therefore, the Plaintiff hereby makes claims for all damages recoverable under the Florida Survival Statute and any other Florida law.

44. As a direct and proximate result of the conspiracy to commit fraud perpetuated by each Defendant, DONALD BARBER was addicted to cigarettes, containing nicotine, manufactured and sold by one or more of said Defendants. As a direct and proximate result of his addiction, the inherently defective nature of the cigarettes and the negligent and willful acts or omissions of the Defendants; Plaintiff's Decedent, DONALD BARBER, suffered: COPD, Emphysema, other bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, loss of earning capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries were permanent in nature and plagued Mr. Barber until his untimely death.

45. As a proximate result of the conspiracy to commit fraud by each Defendant; the Smoker's Surviving Spouse, SUZANNE BARBER, has sustained damages resulting from the injuries to her spouse, including, but not limited to, damages for the loss of his comfort, companionship, society, support and services, and past and future mental pain and suffering from the date of the initial smoking-related illness and injury. The Estate has suffered medical expenses which have become charges against the Estate. The Estate has also suffered a loss of net accumulations.

WHEREFORE, Plaintiff prays for Wrongful Death compensatory damages, Survival and Loss of Consortium compensatory damages, for punitive damages, costs, interest allowable by law and a trial by jury as to all pertinent issues.

## COUNT IV: NEGLIGENCE/GROSS NEGLIGENCE

46. Plaintiffs re-allege and incorporate the allegations in paragraphs 1-16.

47. The *Engle* Phase I findings conclusively established that all of the Defendants were negligent. Indeed, the Defendants had a duty to provide the public with a product (cigarettes) that was reasonably safe and did not endanger the health and lives of all members of the public, including Mr. and Mrs. Barber. Defendants breached their duty to the general public, including Mr. and Mrs. Barber, by negligently designing, manufacturing, producing, distributing, selling wholesale or retail, advertising and marketing their product (cigarettes, which endangered the health and lives of the public, including the Plaintiff and Plaintiff's Decedent), as determined by the jury and court in *Engle* and set forth in the jury verdict form previously filed in the original complaint as Exhibit "B."

48. The Defendants owed all class members a duty to prevent injury from cigarettes the Defendants knew to be harmful.

49. The Defendants breached their duty by selling cigarettes that were dangerous to the health of smokers, without taking reasonable measures to prevent injury. The Defendants had actual knowledge that their cigarettes contained carcinogens, nitrosamines, and carbon dioxide, among other harmful ingredients, which, when combined with the nicotine cigarettes also contain, make the product defective and unreasonably dangerous. Plaintiffs realize that the Decedent, DONALD BARBER, may bear some degree, though substantially less than half, of

the operative negligence and therefore responsibility as to the compensatory damages on this Count only. Therefore, an apportionment of the liability as to Count IV, as to the compensatory damages only, may be in order. However, there is to be no apportionment as to any other Count, as the Defendants are one-hundred percent (100%) liable for those damages.

50. Furthermore, the Defendants were personally and corporately guilty of gross negligence.

51. The Defendants' conduct was so reckless and/or wanton in care that it constituted a conscious disregard and /or indifference to the life, safety, and/or rights of persons exposed to such conduct, including but not limited to DONALD and SUZANNE BARBER.

52. To the extent that these acts of gross negligence were committed by employees and/or agents of the Defendants: the officers, directors and/or managers of the Defendants actively and knowingly participated in such conduct and furthermore knowingly condoned, ratified and consented to such conduct.

53. The Defendants' employers, principals, corporations or other legal entities actively, fraudulently, willfully and wantonly engaged in the conduct that constituted gross negligence and gross misconduct. Said conduct caused injury so gross and flagrant as to show a reckless disregard for human life and the safety of persons exposed to the effects of such conduct, including the Plaintiff and Plaintiff's Decedent herein. The Defendants further engaged in conduct that substantially contributed to the gross losses, injuries and damages suffered by the Plaintiff.

54. As a legal, direct and proximate result of his addiction to cigarettes manufactured and sold by the Defendants, as well as the negligent, grossly negligent, willful, wanton, and malicious acts of Defendants, Plaintiff's Decedent, DONALD BARBER, suffered, during his lifetime, several smoking-related illnesses, including but not limited to, COPD and Emphysema.

Therefore, the Plaintiff hereby makes claims for all damages recoverable under the Florida Survival Statute and any other Florida law. As a legal, direct, and proximate of the Defendants' negligence and gross negligence, DONALD BARBER suffered an untimely death. Accordingly, the Plaintiff hereby makes claim for all damages recoverable under the Florida Wrongful Death; including, but not limited to, the following: (A) For the surviving spouse, the loss of companionship, guidance, protection, support and services, and past and future mental pain and suffering from the date of initial injury and disease.

55. As a direct and proximate result of the conspiracy and fraud perpetuated by each Defendant, DONALD BARBER was addicted to cigarettes, containing nicotine, manufactured and sold by one or more of said Defendants. As a direct and proximate result of his addiction, the inherently defective nature of the cigarettes, as well as the grossly negligent and willful acts or omissions of the Defendants, Plaintiff's Decedent, DONALD BARBER, suffered: COPD, Emphysema, other bodily injury; pain and suffering; disability; disfigurement; loss of capacity for enjoyment of life, medical care and expenses (including expenses for physicians' care, hospital care, medications, medical apparatus, custodial care and nursing care); lost wages, loss of earning capacity; mental anguish (including a fear of a shortened and/or diminished life expectancy, and fear of contracting cancer in the future); psychological and psychiatric damages and the aggravation of pre-existing injuries. These injuries were permanent in nature and plagued Mr. Barber until his untimely death.

56. As a proximate result of the defective cigarettes manufactured and sold by one or more Defendants, the Smoker's Surviving Spouse, SUZANNE BARBER, has sustained damages resulting from the injuries to her spouse, including, but not limited to, damages for the loss of

his comfort, companionship, society, support and services, and past and future mental pain and suffering from the date of the initial smoking-related illness and injury.

WHEREFORE, Plaintiff prays for all Wrongful Death compensatory damages, all Survival Statute compensatory damages, for punitive damages, and for costs, interest allowable by law and a trial by jury as to all pertinent issues.

Respectfully Submitted,

/s/ Donald N. Watson
**Donald N. Watson, Esq.**
Florida Bar No. 324442
dnw@williegary.com
**GARY, WILLIAMS, PARENTI,**
**WATSON & GARY, PLLC**
221 SE Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Fax: (772) 220-3343
**Attorneys for the Plaintiff**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic mail and the Florida ePortal to all parties on the attached Service List, this 4th day of  April , 2016.

/s/ Donald N. Watson
**Donald N. Watson, Esq.**
Florida Bar No. 324442
dnw@williegary.com
**GARY, WILLIAMS, PARENTI,**
**WATSON & GARY, PLLC**
221 SE Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Fax: (772) 220-3343
**Attorneys for the Plaintiff**

## SERVICE LIST

*Attorneys for Defendant Lorillard Tobacco
Company:*
John A. DeVault III, Esq.
Patrick P. Coll, Esq.
**BEDELL, DITTMAR, DEVAULT
PILANS & COXE, P.A.**
The Bedell Building
101 East Adams Street
Jacksonville, FL 32202
Telephone: (904) 353-0211
Fax: (904) 353-9307
jad@bedellfirm.com
ppc@bedellfirm.com

*Attorneys for Defendant R.J. Reynolds
Tobacco Company:*
Stephanie E. Parker, Esq.
John F. Yarber, Esq.
John M. Walker, Esq.
**JONES DAY**
1420 Peachtree St., N.E. Ste. 1800
Atlanta, GA 30309-3053
Telephone: (404) 521-3939
Fax: (404) 581-8330
separker@jonesday.com
jyarber@jonesday.com
jmwalker@jonesday.com
sberesheim@jonesday.com

*Attorneys for Defendant R.J. Reynolds
Tobacco Company:*
J.W. Prichard, Esq.
Robert B. Parrish, Esq.
**MOSELEY, PRICHARD, PARRISH,
KNIGHT & JONES**
501 West Bay Street
Jacksonville, Florida 32201
Telephone: (904) 356-1306
Fax: (904) 354-0194
jwprichard@mppkj.com
bparrish@mppkj.com

*Attorneys for Defendant Lorillard Tobacco
Company:*
Dawn Giebler-Millner, Esq.
Michelle L. Johnson, Esq.
Michael G. Murphy, Esq.
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, Florida 32801
Telephone: (407) 420-1000
Fax: (407) 841-1295
gieblerd@gtlaw.com
DGMAssistant@gtlaw.com
johnsonm@gtlaw.com
MLJAssistant@gtlaw.com
murphymg@gtlaw.com
FLService@gtlaw.com

*Attorneys for Defendant R.J. Reynolds
Tobacco Company:*
Troy A. Fuhrman, Esq.
R. Craig Mayfield
**HILL, WARD, & HENDERSON, P.A.**
101 East Kennedy Boulevard, Suite 3700
P.O. Box 2231
Tampa, FL 33601
Telephone: (813) 221-3900
Fax: (813) 221-2900
tfuhrman@hwhlaw.com
reynolds@hwhlaw.com

*Attorneys for Defendant Philip
Morris USA, Inc.:*
William P. Geraghty, Esq.
Frank Cruz-Alvarez, Esq.
Victoria B. Kush, Esq.
**SHOOK, HARDY & BACON, L.L.P.**
100 N. Tampa Street, Suite 2900
Tampa, Florida 33602
Telephone: (813) 202-7100
Fax: (813) 221-8837
wgeraghty@shb.com
falvarez@shb.com
vkush@shb.com
SHBPMattyVolusia@shb.com

# Exhibit H

*Suzanne J. (Suzy) Barber*
*765 Annette Road*
*New Smyrna Beach, FL 32168*
*Phone 386-426-5657*
*Email: flafolkus@cfl.rr.com*

April 29, 2016

Honorable Judge Karen S. Jenneman
U.S.Bankruptcy Court
400 W. Washington St., Suite 5100
Orlando, FL 32801

RE: Bankruptcy case 6:10-bk-14338-ABB- Suzanne Barber-Gene Chambers, Trustee
and Donald  Barber, case 6:12-bk-00408-KSJ- Richard Webber, Trustee

Dear Judge Jenneman:

I have just returned from a hearing in Circuit Court in Volusia County, Daytona Beach, held by Judge Rouse (Ret.) regarding my late husband's and my case against R.J.Reynolds Tobacco, which has been pending since January, 2008. Due to the lack of activity in that case in all these years,  I wrote to the current-assigned judge for tobacco lawsuits, Dennis Craig, in February this year, thinking it was the judges' faults (collectively) that too many of these cases had not been heard in all this time. However, Judge Craig was kind enough to call a case conference which I attended in February, during which he read my letter aloud to the other attorneys in similar cases, stating that my letter had awakened him to why there was the backup of cases, realizing it was the lawyers who were "not ready for trial", and admonishing them for not making more progress on setting trial dates.  My own attorney, Donald Watson of the law firm of Gary, Williams, Et Al of Stuart, Fl. was not in attendance but was on the long-distance phone hookup. Judge Dennis chastised Mr. Watson for not being ready to go to trial, and set a date for May 9th, 2016, which is now in jeopardy.

At that meeting an attorney for R.J.Reynolds, Mr. Fuhrman, claimed he was new to the case and had not enough knowledge to adequately prepare for a trial so soon, but Judge Craig advised him to "get ready" and told Mr. Watson to provide Mr. Fuhrman with everything he needed from the Gary law firm by 5 PM on the following Monday. (This was on a Friday.)

Thinking we were finally going to get some progress on this case, which had lain dormant since 2009, Mr. Gary himself took over the case, along with a couple of others in his firm. In that regard we had a hearing before Judge Craig on April 5th, during which time the Reynolds attorneys brought up the fact that I had filed bankruptcy in 2010, Chapter 7, which was discharged in December, 2010.  At no time was I told, nor have I yet to find anything in the bankruptcy forms stating that a pending lawsuit must be declared as an "asset". Since it had lain unattended for many months I assumed it was a dead issue anyway. It certainly had no value then, and to this day still has no value any more than a lottery ticket might have.

I filed all the paperwork myself and attended the hearing by the then-Trustee, who also never asked about anything of the kind. At the April 5th this month hearing the Reynolds attorneys made a Motion for Summary Judgment, which Judge Craig denied, knowing how long my case had languished. He did, however, instruct that the bankruptcies be re-opened, based on the fact that I had not included this dormant lawsuit as a possible asset! That was 6 years ago. Can you imagine those creditors waiting this long to see if they might POSSIBLY get paid from a lawsuit settlement? This is ludicrous and ridiculous!

So the Reynolds group thought they had found a way to not pay me anything for all I went through watching my husband die, along with the suffering in the ensuing years since the suit was first filed, and had the bankruptcies reopened. There is a huge question now, however, because we had reaffirmed our house and it was not included in the discharge of either mine or my husband's bankruptcies. Our mortgage company, U.S. Bank modified the mortgage for me after my husband died in March, 2012, and I have been faithfully paying on it since June, 2012. This should not be included in the re-opened cases.

At today's hearing which had a substitute judge, former Judge Rouse, the Reynolds attorneys presented a Motion which would remove my case from the calendar, and dismiss it entirely. He did not sign that, and then the one female attorney (I think her name is Parker) said they had reached a settlement with the Trustees (Chambers and Richard B. Webber) and that the case would be dismissed!

This was a total shock to me and Mr. Gary, as no one had contacted me about any such thing, and it was as though I virtually do not exist anymore! This cannot be true!

Mr. Gary is filing a Motion with Judge Craig now to set all that aside, because it was underhanded and smacks of collusion and lying by the Reynolds people.

I am writing to ask your forbearance in this matter because when I filed both of our petitions for bankruptcy, I had no legal representation and filled in all the forms myself as best I could. I even had the filing fees waived, due to being totally broke. My husband was dying of COPD (hence this lawsuit against Reynolds Tobacco) and he did pass away one month after filing his bankruptcy. I have suffered immeasurably in all these years, by having to care for him 24/7 and giving up my formerly profitable small Real Estate business, and of course, suffering his loss for the past four years. The action by Reynolds is no more than harassment and spite. They had plenty of time to respond to our lawsuit over the past 9 years, and now they take this tactic to destroy me, financially, physically, and mentally. I am 80 years old and have been struggling to keep a roof over my head, and to have to relive all the horror of losing everything including my wonderful husband of forty years, who died one month after our 40th anniversary, is just too much.

Shouldn't I be involved in any discussions of a settlement with Reynolds, and also, shouldn't someone assigned to represent me, come to court with me? I am desperately broke and have hoped for a decent settlement to live on for what might remain of my life, since I can  no longer work. I've been struggling to live on Social Security alone, and it is nigh impossible. Without help from my children I would be homeless today. This entire thing is a ploy by Reynolds to keep from paying me anything. They ought to be ashamed of themselves and I said that in court!  Any people who would willfully scam an old lady out of some money are reprehensible! They are the villains in this situation.
Thank you for anything you can do to help me.

# Exhibit I

# SUZANNE J. BARBER

765 Annette Road, New Smyrna Beach, FL 32168
Phone 386-426-5657--
e-mail: flafolkus@cfl.rr.com

| Send to: Judge Dennis Craig | From: *Suzanne Barber* |
|---|---|
| Company- 7th Judicial Circuit | Date: May 2, 2016 |
| Fax Number : 248-8132 | RE: Donald P. Barber vs R.J.Reynolds- 2008 30102 |

☐ _X_Please Review_ _ For your Information

Total pages, including cover : 4    Time sent: _____

Your Honor,

    I am sorry you weren't available for the hearing we had in your court last Friday, April 29th. It was a sham and disgrace to the judicial system being perpetrated upon me by the R.J.Reynolds attorneys. When we last saw you on April 5th, the Reynolds people brought up that I had filed bankruptcy in 2010 which was discharged in December, that year. They cited a case called Ah Quin which set a standard to determine whether to apply judicial estoppel and reopen the bankruptcy, due to their assertion that I had failed to include my lawsuit against RJR as an asset. I'm sending you a copy of the outcome which shows that a woman in Hawaii had sued her former employer for "Workplace discrimination" and WILLFULLY omitted in her bankruptcy petition that fact. She later admitted it, and her bankruptcy was reopened. I did not willfully omit this RJR case, I did not know nor to this day have I heard or seen written anything that says an open lawsuit with no current activity must be declared as an asset!

    As of June, 2010 our case against Reynolds had languished on the record without much if any action. We had no idea that it might ever amount to anything and considered it null of value, then, and it still is. Now, although the findings of that Ah Quin suit DO NOT have any similarity to my situation, Ms. Parker, the "speaker" for the Reynolds group, told Judge Rouse that they had reached a settlement with the Trustees and that my suit should be dismissed! This is a total farce and travesty of justice! Judge Rouse didn't know what to do and delayed everything, turning it back to

you (I think. I could barely hear what was going on and nobody seemed to care.) Ms. Parker is an underhanded, reprehensible person and I told them all they should be ashamed of themselves. Mr. Willie Gary was there with me and he had wanted to submit a Motion to add Wrongful Death to our suit, but he was over-ridden by all of this sudden turn of events. They even told him he was no longer representing me!

But please read what the Court said:

*"The Court opined that judicial estoppel requires an inquiry into a plaintiff-debtors' subjective intent at the time of initiating the bankruptcy proceeding to determine whether the initial incomplete filing was truly inadvertent or mistaken, as those terms are commonly understood; and The Court reasoned that <u>without a specific finding that the plaintiff-debtor's omission  was not mistaken or inadvertent,</u> judicial estopple should not apply."*

*The decision of the Ninth Circuit in Ah Quin  was unexpected because it differed from the holdings in most other Circuits, <u>in particular the decision eliminates the presumption of deceit from plaintiff-debtors who claim that their failure to list pending lawsuits in their schedules was due to inadvertence or mistake,</u> and seek to reopen their bankruptcy cases and amend their schedules. (That was done by my attorneys.) The last paragraph of this states: Ultimately, both creditors and the debtor may benefit if the court permits the lawsuit to proceed because any judgment obtained will be used to satisfy creditors' claims, with any surplus being distributed to the debtor. Under the majority rule, however, the Defendant wrongdoer is the only party that benefits because judicial estoppel will most likely bar the omitted lawsuit.*
This is what Reynolds is hoping for and Ms. Parker already mentioned that they would submit a Motion to dismiss the suit! Now there are two Trustees standing in my stead, with whom Reynolds claim they have reached a settlement agreement WITHOUT ME!

       Your Honor, the Reynolds group has had 9 years to respond to our lawsuit and now they are coming up with these last-minute tactics to try to discredit me and leave me out in the cold! We had been set for May 9th to begin a trial, and they now know that we have ample evidence that my late husband, Donald Barber, smoked cigarettes for 31 years, and suffered the consequences for the rest of his life from nicotine poisoning!  I think they are afraid of losing, and thus desperately trying to get out of the trial. What can we do? The Trustees have given my former creditors until sometime in July to respond , but NO ONE showed up at the meeting of creditors in 2010 and most of those debts have been written off. I beg the mercy of the Court in this abuse of the judicial system! Thank you.

                                        *Suzanne Barber*

# Exhibit J

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT,
IN AND FOR VOLUSIA COUNTY, FLORIDA

DONALD BARBER and
SUZANNE BARBER, his wife,                    CASE NO.  2008-30102-CICI

     Plaintiffs,

vs.

R.J. REYNOLDS TOBACCO
COMPANY, *et. al.*,

     Defendants.
_____/

## PLAINTIFF, DONALD BARBER'S, ANSWERS TO DEFENDANT LORILLARD TOBACCO COMPANY'S FIRST SET OF INTERROGATORIES

COMES NOW, Plaintiff, Donald Barber, by and through undersigned counsel, and pursuant to the Florida Rules of Civil Procedure, and hereby answers Defendant, Lorillard's, First Set of Interrogatories served on May 23, 2008.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished this 4 day of January 2012  via US mail to counsel on the following service list:

Respectfully submitted,

Charles E. Emanuel, Esquire
Florida Bar No.: 0913391
**Willie E. Gary, Esquire**
Florida Bar No.: 187843
**GARY, WILLIAMS, FINNEY, LEWIS,
   WATSON & SPERANDO, P. L**
221 S. Osceola Street
Stuart, FL 34994
Ph.: (772) 283-8260
Fax: (772) 283-4996
*Attorneys for Plaintiffs*

SERVICE LIST

*Attorneys for Defendants Liggett Group,*
*LLC., and Vector Group Ltd.:*
Kelly Anne Luther, Esquire
Maria H. Ruiz, Esquire
Giselle Gonzalez Mansuer, Esquire
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
1441 Brickell Plaza, Suite 1420
Miami, Florida 33131
(305) 377-1666
(305) 377-1664 facsimile

*Attorneys for Defendant Lorillard Tobacco*
*Company:*
Dawn Giebler-Millner, Esquire
Michelle L. Johnson, Esquire
GREENBERG TRAURIG, P.A.
450 S. Orange Ave., Suite 650
Orlando, Florida 32801
(407) 420-1000
407) 841-1295 facsimile
*and*
David L. Ross, Esquire
Marlene K. Silverman, Esquire
Sabrina R. Ferris, Esquire
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
(305) 579-0500
(305) 579-0717 - Facsimile

*Attorneys for Defendants Lorillard*
*Tobacco Company and Philip Morris USA,*
*Inc.*
Kenneth J. Reilly, Esquire
Rafael Cruz-Alvarez, Esquire
Stacey A. Koch, Esquire
Shook, Hardy & Bacon, LLP
201 South Biscayne Blvd., Suite 2400
Miami, Florida 33131
(305) 358-5171
(305) 358-7470 - Facsimile

*Attorneys for Defendant R.J. Reynolds*
*Tobacco Company:*
Benjamin H. Hill, Esquire
Troy A. Fuhrman, Esquire
R. Craig Mayfield
HILL, WARD, & HENDERSON, P.A.
101 East Kennedy Boulevard, Suite 3700
P.O. Box 2231
Tampa, FL 33601
(813) 221-3900
(813) 221-2900 - Facsimile
*and*
Stephanie E. Parker, Esquire
John F. Yarber, Esquire
John M. Walker, Esquire
Jones Day
1420 Peachtree St., N.E. Ste. 1800
Atlanta, GA 30309-3053
(404) 521-3939
(404) 581-8330 - Facsimile

*Attorneys for Defendant Philip Morris*
*USA, Inc.:*
Daniel F. Molony, Esquire
Bonnie C. Daboll, Esquire
Talibah A. Jaffree, Esquire
C. Ryan Jones, Esquire
Terri L. Parker, Esquire
SHOOK, HARDY & BACON, L.L.P.100 N.
Tampa Street, Suite 2900
Tampa, Florida 33602
(813) 202-7100
(813) 221-8837 - Facsimile

the extent Plaintiff can recall, Plaintiff states the following: I made a claim for unemployment benefits in 1984 after I lost my job with WMOD TV station in Melbourne, Florida, because the station was sold. I do not remember the amount, but I received several weeks' pay, probably the limit they paid at the time, approximately $100 per week or less. I have been on Medicare since 1995, but turned that over to Humana when I signed up with them, so all my medical claim payments go to them. I am on Social Security now, and I receive $1,061 per month as of 2008.

**INTERROGATORY NO. 18**: State the brand names of all tobacco products you have ever used and identify the dates and length of time that you used each brand and product.

**ANSWER**: Plaintiff objects to this interrogatory to the extent it is overly broad, not limited in time and scope and unduly burdensome. Subject to and without waiving said objections, and to the extent Plaintiff can recall, Plaintiff states the following:

1.      Old Gold, 1 to 1-1/2 packs per day, 1940 to 1946.

2.      Chesterfield, 1 to 1-1/2 packs per day, 1946 to 1969.

3.      Lucky Strike, 1 to 1-1/2 packs per day, 1951, occasionally.

4.      Salem, 1 to 1-1/2 packs per day, 1969 to 1972.

5.      Camel, occasionally.

6.      Kool, occasionally.

**INTERROGATORY NO. 19**: State the brand names of all tobacco products smoked by you prior to November 21, 1996 that you contend caused the injuries *identified in your response to Interrogatory No. 10.*

**ANSWER**: Plaintiff objects to this interrogatory to the extent it is overly broad and calls for an expert opinion. Subject to and without waiving general and said objections, Plaintiff states the

20

# Exhibit K

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR VOLUSIA COUNTY
CIVIL DIVISION


Suzanne Barber, Individually
and as Personal representative
of the estate of DONALD BARBER,

      Plaintiffs,

                              Case No. 2008-30102-CICI

vs.

R. J. REYNOLDS TOBACCO
COMPANY, et al,

      Defendants.
_____/



    VIDEOTAPED
    DEPOSITION OF:     SUZANNE BARBER

    DATE:              March 10, 2016

    TIME:              9:00 a.m. to 2:48 p.m.

    PLACE:            Hilton Daytona Beach Resort
                    100 North Atlantic Avenue
                    Daytona Beach, Florida

    PURSUANT TO:      Notice by counsel for
                    Defendants for purposes of
                    discovery, use at trial
                    or such other purposes
                    as are permitted under
                    the Florida Rules
                    of Civil Procedure

    BEFORE:           Nathan F. Perkins, RDR
                    Notary Public, State of
                    Florida at Large


                    Volume 1
                    Pages 1 to 187

```
 1   APPEARANCES:

 2      GLENN CRICKENBERGER, ESQUIRE
        CHARLES L. SCOTT, JR., ESQUIRE
 3      Gary, Williams, Parenti, Watson & Gary, P.L.L.C.
        Waterside Professional Building
 4      221 S.E. Osceola Street
        Stuart, Florida 34994
 5          Attorney for Plaintiffs

 6      BRADLEY W. HARRISON, ESQUIRE
        Jones Day
 7      North Point
        901 Lakeside Avenue
 8      Cleveland, Ohio 44114-1190
            Attorney for Defendant R. J. Reynolds Tobacco
 9          Company Individually and as successor-by-merger
            to Lorillard Tobacco Company
10
        W. EDWARDS MUNIZ, ESQUIRE
11      Shook, Hardy & Bacon, L.L.P.
        100 North Tampa Street
12      Suite 2900
        Tampa, Florida 33602-58-1
13          Attorney for Defendant Philip Morris USA Inc.

14
     VIDEOGRAPHER:  MICHAEL HEINY
15

16
                      I N D E X
17
     DIRECT EXAMINATION BY MR. HARRISON        Page    4
18
     CERTIFICATE OF OATH                       Page  185
19
     REPORTER'S CERTIFICATE                    Page  186
20
     WITNESS' SIGNATURE PAGE                   Page  187
21

22

23

24

25
```

1    filled that form out, you didn't correct your

2    husband's --

3         A.   I didn't.

4         Q.   -- packs per day, correct?

5         A.   I could not know that.  And how could I

6    correct it?

7         Q.   If you look at Exhibit 3, those appear to be

8    the doctor's notes from the May 2005 visit, correct?

9         A.   Yeah.  That's the same thing.

10        Q.   Okay.  So the physician reports that Mr.

11   Barber reported that he was a half-a-pack-per-day

12   smoker, correct?

13        A.   Yeah.  It's the same thing as this other one.

14        Q.   And to be sure, both records report that Mr.

15   Barber had long ago quit smoking, in 1972, correct?

16        A.   Right.

17        Q.   And that is consistent with your recollection

18   that your husband quit smoking in 1971 or 1972, correct?

19        A.   Correct.

20        Q.   And after your -- Mr. Barber quit smoking in

21   1971 or 1972, he never smoked a cigarette again,

22   correct?

23        A.   Correct.  Who gets this?

24             MR. CRICKENBERGER:  The court reporter will

25        hold on to it.

1    was it 1971 or 1972, to the best of your recollection?

2         A.   Well, he was quitting in '71, we got married

3    in February of '72.  So I'm just going to say yes, he

4    had quit by 1972.

5         Q.   Okay.  So for our purposes -- so I don't want

6    to get confused whether it was late 1971 or early 1972.

7    We can agree that your husband was a nonsmoker when you

8    got married, correct?

9         A.   I believe he was.

10        Q.   Okay.  And that was, you said, February of

11   1972?

12        A.   Correct.

13        Q.   Okay.  He may have quit sometime before that,

14   be it in early '72 or later in 1971, but certainly by

15   the time you were married --

16        A.   Yes.

17        Q.   -- it's your understanding he was a

18   nonsmoker --

19        A.   Correct.

20        Q.   -- correct?  How did Mr. Barber quit smoking?

21        A.   I don't know.

22        Q.   Safe to say that one day you noticed he just

23   wasn't smoking any longer?

24        A.   Maybe.  I really don't remember that.

25        Q.   Did he talk to you about his methods or how he

1    television personality for a show sponsored by --

2         A.    No, that was radio.

3         Q.    Excuse me.  Let me correct that then.  Your

4    husband was the host of a radio show sponsored by

5    Liggett, which is the manufacturer of Chesterfield

6    cigarettes, correct?

7         A.    Yes.

8         Q.    That show was promoted and sponsored by the

9    maker of Chesterfield cigarettes, correct?

10        A.    Correct.

11        Q.    That show was in part to promote Chesterfield

12   cigarettes, correct?

13        A.    Yes.

14        Q.    Your husband was engaged in that show as a

15   radio personality, correct?

16        A.    Yes.

17        Q.    Do you therefore agree that your husband was

18   engaged in the promotion of Chesterfield cigarettes?

19        A.    I don't think he ever personally did a

20   commercial for them, just that the sponsor was

21   Chesterfield.  I don't know that he ever spoke for them

22   as far as buy this package of cigarettes.  I do not know

23   that.  To my knowledge, he never advertised cigarettes

24   as one of the commercials he did.  And he did a hundred

25   and some many commercials for other brands -- I mean,

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR VOLUSIA COUNTY
CIVIL DIVISION


Suzanne Barber, Individually
and as Personal representative
of the estate of DONALD BARBER,

     Plaintiffs,

                            Case No. 2008-30102-CICI

vs.

R. J. REYNOLDS TOBACCO
COMPANY, et al,

     Defendants.

   _____/



| | |
|---|---|
| CONTINUED VIDEOTAPED DEPOSITION OF: | SUZANNE BARBER |
| DATE: | March 11, 2016 |
| TIME: | 10:17 a.m. to 1:11 p.m. |
| PLACE: | Hilton Daytona Beach Resort 100 North Atlantic Avenue Daytona Beach, Florida |
| PURSUANT TO: | Notice by counsel for Defendants for purposes of discovery, use at trial or such other purposes as are permitted under the Florida Rules of Civil Procedure |
| BEFORE: | Nathan F. Perkins, RDR Notary Public, State of Florida at Large |

Volume 2
Pages 188 to 303

```
 1    APPEARANCES:

 2      GLENN CRICKENBERGER, ESQUIRE
        Gary, Williams, Parenti, Watson & Gary, P.L.L.C.
 3      Waterside Professional Building
        221 S.E. Osceola Street
 4      Stuart, Florida 34994
            Attorney for Plaintiffs
 5
        BRADLEY W. HARRISON, ESQUIRE
 6      Jones Day
        North Point
 7      901 Lakeside Avenue
        Cleveland, Ohio 44114-1190
 8          Attorney for Defendant R. J. Reynolds Tobacco
            Company Individually and as successor-by-merger
 9          to Lorillard Tobacco Company

10      W. EDWARDS MUNIZ, ESQUIRE
        Shook, Hardy & Bacon, L.L.P.
11      100 North Tampa Street
        Suite 2900
12      Tampa, Florida 33602-58-1
            Attorney for Defendant Philip Morris USA Inc.
13
      VIDEOGRAPHER:  MICHAEL HEINY
14

15
                       I N D E X
16
```

```
17    CONT'D DIRECT EXAMINATION BY MR. HARRISON    Page  192

18    CROSS-EXAMINATION BY MR MUNIZ                Page  293

19    CROSS-EXAMINATION BY MR. CRICKENBERGER       Page  297

20    REDIRECT EXAMINATION BY MR. HARRISON         Page  298

21    CERTIFICATE OF OATH                          Page  301

22    REPORTER'S CERTIFICATE                       Page  302

23    WITNESS' SIGNATURE PAGE                      Page  303
```

```
24

25
```

Page 255

1    separately.

2         A.   Okay.

3         Q.   There was previously the Engle Trust Fund.  Do

4    you understand that?  Correct?

5         A.   Yes.

6         Q.   We'll talk about the Liggett settlement that

7    you reached in a bit.  Put that aside.

8         A.   Okay.

9         Q.   The Engle Trust Fund, you said under $10,000.

10   How much money did you receive?

11        A.   I don't remember exactly.  It was in little

12   increments.

13        Q.   Okay.  It is true that you also reached a

14   settlement in this case with Liggett & Myers, correct?

15        A.   I didn't know -- I guess it was part of this

16   case.  I wasn't sure.  You know, he signed "et al,"

17   which includes a lot of people, I guess.

18        Q.   You understand that when you instituted this

19   lawsuit, in addition to the defendants that are

20   currently in the lawsuit, you had also sued a company

21   Liggett & Myers, correct?

22        A.   Yes, I guess so.

23        Q.   You understand that that is the manufacturer

24   of Chesterfield cigarettes, correct?

25        A.   Yes, yes.

1      Q.   And, in fact, you have reached a settlement

2   with Liggett in this case, correct?

3      A.   Yes.

4      Q.   When -- and you have made a settlement claim

5   for -- to receive funds, correct?

6      A.   Yes.

7      Q.   When did you make a settlement claim?

8      A.   After my husband died.

9      Q.   So sometime after 2012?

10     A.   Right.

11     Q.   Did you receive any funds?

12     A.   Yes.

13     Q.   How much money have you received from Liggett

14   & Myers in this case?

15     A.   Very little.

16          MR. CRICKENBERGER:  That's --

17   BY MR. HARRISON:

18     Q.   How much?

19     A.   I'm not going to tell you.

20          MR. CRICKENBERGER:  Yeah.

21   BY MR. HARRISON:

22     Q.   You understand that the defendants have served

23   upon you interrogatories that were served on February

24   17th of this year, correct?

25     A.   Yes.

Page 259

1          identification.)

2     BY MR. HARRISON:

3          Q.   I'm handing you what's marked as Exhibit 23.

4     Defendant Philip Morris USA, Inc.'s Service of First Set

5     of Request for Production to Suzanne Barber.

6               You see at the top it is e-filed 2/17/2016.

7     Let me ask you, have you seen this document before?

8          A.   Is that the same?  No, it's different.

9               No, I haven't gotten anything from Philip

10    Morris.  That's why I was surprised he was even here.

11         Q.   You see that the request for production lists

12    out a number of categories of documents that you were

13    requested to produce in this action, correct?

14         A.   Well, I'm just now seeing it.

15         Q.   You haven't taken any action to identify

16    document that would be responsive to these requests, I

17    assume, correct?

18         A.   Well, no.  I wasn't aware of it at all.

19         Q.   You do understand and accept that you have

20    dismissed Liggett & Myers from this lawsuit, correct?

21         A.   Yes.

22         Q.   You understand that Liggett & Myers, the

23    manufacturer of Chesterfield cigarettes, is not a

24    defendant in this case, correct?

25         A.   Yes.

1          Q.   That was a decision that you made to release

2     Liggett, correct?

3          A.   Yes, at the insistence of my attorneys.

4          Q.   While we are talking about discovery requests,

5     I want to turn to the discovery requests that were

6     recently served by R. J. Reynolds.

7          A.   Okay.  That's the ones I answered.

8               MR. HARRISON:  Let's mark this.

9               (Exhibit 24, Defendant R. J. Reynolds Tobacco

10              Company's First Interrogatories to Plaintiff

11              Suzanne Barber, and Exhibit 25, Defendant R. J.

12              Reynolds Tobacco Company's First Request for

13              Production to Plaintiff Suzanne Barber, were marked

14              for identification.)

15              THE WITNESS:  Which were duplicate of ones

16              that my husband had answered in 2008.

17    BY MR. HARRISON:

18         Q.   Ms. Barber, I'm going to hand you Exhibits 24

19    and 25.

20         A.   Okay.

21         Q.   Let me ask you, have you seen these documents

22    before?

23         A.   Yes.  I believe it's the one I answered.

24         Q.   Okay.  These were served on February 23rd of

25    2016.  Does that comport with your understanding?

# Exhibit L

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

CASE NO.:  2013-CA-005673-NC

GEORGE J. DION, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
MARION T. DION,

PLAINTIFF,

VS.

R.J. REYNOLDS TOBACCO COMPANY,
ET AL.,

DEFENDANTS.
_____/

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

VOLUME 20 (PAGES 3086 - 3287)

DATE TAKEN:  TUESDAY, MAY 10, 2016
TIME:        1:15 P.M.
PLACE:       JUDGE LYNN N. SILVERTOOTH
             JUDICIAL CENTER
             2002 RINGLING BLVD.
             SARASOTA, FL 34237
BEFORE:      DIANA L. MORELAND, CIRCUIT JUDGE


THIS CAUSE CAME ON TO BE HEARD AT THE TIME AND
PLACE AFORESAID, WHEN AND WHERE THE FOLLOWING
PROCEEDINGS WERE STENOGRAPHICALLY REPORTED BY:

TAMARA A. JENKINS, RPR, RMR, CLR, FPR
CERTIFIED REALTIME REPORTER

a112108d-bfdc-4b48-8dc2-30520ec3c49a

3087

1    APPEARANCES:

2    ON BEHALF OF PLAINTIFF:

3         WILLIAM J. WICHMANN, P.A.
          12 SOUTHEAST 7TH STREET
4         SUITE 609
          FT. LAUDERDALE, FL 33301
5         (954)522-8999
          BY:   WILLIAM J. WICHMANN, ESQ.
6         WWICHMANN@ICLOUD.COM

7         ENGSTROM, LIPSCOMB & LACK
          10100 SANTA MONICA BLVD.
8         12TH FLOOR
          LOS ANGELES, CA 90067
9         (310)552-3800
          BY:   MARK E. MILLARD, ESQ.
10        MMILLARD@ELLLAW.COM
          BY:   BRYAN C. PAYNE, ESQ.
11        BPAYNE@ELLLAW.COM

12

13   ON BEHALF OF R.J. REYNOLDS TOBACCO COMPANY:

14        JONES DAY
          1420 PEACHTREE STREET
15        SUITE 800
          ATLANTA, GA 30309
16        (404)581-8206
          BY:   JOHN M. WALKER, ESQ.
17        JWALKER@JONESDAY.COM
          BY:   JACK WILLIAMS, ESQ.
18        JMWILLIAMS@JONESDAY.COM
          BY:   JENNIFER L. WEIZENECKER, ESQ.
19        JWEIZENECKER@JONESDAY.COM

20

21   ALSO PRESENT:

22   GEORGE DION

23

24

25

a112108d-bfdc-4b48-8dc2-30520ec3c49a

3088

1              I N D E X

2    PROCEEDINGS                                  PAGE

3            VOLUME 20 (Pages 3086 - 3287)

4

5    PLAINTIFF EXHIBITS ENUMERATED FOR THE        3090
     RECORD
6

7    DEFENSE MOTIONS FOR DIRECTED VERDICT         3092

8    CHARGE CONFERENCE                            3101

9    DEFENSE EXHIBITS ENUMERATED FOR THE RECORD   3109

10   MORTALITY TABLES PUBLISHED                   3114

11   PLAINTIFF RESTS                              3115

12   DEFENSE RESTS                                3117.

13   INSTRUCTIONS BY THE COURT                    3117

14   CLOSING STATEMENT    - MR. WICHMANN          3134

15   CLOSING STATEMENT    - MR. MILLARD           3176

16   CLOSING STATEMENT    - MR. WALKER            3200

17   REBUTTAL STATEMENT   - MR. WICHMANN          3269

18

19        PLAINTIFF EXHIBITS MARKED IN EVIDENCE

20                                                PAGE

21

22   Plaintiff Exhibit ATS00731                   3115

23

24

25

a112108d-bfdc-4b48-8dc2-30520ec3c49a

3137

1          FOLKS, WE TALKED ABOUT CLASS MEMBERSHIP
2     AND WHAT THE PLAINTIFF HAS TO PROVE TO BE AN
3     ENGLE CLASS MEMBER.
4          WOULD YOU PUT UP THE FIRST SLIDE, PLEASE.
5          WELL, THIS GIVES YOU AN IDEA OF WHAT CLASS
6     MEMBERSHIP IS NOT ABOUT.  IT'S NOT ABOUT
7     WHETHER ADDICTED SMOKERS CAN QUIT, BECAUSE THEY
8     CAN.  WE SAW IT IN THIS CASE.
9          AND IT WASN'T UNTIL THE PATCH CAME OUT AND
10    MARION WENT TO HER DOCTOR AND GOT A
11    PRESCRIPTION AND GOT THE NICOTINE REPLACEMENT
12    THERAPY THAT SHE WAS ABLE TO QUIT.
13         IT'S NOT ABOUT THE FAULT OF EITHER PARTY.
14         IT'S NOT ABOUT WHETHER SMOKERS SHARE SOME
15    RESPONSIBILITY.  WE'LL GET TO THAT IN A SECOND.
16         AND IT'S NOT ABOUT RELIANCE ON A STATEMENT
17    FROM THE TOBACCO INDUSTRY.
18         WHAT CLASS MEMBERSHIP IS ABOUT IS THIS:
19         YOU WILL BE GETTING A VERDICT FORM, AND
20    HERE IT IS.  YOU'LL FILL IT OUT, FOLKS, IT'S
21    TWO PAGES, AND THE VERY FIRST QUESTION -- LET
22    ME MAKE SURE I GET THIS RIGHT, BECAUSE I'M NOT
23    SO GOOD WITH THE TECHNOLOGY -- IS:  "WAS MARION
24    DION ADDICTED TO CIGARETTES CONTAINING
25    NICOTINE?  AND, IF SO, WAS SUCH ADDICTION A

a112108d-bfdc-4b48-8dc2-30520ec3c49a

3150

1        WAY OF SOMEONE MAKING A FREE CHOICE.

2            WELL, THE EVIDENCE IN THIS INDICATES IS,

3        IS THAT FOR SURE WHEN SHE WAS 17 SHE WAS

4        SMOKING A PACK AND A HALF A DAY.   SEVENTEEN.

5            YOU HEARD FROM DR. HURT.   YOU DON'T JUST

6        START SMOKING A PACK AND A HALF OF CIGARETTES

7        ONE DAY; YOU HAVE TO BUILD UP TOLERANCE.   YOU

8        HEARD GEORGE TELL YOU, SHE TOLD GEORGE SHE WAS

9        15 WHEN SHE STARTED.   GUESS WHAT?   THAT WAS

10       16 YEARS OR MORE BEFORE THE VERY FIRST LITTLE

11       CAUTION, IN 1967, WAS PUT ON THE PACKAGE OF

12       CIGARETTES.

13           YET THEY WANT TO BLAME THIS 15, 16,

14       17-YEAR-OLD GIRL WHO GREW UP IN THIS CULTURE OF

15       SMOKING, WHOSE MOTHER SMOKED, WHOSE FATHER

16       SMOKED, WHO ALL HER BROTHERS SMOKED, EVERYBODY

17       AROUND HER SMOKED.   DR. CUMMINGS TOLD YOU,

18       BASED ON THE COHORT STUDIES, OVER 50 PERCENT OF

19       GIRLS HER AGE, HIGH-SCHOOL-AGE GIRLS IN AMERICA

20       AT THAT TIME SMOKED.   THERE WERE NO WARNINGS.

21       THERE WAS NOBODY OUT THERE CALLING AND

22       DECLARING:   FULL BLAST!   STOP!   STOP!   NO.

23           AND DR. BRADY SHOWED YOU SCIENTIFICALLY,

24       SCIENTIFICALLY, THROUGH BRAIN STUDIES, WHAT

25       NICOTINE DOES TO THE BRAIN AND HOW IT

a112108d-bfdc-4b48-8dc2-30520ec3c49a

3194

1          ALLOCATE DAMAGES.  HOW DO WE GO ABOUT IT?

2          WHAT'S THE NUMBER?

3                WE ARE ASKING FOR A NUMBER.  WE TOLD YOU

4          IN VOIR DIRE, WE ARE GOING TO ASK FOR A BIG

5          NUMBER.  BUT HOW DO YOU GET THERE?

6                THAT'S A TOUGH JOB.  IT'S YOUR JOB.  I

7          DON'T KNOW.  HOW DO YOU THAT?  OKAY.  YOU HAVE

8          TO FIGURE IT OUT AMONG YOURSELVES.

9                YOU HAVE TO LOOK AT THE EVIDENCE.  YOU

10         HAVE TO FIGURE OUT A WAY THAT MAKES SENSE TO

11         YOU BASED ON THE EVIDENCE AND THE LAW.  WE

12         BELIEVE THE EVIDENCE AND THE LAW BOTH SUPPORT

13         THE FACT THAT A SUBSTANTIAL AWARD IS

14         APPROPRIATE IN THIS CASE.

15               I'M GOING TO TALK A LITTLE BIT ABOUT A

16         COUPLE OF WAYS TO THINK ABOUT IT THAT MIGHT

17         HELP YOU, BUT ULTIMATELY THE DECISION IS YOURS.

18         YOU HAVE TO FIGURE IT OUT.

19               SHE PASSED IN 1994, IT'S BEEN 22 YEARS.

20         HE'S ENTITLED TO RECOVER FOR ALL THAT PERIOD OF

21         TIME AS WELL AS WHATEVER TIME REMAINS IN HIS

22         FUTURE.

23               AND I'LL TELL YOU, IT'S UNCOMFORTABLE FOR

24         ME TO TALK ABOUT HOW LONG HE MIGHT LIVE IN HIS

25         FUTURE, ESPECIALLY WITH HIM IN THE ROOM, BUT,

a112108d-bfdc-4b48-8dc2-30520ec3c49a

3218

1      A BOARD THIS TIME.  I HOPE YOU ALL WILL BE ABLE

2      TO READ THIS.

3             THE COURT:  CAN YOU ALL SEE THAT?

4             MR. WALKER:  IT LOOKS LIKE IT.

5             AND THESE ARE THE THINGS THAT I WILL BE

6      TALKING ABOUT FOR WHAT I WANT TO SAY TO YOU

7      TODAY ABOUT THE EVIDENCE IN THIS CASE.

8             FIRST, THE ENTIRE TIME THAT MRS. DION

9      SMOKED, SHE WAS SURROUNDED BY WARNINGS ABOUT

10     THE HEALTH RISKS AND ADDICTIVE NATURE OF

11     CIGARETTES.  SHE KNEW THE RISKS.

12            TWO, OVER A 40-YEAR PERIOD, SHE PUT DOWN

13     HER CIGARETTES IN AN EFFORT TO QUIT TWICE IN

14     THE '50S AND ONCE IN THE '60S.  QUITTING WASN'T

15     A PRIORITY FOR HER UNTIL THE 1990S.

16            THREE, SHE QUIT WHEN SHE WAS READY AND SHE

17     COULD HAVE QUIT EARLIER.  AND WE'RE REALLY

18     GOING TO TALK ABOUT THAT ONE BECAUSE DR. BRADY

19     ADMITTED SHE COULD HAVE QUIT EARLIER.

20            THINK ABOUT THAT FOR JUST ONE MOMENT.  SHE

21     QUIT SUCCESSFULLY IN THE 1990S.  THEY SAY THAT

22     MRS. DION WAS ADDICTED AND THAT THAT MEANT SHE

23     COULDN'T QUIT.  IF SHE WAS, WELL, WHAT HAPPENED

24     IN THE 1990S?  DID SHE SUDDENLY STOP BEING

25     ADDICTED TO CIGARETTE SMOKING?

a112108d-bfdc-4b48-8dc2-30520ec3c49a

# Exhibit M

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA IN AND FOR POLK COUNTY
CIVIL DIVISION

MARLENE NALLY, as Personal
Representative for the ESTATE
OF JOSEPH NALLY, SR.,

              Plaintiff,        Case No.
                             2007-CA-007627
vs.

R.J. REYNOLDS TOBACCO COMPANY,
et al.,

              Defendants.
_____/


TRIAL PROCEEDINGS BEFORE
THE HONORABLE JOHN M. RADABAUGH,
and a jury


DATE:             May 16, 2016


TIME:             9:00 a.m. to 12:05 p.m.


PLACE:           Polk County Courthouse
                 222 North Broadway
                 Courtroom 7C
                 Bartow, Florida


REPORTED BY:     Nathan F. Perkins, RDR
                 Aaron T. Perkins, RPR
                 Notaries Public, State of
                 Florida at Large


                 Volume 21
                 Pages 2976 to 3123

```
 1    APPEARANCES:

 2

      JAMES D. CLARK, ESQUIRE
 3    DONALD G. GREIWE, ESQUIRE
      Alley, Clark & Greiwe
 4    701 East Washington Street
      Tampa, Florida  33602
 5
              -  and  -
 6
      GEORGE A. VAKA, ESQUIRE
 7    Vaka Law Group, P.A.
      777 South Harbour Island Boulevard
 8    Suite 300
      Tampa, Florida  33602
 9
              -  and  -
10
      BRENT R. BIGGER, ESQUIRE
11    Knopf Bigger
      511 West Bay Drive
12    Suite 450
      Tampa, Florida  33606
13

14            Attorneys for Plaintiff

15

16

17

      APPEARANCES CONTINUED:
18

19

20

21

22

23

24

25
```

1

   APPEARANCES CONTINUED AS FOLLOWS:

2

3
  STEVEN N. GEISE, ESQUIRE
  Jones Day
4
  12265 El Camino Real
  Suite 200
5
  San Diego, California  92130

6
      - and -

7
  EMILY C. BAKER, ESQUIRE
  MICHAEL F. STOER, ESQUIRE
8
  Jones Day
  1420 Peachtree Street, N.E.
9
  Suite 800
  Atlanta, Georgia  30309
10

11
      - and -

12
  CASTEEL E. BORSAY, ESQUIRE
  Jones Day
  325 John H. McConnell Boulevard
13
  Suite 600
  Columbus, Ohio  43215
14

15
      - and -

16
  LINDSEY M. JUMP, ESQUIRE
  Jones Day
  901 Lakeside Avenue
17
  Cleveland, Ohio  44114

18
      Attorneys for Defendant R.J. Reynolds
      Tobacco Company
19

20
  ALSO PRESENT:

21
      Marlene Nally
22
      Ryan Plackemeier (media consultant)
      Jeff Telofski (media consultant)
23

24

25

1                          I N D E X
                                                  PAGE
2

3

     PROCEEDINGS                                  2980
4

5

6

     EXCERPTS OF THE DEPOSITION OF                2990
7      KELLYN E. NALLY WERE READ

8

9

10   CLOSING ARGUMENTS BY MR. BIGGER              3026

11

12

13

     REPORTER'S CERTIFICATE                       3123
14

15

16

17

18                    E X H I B I T S
                                                  PAGE
19              (NONE ADMITTED/RECEIVED)

20

21

22

23

24

25

1     smoked cigarettes, addicted themselves.

2          Smoking was permitted everywhere.  It was the

3     fabric of our lives, and it was always by design

4     and manipulation.

5          Thinking for a second, about a week before

6     Joseph Nally's 13th birthday, we were attacked at

7     Pearl Harbor and America was drawn into World

8     War II.  Young boys like Joe Nally would idolize

9     the brave men of our military serving in World

10    War II.  You can use your common sense to

11    understand that.

12         Meanwhile, Reynolds and its future

13    coconspirators were addicting these same men with

14    cigarettes in their rations, using them as brand

15    ambassadors in their prolific advertisements.

16    These messages were inescapable by anyone going

17    through their adolescence in the 1940s like

18    Joe Nally.

19         They desperately desired to get Joe Nally

20    smoking as a teenager, and they succeeded.  Just

21    like they needed him too, he started smoking

22    regularly around 16 years old.  You heard from

23    some of the evidence, he had his first cigarette

24    around 12 in the movie theater.  As expected and

25    needed, by the time he enlisted in the U.S. Army

1           Excuse me.

2           He smoked a pack to pack-and-a-half a day for

3     those 50 to 60 years, like I showed you on that

4     last slide.  Multiple quit attempts.

5           He used nicotine replacement therapy.  Okay?

6     Patches and gums.  People who aren't addicted

7     don't use nicotine replacement therapy.  That's

8     for people who where addicted.  And the quit

9     attempts before too.  So Mrs. Nally testified,

10    thinking back over all those years, yes, he had

11    multiple quit attempts before.  Could she

12    remember, was she writing down, Okay, this time

13    Joseph Nally, Sr., quit for three days or for a

14    day-and-a-half or for 20 hours.  Of course she

15    wasn't.  Okay?  That's not expected.  She's being

16    asked in a deposition a year ago to remember back

17    40, 50 years and do the best she can.  She said he

18    tried to quit.  There was time when he tried to

19    quit.  Okay?

20          And if your wife didn't like you wearing

21    yellow shirts and said, You know what, Joe?  You

22    just don't look very good in yellow shirts.  Don't

23    wear those anymore.  He's, Okay, I won't wear

24    those anymore.  He'd stop wearing yellow shirts.

25    All right?

1      You can't do that, though, when you're

2 addicted to something.  You can't just stop doing

3 it.  It's different.  So he struggled.  He wanted

4 to quit, but he struggled with it.  And you heard

5 about those quit attempts.

6      Even, you know, unfortunately, he didn't even

7 tell his doctors the truth.  He wasn't telling the

8 doctors.  You heard from the Mrs. Nally, she said,

9 Look, he didn't quit.  He told his doctors he did.

10 And if you look at the records, you will see he's

11 saying he quit in '96, then he's saying in '98,

12 then he's saying in 2000.  The times don't match

13 up.  You can see the inconsistencies in him saying

14 when he quit.  He may have been talking about quit

15 attempts, that I attempted to quit, but he wasn't

16 telling his doctors the truth about that, because

17 Mrs. Nally knows he smoked right up until the end.

18 You know, he's dying of lung cancer and he's

19 smoking.

20      That's an addicted smoker, folks.  That's

21 exactly what their products are designed to do,

22 take them all way to the end.

23      Three hundred doses to the brain every day.

24 If it was 300 bumps of cocaine or 300 shots, would

25 there be any question?  Of course not.  But that's

# Exhibit N

```
          IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
          OF THE STATE OF FLORIDA, IN AND FOR HILLSBOROUGH COUNTY
                              CIVIL DIVISION


       IN RE:  ENGLE PROGENY CASES
       TOBACCO LITIGATION
                                         Case No. 07-CA-017632
       Pertains to:  JAMES C. MCCABE as
       Personal Representative for the       Division J
       Estate of DOROTHY J. MCCABE

       _____/



                        TRIAL PROCEEDINGS BEFORE
                    THE HONORABLE RONALD N. FICARROTTA,
                              and a jury



            DATE:             May 18, 2016


            TIME:             8:21 a.m. to 11:41 a.m.


            PLACE:            800 East Twiggs Street
                              Courtroom 1
                              Tampa, Florida


            BEFORE:           Valerie A. Hance, RPR
                              Notary Public, State of
                              Florida at Large



                              Volume 32
                              Pages 4084 to 4234
```

```
 1    APPEARANCES:

 2        MICHAEL J. TRENTALANGE, ESQUIRE
          Trentalange & Kelley, P.A.
 3        218 North Dale Mabry Highway
          Tampa, Florida  33609
 4
                  -and-
 5
          HENDRIK UITERWYK, ESQUIRE
 6        PAUL E. BERG, ESQUIRE
          Abrahamson & Uiterwyk
 7        900 West Platt Street
          Suite 100
 8        Tampa, Florida  33606

 9                -and-

10        ANNA FREDERIKSEN-CHERRY, ESQUIRE
          Vaka Law Group
11        777 South Harbour Island Boulevard
          Suite 300
12        Tampa, Florida  33602
                  Attorneys for Plaintiff
13

14

15

16

17    CONTINUED:

18

19

20

21

22

23

24

25
```

```
1    APPEARANCES CONTINUED AS FOLLOWS:

2        MARK A. BELASIC, ESQUIRE
         MICHAEL S. QUINLAN, ESQUIRE
3        Jones Day
         901 Lakeside Avenue
4        North Point
         Cleveland, Ohio  44114-1190
5
                 -and-
6
         EDWARD M. CARTER, ESQUIRE
7        Jones Day
         325 John H. McConnell Boulevard, Suite 600
8        Columbus, Ohio  43216
                 Attorneys for R.J. Reynolds Tobacco Company
9

10   ALSO PRESENT:

11       James McCabe
         Baron Philipson
12       Tammy Theriot

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               I N D E X

2    PROCEEDINGS(CONTINUED)              Page 4088

3    JURY CHARGE                        Page 4100

4    CLOSING ARGUMENT FOR THE PLAINTIFF  Page 4117
     (By Mr. Trentalange)
5
     DEFENSE MOTION FOR MISTRIAL        Page 4177
6
     CLOSING ARGUMENT FOR THE DEFENSE   Page 4198
7    (By Mr. Belasic)

8    REPORTER'S CERTIFICATE             Page 4234

9

10               E X H I B I T S

11   PLAINTIFF'S EXHIBITS:

12        Description                    Marked

13   1745   Corrected to 4725-A         Page 4088

14

15

16

17

18

19

20

21

22

23

24

25

1    McCabe was highly addicted.

2         And that's really consistent with common sense,

3    right?  She started smoking cigarettes, the

4    testimony is, between the ages of eight -- I'm

5    sorry -- 11 and 14.  By 14, high school, she was a

6    persistent daily smoker.

7         We know that nicotine made structural changes

8    in her brain that made it more likely for her to

9    keep smoking and harder for her to quit.  She smoked

10   two to two-and-a-half packs of cigarettes a day for

11   50-plus years.  She was exposed to millions of doses

12   of nicotine.  Each cigarette contains about ten

13   puffs.  That's -- each puff is a dose of nicotine.

14   She took in millions of doses of nicotine over the

15   years.

16        It would be foolish to say that somebody that

17   took in millions of doses of cocaine or heroin over

18   the course of 50 years wouldn't be addicted.  It's

19   just implausible that somebody that took in millions

20   of doses of nicotine in the form of a cigarette over

21   50-plus years is not addicted.

22        In this photo, she was already a persistent

23   daily smoker.  She smoked first thing in the

24   morning.  She smoked in bed.  She kept an ashtray by

25   her bed.  She got up to smoke in the middle of the

1    night.  She smoked while she was pregnant with her

2    children.  She was caught smoking at the convent.

3    She barely made it through church services.  You

4    heard about how she was fumbled and was preparing

5    her cigarettes and her matches when she went out the

6    door.  And she chain smoked, according to people

7    that were in a position to observe her chain

8    smoking.  People that weren't there obviously didn't

9    see that.  But remember, absence of evidence is not

10   evidence of absence.  Somebody's not in China, it

11   doesn't mean China doesn't exist.  Can't see China

12   from here, but China exists.  We know it from other

13   people.  We know from the people who were in the

14   position to see her chain smoking that she chain

15   smoked.

16        This is her when she was a nurse in Orlando at

17   Orange Memorial Hospital.

18        There are other genetic factors that

19   predisposed her to smoking and addiction.  She had

20   first-degree relatives who smoked.  They want to

21   talk about the fact that she had a father and

22   uncles.  Well, her father smoking genetically

23   predisposed her to starting and continuing and being

24   addicted to nicotine.

25        Remember, she needed a nicotine patch to quit,

1    and the nicotine patch wasn't available until 1992.

2         Romayne McCabe.  She's kind of almost a double

3    for Jane McCabe.  This is the lady that was with her

4    when she was a young smoker.  She went to school

5    with her.  She's a year older than Ms. McCabe.  And

6    she'll tell you that she smoked and she considered

7    herself addicted, and she considered her good friend

8    to be addicted, too.

9         (The videotaped trial testimony clip of Romayne

10   McCabe was published to the jury in open court as

11   follows:)

12        "Q.  Did you personally feel like you were

13   addicted?

14        A.  Yes.

15        Q.  Why did you feel like you were addicted?

16        A.  Because I wanted a cigarette first thing in

17   the morning and craved for cigarettes during the

18   day.

19        Q.  All right.  And did that ever go away?

20        A.  No.

21        Q.  Up until the time you quit, which we're

22   going to discuss later on, did you feel you yourself

23   were addicted?

24        A.  Yes.

25        Q.  Now, from your vantage point of lifelong

1    reasonable medical probability or certainty, that

2    lung cancer was -- that cigarettes were the cause of

3    her lung cancer."

4         (The videotaped trial testimony clip

5    concluded.)

6         MR. TRENTALANGE:  So we know she had cancer.

7    We know that cigarettes caused her lung cancer.  You

8    have not heard any contrary testimony from anybody

9    in this case.

10        She presented to the hospital in August of

11   1995.  And Dr. Schiff told you they did what they

12   do.  Somebody comes in.  They've got a productive

13   cough.  He took down the history.  Basically, what's

14   going on, Ms. McCabe?  What brings you here?  She

15   had a cough.  She was coughing up blood before she

16   came.  It had stopped at the time of her

17   presentation.  So what do they do?  They looked at

18   her.  She had a large pleural effusion, in a patient

19   with greater than a hundred pack-years of smoking.

20        So these are doctors.  And even though this is

21   1995, and a year earlier cigarette heads had denied

22   addiction and denied the causal link between -- they

23   were still denying that cigarettes cause cancer in

24   1995.  Okay?  But the doctors knew by 1995, and they

25   didn't have any interest.  So they looked at this.

1    You know, when you hear hoof beats, think horses,

2    not zebras.  Somebody smokes cigarettes for 50 years

3    and she's got something, a foreign object in her

4    lungs, got to -- first thing we got to worry about

5    is whether or not this is a malignancy, whether or

6    not this is cancer.  So that's what they do.

7        And you heard that she went through a

8    bronchoscopy, because they go from least invasive to

9    most invasive.  The bronchoscopy wasn't

10   determinative.  She ended up having to have this

11   operation, a thoracotomy.  They go in, spread your

12   ribs, take out a piece of your lung.  They did that

13   with her.  It's called a biopsy.  There was a frozen

14   section that's done intraoperatively, and it

15   revealed a large cell carcinoma.  That's the cell

16   type.

17       They sent that to pathology, and it came back

18   consistent with a diagnosis of poorly differentiated

19   adenocarcinoma.  That's a smoking cancer.  And

20   that's what she had.  And that's what caused it.

21       She went on to develop metastasis.  Now,

22   Dr. Schiff reminded us -- and as soon as he did, the

23   next witness, one of the daughters, broke his rule.

24   Cancer gets its name from where it starts.  So she

25   didn't have brain cancer.  She had lung cancer that

1    metastasized or spread to her brain.  So don't be

2    confused by that when you get instructed about

3    whether or not she had lung cancer.  If somebody

4    says, No, she had brain cancer and she had bone

5    cancer, remind them that cancer gets its name from

6    where it starts.  And even though it spread to her

7    bone, it's still lung cancer.  It's metastatic lung

8    cancer in the bone.  If somebody says, No, she had

9    brain cancer, remind them it's metastatic cancer

10   from the lung that spread to the brain.  Okay?  And

11   that's what Dr. Schiff said.  There is no contrary

12   evidence.  That's not disputed by anyone.  Cancer

13   that starts in the lung and spreads somewhere else

14   retains its name, even though laymen, including

15   myself, sometimes get confused by that.

16        So it spread to the brain.  She decided that

17   she was going to forego invasive or drastic

18   treatment because, basically, she had a death

19   sentence.  She tried some experimental treatment in

20   Mexico.  And she's within her right to do that.

21   Desperate people do desperate things.  And she was a

22   little bit desperate.  She didn't want to die.  But

23   she knew that chemo and radiation was going to be

24   brutal.  She was a nurse.  She was familiar with it.

25   And she chose not to undergo it.  And everybody in

1     this case, I think, agrees that we've got to respect

2     that choice.

3         But she ended up dying 11 months after her

4     first diagnosis.  And the death certificate that's

5     in evidence tells you she had adenocarcinoma of the

6     lung and metastatic cancer.  That's just what the

7     witnesses told you.  That's just what I went over.

8         So we know that she died of lung cancer, and we

9     know that the lung cancer was caused by cigarette

10    smoking.

11        So did addiction to cigarettes containing

12    nicotine cause or contribute substantially to

13    Jane McCabe's lung cancer and death?  Let's hear

14    from Dr. Cummings on generally how you make that

15    call.

16        (The videotaped trial testimony clip of Kenneth

17    Michael Cummings, Ph.D., was published to the jury in

18    open court as follows:)

19        "Q.  And, Doctor, I want you to assume that

20    there's a medical doctor who will give medical

21    testimony that smoking caused lung cancer.  Okay?

22        A.  Okay.

23        Q.  And I just want you to explain to the jury,

24    in general -- just in general, if you could explain

25    how addiction is a cause of lung cancer and death in

1   even more specific.  They had no effect on her.

2       And in '93, she quit smoking and she never

3   smoked again.

4       Now, at any time in that chain of events, she

5   could have quit smoking.  That's what Dr. Barnett,

6   who's seen hundreds or thousands of substance abuse

7   patients, not just the one, she told you that she

8   had seen up to hundreds or thousands of substance

9   abuse patients, hundreds of patients with smoking

10  issues.  And, yes, only one person came in and said,

11  that's the only thing I want.

12      That's the only board certified addiction

13  professional medical doctor in this case.  And she

14  told you quite frankly, she has received cases from

15  tobacco companies where she says, this smoker is

16  addicted.  You heard that testimony.

17      In the instructions that you'll get, you'll

18  have the written copy.  It says -- right off the

19  bat, there's an instruction on legal product.  And,

20  obviously, making cigarettes is legal, selling

21  cigarettes is legal, and advertising cigarettes is

22  legal.

23      And the judge is instructing you, Reynolds

24  cannot be held liable -- that means forced to pay

25  money -- merely for manufacturing, selling, or

# Exhibit O

STATE OF FLORIDA
OFFICE of VITAL STATISTICS
CERTIFIED COPY

CERTIFICATE OF DEATH
FLORIDA

| | | | |
|---|---|---|---|
| 1 DECEDENT'S NAME | FIRST MARION | MIDDLE | LAST DION |

2 SEX: Female

3 DATE OF DEATH (Month, Day, Year) 1994
4 SOCIAL SECURITY NUMBER
5a AGE Last Birthday 61
6 DATE OF BIRTH 1932
7 BIRTHPLACE: Lawrence, Massachusetts
8 WAS DECEDENT EVER IN U.S. ARMED FORCES: No

9a PLACE OF DEATH: HOSPITAL X Inpatient
9b FACILITY NAME: Venice Hospital
9d CITY, TOWN, OR LOCATION OF DEATH: Venice
9e INSIDE CITY LIMITS: Yes
9c COUNTY OF DEATH: Sarasota

10a DECEDENT'S USUAL OCCUPATION: Supervisor
10b KIND OF BUSINESS/INDUSTRY: Computer Printers
11 MARITAL STATUS: Married
12 SURVIVING SPOUSE: George James Dion

13a RESIDENCE – STATE: Florida
13b COUNTY: Sarasota
13c CITY, TOWN, OR LOCATION: Englewood
13d STREET AND NUMBER: 816 Manchester Court
13e INSIDE CITY LIMITS: No
13f ZIP CODE: 34223
14 HISPANIC ORIGIN: No
15 RACE: White
16 DECEDENT'S EDUCATION: 12

17 FATHER'S NAME: Herbert S. Blackington
18 MOTHER'S NAME: Gladys Anderton

19a INFORMANT'S NAME: George James Dion
19b MAILING ADDRESS: 816 Manchester Court, Englewood, Florida 34223

20a METHOD OF DISPOSITION: X Cremation
20b PLACE OF DISPOSITION: Southeastern Crematory
20c LOCATION: Punta Gorda, Florida

21a SIGNATURE OF FUNERAL SERVICE LICENSEE
21b LICENSE NUMBER: 110280
21c NAME AND ADDRESS OF FACILITY: National Cremation Society, 2751 Tamiami Trail, Port Charlotte, Florida, 33952

22b DATE SIGNED: 10/11/94
22c HOUR OF DEATH: 10:40 P M

24 NAME AND ADDRESS OF CERTIFIER: Stephen V. Orman, M.D., 901 South Tamiami Trail, Venice, Florida 34285

25b LOCAL REGISTRAR – SIGNATURE: Mary K. Breed
25c DATE REGISTERED: Oct 12, 1994

26 PART I
IMMEDIATE CAUSE: Lung Cancer
DUE TO: Bone Metastases
DUE TO: Hypercalcemia

27a WAS AN AUTOPSY PERFORMED: No
27b WERE AUTOPSY FINDINGS USED: No
28 CASE REPORTED TO MEDICAL EXAMINER: Yes

31 PROBABLE MANNER OF DEATH: Natural

THIS IS A CERTIFIED TRUE AND CORRECT COPY OF THE OFFICIAL RECORD ON FILE IN THIS OFFICE

BY: Elizabeth A. Kreel   Oct 12, 1994   State Registrar

WARNING: ANY REPRODUCTION OF THIS DOCUMENT IS PROHIBITED BY LAW. DO NOT ACCEPT UNLESS ON SECURITY PAPER WITH LINES AND SECURITY WATERMARK ON BACK AND COLORED BACKGROUND AND GOLD EMBOSSED GREAT SEAL OF THE STATE OF FLORIDA ON FRONT. ALTERATION OR ERASURE VOIDS THIS DOCUMENT.

4789192

HRS FORM 1564A (6-93)



CERTIFICATION OF VITAL RECORD

# STATE OF FLORIDA

## OFFICE of VITAL STATISTICS

### CERTIFIED COPY

### CERTIFICATE OF DEATH

### FLORIDA

TYPE OR PRINT IN PERMANENT BLACK INK

LOCAL FILE NO.

| 1. DECEDENT'S NAME | FIRST | MIDDLE | LAST | 2 SEX |
|---|---|---|---|---|
| | Dorothy | Jane | McCabe | Female |

| 3. DATE OF DEATH (Month, Day, Year) | 4 SOCIAL SECURITY NUMBER | 5a. AGE-Last Birthday (years) 67 | 5b. UNDER 1 YEAR Months / Days | 5c. UNDER 1 Day Hours / Minutes |
|---|---|---|---|---|
| 1996 | | | | |

| 6 DATE OF BIRTH (Month, Day, Year) | 7. BIRTHPLACE (City and State or Foreign Country) | 8 WAS DECEDENT EVER IN U.S. ARMED FORCES? (Yes or No) |
|---|---|---|
| 1929 | Dade City, Florida | No |

9a. PLACE OF DEATH (Check only one, see instructions on other side)

HOSPITAL: __ Inpatient __ ER/Outpatient __ DOA    OTHER: __ Nursing Home __ Residence X Other (Specify) **Daughters Residence**

9b INSIDE CITY LIMITS? (Yes or No)   **Yes**

| 9b. FACILITY NAME (If not institution, give street and number) | 9c. CITY, TOWN, OR LOCATION OF DEATH | 9e COUNTY OF DEATH |
|---|---|---|
| 37440 Southview Avenue | Dade City | Pasco |

| 10a. DECEDENT'S USUAL OCCUPATION | 10b. KIND OF BUSINESS/INDUSTRY | 11. MARITAL STATUS —Married, Never Married, Widowed, Divorced (Specify) | 12. SURVIVING SPOUSE (If wife, give maiden name) |
|---|---|---|---|
| Nurse | Medical | Widowed | ------- |

| 13a. RESIDENCE — STATE | 13b. COUNTY | 13c. CITY, TOWN, OR LOCATION | 13d. STREET AND NUMBER |
|---|---|---|---|
| Florida | Pasco | Dade City | 37440 Southview Avenue |

| 13e. INSIDE CITY LIMITS? (Yes or No) | 13f. ZIP CODE | 14. WAS DECEDENT OF HISPANIC OR HAITIAN ORIGIN? (Specify No or Yes — If yes, specify Haitian, Cuban, Mexican, Puerto Rican, etc.) | 15. RACE — American Indian, Black, White, etc. Specify | 16. DECEDENT'S EDUCATION (Specify only highest grade completed) Elementary/Secondary (0-12) / College (1 or 5 +) |
|---|---|---|---|---|
| Yes | 33525 | X No   __ Yes   Specify | White | 4 |

| 17 FATHER'S NAME (First, Middle, Last) | 18. MOTHER'S NAME (First, Middle, Maiden Surname) |
|---|---|
| Leon    Hudson | Flossie    Peterson |

| 19a. INFORMANT'S NAME (Type/Print) | 19b. MAILING ADDRESS (Street and Number or Rural Route Number, City or Town, State, Zip Code) |
|---|---|
| Melinda Norman | 37440 Southview Avenue, Dade City, Florida   33525 |

| 20a. METHOD OF DISPOSITION | 20b. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place) | 20c. LOCATION — City or Town, State |
|---|---|---|
| XX Burial __ Cremation __ Removal from State __ Donation __ Other (Specify) | Mt. Zion Cemetery | Dade City, Florida |

| 21a. SIGNATURE OF FUNERAL SERVICE LICENSEE OR PERSON ACTING AS SUCH | 21b. LICENSE NUMBER (Of Licensee) 1601 | 21c. NAME AND ADDRESS OF FACILITY |
|---|---|---|
| (signature) | | Kelly Memorial Funeral Home 5221 8th Street, Zephyrhills, FL 33540 |

| 22a. To the best of my knowledge, death occurred at the time, date and due to the cause(s) as stated. (Signature and Title) ▶ | 22b. HOUR OF DEATH | 23a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) and manner as stated (Signature and Title) ▶ | 23b. HOUR OF DEATH |
|---|---|---|---|
| | | | |

| 22c. DATE SIGNED (Mo., Day, Yr.) 7-23-96 | 22c. HOUR OF DEATH 2:28 P M | 23c. DATE SIGNED (Mo., Day, Yr.) | 23c. HOUR OF DEATH |
|---|---|---|---|

| 22d. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print) | 23d. MEDICAL EXAMINER'S CASE # |
|---|---|

24. NAME AND ADDRESS OF CERTIFIER (PHYSICIAN, MEDICAL EXAMINER) (Type or Print)
Dr. Carol Roberts, M.D., 1209 Lakeside Drive, Brandon, Florida   33510

| 25a. SUBREGISTRAR — SIGNATURE AND DATE | 25b. LOCAL REGISTRAR — SIGNATURE Marilyn C. Griffin | 25c. DATE REGISTERED July 24 1996 |
|---|---|---|

26. PART I   Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line.

| IMMEDIATE CAUSE (Final disease or condition resulting in death) ▶ | a. Metastatic Cancer | Approximate Interval Between Onset and Death 11 mos |
|---|---|---|
| | DUE TO (OR AS A CONSEQUENCE OF): | |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST | b. Adeno carcinoma of lung | |
| | DUE TO (OR AS A CONSEQUENCE OF): | |
| | c. | |
| | DUE TO (OR AS A CONSEQUENCE OF): | |
| | d. | |

| PART II  Other significant conditions contributing to death but not resulting in the underlying cause given in Part I | 27a. WAS AN AUTOPSY PERFORMED? (Yes or No) No | 27b. WERE AUTOPSY FINDINGS USED TO COMPLETE CAUSE OF DEATH? (Yes or No) | 28 CASE REPORTED TO MEDICAL EXAMINER? (Yes or No) No |
|---|---|---|---|

| 29. IF FEMALE, WAS THERE A PREGNANCY IN THE LAST 3 MONTHS? __ YES XX NO | 30a. IF SURGERY IS MENTIONED IN PART I or II ENTER CONDITION FOR WHICH IT WAS PERFORMED | 30b. DATE OF SURGERY (Mo., Day, Year) |
|---|---|---|

| 31. PROBABLE MANNER OF DEATH (Specify) Natural, accident, suicide, homicide, or undetermined Natural | 32a. DATE OF INJURY (Month, Day, Year) | 32b. TIME OF INJURY M | 32c. INJURY AT WORK? (Yes or No) | 32d. DESCRIBE HOW INJURY OCCURRED |
|---|---|---|---|---|
| | 32e. PLACE OF INJURY — At home, farm, street, factory, etc. (Specify) | | 32f. LOCATION (Street and Number or Rural Route Number, City or Town, State) | |

HRS Form 512, Jan. 93 (Previous Editions Obsolete)



**Marilyn C. Griffin**
CHIEF DEPUTY REGISTRAR

JUN 0 5 2007

THE ABOVE SIGNATURE CERTIFIES THAT THIS IS A TRUE AND CORRECT COPY OF THE OFFICIAL RECORD ON FILE IN THIS OFFICE.

WARNING:   THIS DOCUMENT IS PRINTED OR PHOTOCOPIED ON SECURITY PAPER WITH A WATERMARK OF THE GREAT SEAL OF THE STATE OF FLORIDA ON THE FRONT, AND THE BACK CONTAINS SPECIAL LINES WITH TEXT AND SEALS IN THERMOCHROMIC INK.

DH FORM 1946 (08-04)

FLORIDA DEPARTMENT OF HEALTH

23141116   CERTIFICATION OF VITAL RECORD

\* 2 3 1 4 1 1 1 6 \*

VOID IF ALTERED OR ERASED

# OFFICE of VITAL STATISTICS

## CERTIFIED COPY

## CERTIFICATE OF DEATH
### FLORIDA

LOCAL FILE NO.

| 1. DECEDENT'S NAME | FIRST | MIDDLE | | LAST | | 2. SEX |
|---|---|---|---|---|---|---|
| | Joseph | R. | | Nally | | Male |

| 3. DATE OF DEATH (Month, Day, Year) | 4. SOCIAL SECURITY NUMBER | 5a. AGE-Last Birthday (years) | 5b. UNDER 1 YEAR | | 5c. UNDER 1 Day | |
|---|---|---|---|---|---|---|
| | | | Months | Days | Hours | Minutes |
| 2002 | | 74 | | | | |

| 6. DATE OF BIRTH (Month, Day, Year) | 7. BIRTHPLACE (City and State or Foreign Country) | 8. WAS DECEDENT EVER IN U.S. ARMED FORCES? (Yes or No) |
|---|---|---|
| 1928 | Evansville, Indiana | No |

| 9a. PLACE OF DEATH (Check only one; see instructions on other side) | 9b. INSIDE CITY LIMITS? (Yes or No) |
|---|---|
| Good Shepherd Hospice | No |

HOSPITAL: ___ Inpatient ___ ER/Outpatient ___ DOA   OTHER: ___ Nursing Home ___ Residence X Other (Specify)

| 9c. FACILITY NAME (If not institution, give street and number) | 9d. CITY, TOWN, OR LOCATION OF DEATH | 9e. COUNTY OF DEATH |
|---|---|---|
| Good Shepherd Hospice | Auburndale | Polk |

| 10a. DECEDENT'S USUAL OCCUPATION | 10b. KIND OF BUSINESS/INDUSTRY | 11. MARITAL STATUS – Married, Never Married, Widowed, Divorced (Specify) | 12. SURVIVING SPOUSE (If wife, give maiden name) |
|---|---|---|---|
| Accountant | Accounting/ Finance | Married | Marlene J. Score |

| 13a. RESIDENCE – STATE | 13b. COUNTY | 13c. CITY, TOWN, OR LOCATION | 13d. STREET AND NUMBER |
|---|---|---|---|
| Florida | Polk | Auburndale | 105 Arneson Ave. |

| 13e. INSIDE CITY LIMITS? (Yes or No) | 13f. ZIP CODE | 14. WAS DECEDENT OF HISPANIC OR HAITIAN ORIGIN? (Specify No or Yes – If yes, specify Haitian, Cuban, Mexican, Puerto Rican, etc.) | 15. RACE – American Indian, Black, White, etc. (Specify) | 16. DECEDENT'S EDUCATION (Specify only highest grade completed) |
|---|---|---|---|---|
| No | 33823 | X No ___ Yes   Specify: | White | Elementary/Secondary (0–12) 2   College (1–4 or 5+) |

| 17. FATHER'S NAME (First, Middle, Last) | 18. MOTHER'S NAME (First, Middle, Maiden Surname) |
|---|---|
| Joseph Raymond Nally | Christina Cavens |

| 19a. INFORMANT'S NAME (Type/Print) | 19b. MAILING ADDRESS (Street and Number or Rural Route Number, City or Town, State, Zip Code) |
|---|---|
| Marlene J. Nally | 110 6th St. JPV Winter Haven, FL 33880 |

| 20a. METHOD OF DISPOSITION | 20b. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place) | 20c. LOCATION – City or Town, State |
|---|---|---|
| X Burial ___ Cremation ___ Removal from State ___ Donation ___ Other (Specify) | Florida National Cemetery | Bushnell, FL |

| 21a. SIGNATURE OF FUNERAL SERVICE LICENSEE OR PERSON ACTING AS SUCH | 21b. LICENSE NUMBER (of Licensee) | 21c. NAME AND ADDRESS OF FACILITY |
|---|---|---|
| | 3513 | Crisp-Coon Funeral Homes, Inc. 201 1st St. S Winter Haven, FL 33880 |

22a. To the best of my knowledge, death occurred at the time, date and place and due to the cause(s) as stated. (Signature and Title)

| 22b. DATE SIGNED (Mo. Day, Yr) | 22c. HOUR OF DEATH |
|---|---|
| 10-7-02 | 11:45 P M |

22d. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print)

23a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) and manner as stated. (Signature and Title)

| 23b. DATE SIGNED (Mo. Day, Yr) | 23c. HOUR OF DEATH |
|---|---|
| | M |

23d. MEDICAL EXAMINER'S CASE #

| 24. NAME AND ADDRESS OF CERTIFIER (PHYSICIAN, MEDICAL EXAMINER) (Type or Print) |
|---|
| Dr. Lucy Ertenberg 105 Arneson Ave. Auburndale, FL 33823 |

| 25a. SUBREGISTRAR – SIGNATURE AND DATE | 25b. LOCAL REGISTRAR – SIGNATURE | 25c. DATE REGISTERED |
|---|---|---|
| | | Oct. 10, 2002 |

26. PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock or heart failure. List only one cause on each line

IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. Lung Cancer

DUE TO (OR AS A CONSEQUENCE OF):

Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (Disease or injury that initiated events resulting in death) LAST

b. ___ DUE TO (OR AS A CONSEQUENCE OF):

c. ___ DUE TO (OR AS A CONSEQUENCE OF):

d. ___

| | Approximate interval Between Onset and Death |
|---|---|

PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I.

| 27a. WAS AN AUTOPSY PERFORMED? (Yes or No) | 27b. WERE AUTOPSY FINDINGS USED TO COMPLETE CAUSE OF DEATH? (Yes or No) | 28. CASE REPORTED TO MEDICAL EXAMINER? (Yes or No) |
|---|---|---|
| No | No | No |

| 29. IF FEMALE, WAS THERE A PREGNANCY IN THE PAST 3 MONTHS? ___ Yes ___ No | 30a. IF SURGERY IS MENTIONED IN PART I or II, ENTER CONDITION FOR WHICH IT WAS PERFORMED | 30b. DATE OF SURGERY (Mo., Day, Year) |
|---|---|---|

| 31. PROBABLE MANNER OF DEATH (Specify) Natural, accident, suicide, homicide, or undetermined | 32a. DATE OF INJURY (Month, Day, Year) | 32b. TIME OF INJURY | 32c. INJURY AT WORK? (Yes or No) | 32d. DESCRIBE HOW INJURY OCCURRED |
|---|---|---|---|---|

| 32e. PLACE OF INJURY – At home, farm, | 33. LOCATION (Street and Number or Rural Route Number, City or Town, State) |
|---|---|

THIS IS A CERTIFIED TRUE AND CORRECT COPY OF THE OFFICIAL RECORD ON FILE IN THIS OFFICE

BY Ann Palmer
Chief Deputy Registrar
State Registrar

OCT. 1 0 2002

WARNING: THE DOCUMENT IS PRINTED OR PHOTOCOPIED ON SECURITY PAPER WITH THE WATERMARK OF THE GREAT SEAL OF THE STATE OF FLORIDA. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK.

THE DOCUMENT FACE CONTAINS A MULTI-COLORED BACKGROUND AND GOLD EMBOSSED SEAL. THE BACK CONTAINS SPECIAL LINES WITH TEXT AND SEALS IN THERMOCHROMIC INK.

14004554

DOH FORM 1564 (10-98)

FLORIDA DEPARTMENT OF HEALTH

## CERTIFICATION OF VITAL RECORD

# Exhibit P

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
## IN VOLUSIA COUNTY, FLORIDA
## CIVIL DIVISION

SUZANNE BARBER, Individually and as
Personal Representative of the Estate of
DONALD BARBER,

      Plaintiff,

vs.

R. J. REYNOLDS TOBACCO COMPANY,
et al.,

      Defendants.

CASE NO: 2008-30102-CICI

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### BASED ON LACK OF STANDING AND JUDICIAL ESTOPPEL,
### OR IN THE ALTERNATIVE FOR A STAY OF ALL PROCEEDINGS

Plaintiff Suzanne Barber lacks standing to prosecute this action.  Ms. Barber and her now late husband, Donald Barber, each voluntarily filed for Chapter 7 bankruptcy protection in August 2010 and January 2012, respectively, several years after commencing this action in January 2008 to prosecute their *Engle* state law claims.  Though expressly required by federal law, both Mr. and Ms. Barber failed to disclose the existence of their *Engle* claims in either bankruptcy proceeding.  Under these circumstances, federal law is clear that the *Engle* claims became part of their respective bankruptcy estates immediately upon the filing of their Chapter 7 petitions, and their failure to disclose this lawsuit necessarily means the *Engle* claims remain with the bankruptcy estates today.  Said more directly, <u>today</u>, Mr. and Ms. Barber do not own their claims, and in fact, they have not owned the claims for years.  Accordingly, Defendants R. J. Reynolds Tobacco Company and Philip Morris USA Inc. (collectively, "Defendants") present

simple, undisputable facts and undeniable black-letter legal principles, which establish their entitlement to summary judgment.

## INTRODUCTION

Donald Barber and Suzanne Barber jointly commenced this *Engle* action on January 10, 2008. Two and a half years later, on August 13, 2010, Ms. Barber voluntarily filed a Chapter 7 bankruptcy petition. Mr. Barber filed a voluntary Chapter 7 bankruptcy petition on January 12, 2012. Both Mr. and Ms. Barber were fortunate to have all of their debts discharged by the bankruptcy court without any distributions to their creditors, their respective bankruptcy trustees were relieved of their duties, and their bankruptcy cases were formally closed. But all of this occurred under false pretenses. Federal bankruptcy law required both Mr. and Ms. Barber to provide sworn disclosures regarding their respective assets and liabilities. Among the requirements was that Mr. and Ms. Barber disclose both the existence and details regarding their pending claims in this *Engle* action to the bankruptcy trustee, their creditors, and the bankruptcy court. Notwithstanding that this case had been pending for several years, Mr. and Ms. Barber failed to make any such disclosure in their bankruptcy cases. Instead, they both elected to keep their *Engle* claims a secret. As a result, Plaintiff's claims remain the property of the bankruptcy estates and Plaintiff has no standing in this lawsuit. Defendants are entitled to judgment as a matter of law. *See, e.g., Isaac v. IMRG*, 224 F. App'x 907, 909 (11th Cir. 2007) (per curiam) (unpublished) (affirming summary judgment for defendant based on finding that plaintiff lacked standing to pursue discrimination claims that she failed to disclose to the bankruptcy court); *Baxley v. Pediatric Servs. Of Am., Inc.*, 147 F. App'x 59, 60-61 (11th Cir. 2005) (affirming summary judgment for defendant because plaintiff lacked standing to pursue potential claims she had failed to disclose to the bankruptcy court).

Additionally, even if Plaintiff's claims were no longer the property of the bankruptcy estates, Plaintiff's claims would be barred by the doctrine of judicial estoppel. This doctrine prevents parties from taking inconsistent positions in separate legal proceedings. In their bankruptcies, Mr. and Ms. Barber failed to disclose the existence of the very claims they are asserting in this case, despite the fact that the claims had been pending for 2 1/2 years at the time of Ms. Barber's bankruptcy, and 4 years at the time of Mr. Barber's filing. By failing to disclose these claims, Mr. and Ms. Barber deprived their bankruptcy estates of their value, and fared better in the bankruptcies as a result. Plaintiff cannot be allowed to benefit from the non-disclosure by now pursuing this action against Defendants. Therefore, even if the Plaintiff had standing in the instant suit (she does not), she is judicially estopped from bringing it.

Based on Plaintiff's lack of standing, summary judgment should be granted in favor of Defendants. In the alternative, if the Court declines to grant summary judgment at this time, the Court should nevertheless—at a minimum—stay all proceedings in this case to allow the bankruptcy trustees sufficient time to evaluate their positions, confer with creditors, seek any needed relief from the bankruptcy court, engage counsel, consider settlement strategy and, if appropriate, prepare a motion to intervene in the *Engle* action. Several *Engle* cases have been stayed in light of standing issues related to bankruptcies.

## STATEMENT OF UNDISPUTED FACTS

Indisputable facts demonstrate that Plaintiff's *Engle* claims had been filed several years before Mr. and Ms. Barber's bankruptcy filings and that they both failed to disclose those claims as required by federal bankruptcy law.

### A.   Mr. Barber and Ms. Barber Filed Their *Engle* Claims, on January 10, 2008, And Actively Participated in This Lawsuit

Mr. and Ms. Barber jointly commenced this action on January 10, 2008, filing a Complaint asserting strict liability, fraud, conspiracy to commit fraud and negligence/gross negligence claims against defendants. (Ex. A) The original complaint sought damages for, *inter alia*, Mr. Barber's pain and suffering and economic losses, and Ms. Barber's loss of consortium arising from her husband's personal injuries. *Id.* Amended Complaints were filed on, or about, March 3, 2008 and October 21, 2014, and a motion to further amend the complaint a third time has been filed. (Exs. B,C,D) In each of these pleadings, the same four claims are asserted and Plaintiff continues to prosecute this action to seek damages for Mr. Barber's pain and suffering and economic losses, and Ms. Barber's loss of consortium arising from her husband's personal injuries.[1]

Mr. and Ms. Barber were active participants in this lawsuit prior to their respective bankruptcy filings. For example, Mr. and Ms. Barber each executed sworn verifications in connection with interrogatory responses they provided. *See* (Ex. E) (June 17, 2008 verification executed by Ms. Barber) and Ex. F (February 17, 2009 verification executed by Mr. Barber). On January 12, 2009, Mr. Barber personally sent a letter to Judge Parsons asking for an expedited trial of his *Engle* claims. (Ex. G) On September 15, 2011, just four months prior to Mr. Barber's bankruptcy filing, Mr. Barber and Ms. Barber, acting in this *Engle* action "without aid of counsel," served upon defendants (and publicly filed) an Offer to Settle Out of Court in which they offered to settle for the sum of five million ($5,000,000.00) dollars. (Ex. H) On this

---

[1] Mr. Barber passed away in 2012. In 2014, Ms. Barber successfully moved the Court in her capacity as personal representative of the Estate of Mr. Barber to be substituted to pursue his survival claims. As a result, she is now the sole plaintiff in this case, pursuing her original individual claims, and in a representative capacity asserting Mr. Barber's original survival claims. To be sure, because Mr. Barber did not own his prior *Engle* claims at the time he passed away, his estate similarly has no claim today.

record there can be no serious claim that Mr. and Ms. Barber were unaware of the *Engle* claims at the time of their bankruptcy proceedings.

      **B.**     **Ms. Barber's August 13, 2010 Bankruptcy Filing,
and Her Failure to Disclose Her *Engle* Claims**

     On August 13, 2010, more than 2 and 1/2 years after filing this *Engle* lawsuit, Ms. Barber filed her Voluntary Petition for relief under Chapter 7 of The Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida.  Ms. Barber's bankruptcy schedules indicated that she was seeking protection from creditors holding more than $300,000 in claims. Voluntary Petition, *In re: Suzanne J. Barber*, No. 6-10-bk-14338-ABB (Bankr. M.D. Fla.) (Filed Aug. 13, 2010) ("Voluntary Petition") (Ex. I).  Schedule B to the Voluntary Petition required Ms. Barber to list all "contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to set off claims . . ." and required her to "[g]ive [an] estimated value of each."  *Id.* at Schedule B, Number 21.  Item 35 required disclosure of "Other personal property of any kind not already listed.  Itemize."  *Id.* at Schedule B, Number 35. In response to both items, Ms. Barber indicated "None."  *Id.*  Ms. Barber swore under penalty of perjury that those responses were "true and correct to the best of [her] knowledge, information and belief."  *Id.*, at Declaration Concerning Debtor's Schedules.  Ms. Barber had a second chance to make a proper disclosure.  On September 23, 2010, Ms. Barber filed revised Schedules with the bankruptcy court.  These, too, were sworn to by her under penalties of perjury.  Once again, Ms. Barber did not disclose her *Engle* claims.   *See* Summary of Schedules Revised 9/21/10, *In re: Suzanne J. Barber*, No. 6-10-bk-14338-ABB (Bankr. M.D. Fla.) (Filed Sep. 23, 2010) (Ex. J).

     Ms. Barber's initial bankruptcy filing also included a Statement of Financial Affairs which required disclosure of all pending lawsuits to which she was a party.  Here too, Ms. Barber

did not disclose her *Engle* lawsuit.    *See* (Ex. I at Statement of Financial Affairs, Number 4, p. 2-3.)  Again, Ms. Barber executed a (second) declaration, subject to penalty of perjury, swearing that the representations in her Statement of Financial Affairs were true and correct.  They were not.

Ms. Barber's Chapter 7 Trustee issued a Report of No Distribution on October 2, 2010. The Chapter 7 Trustee's report makes clear that he relied upon the disclosures in Ms. Barber's schedules, stating in pertinent part:

> Pursuant to Fed R Bank P 5009, I hereby certify that the estate of the above-named debtor(s) has been fully administered. I request that I be discharged from any further duties as trustee. Key information about this case as reported in schedules filed by the debtor(s) or otherwise found in the case record: This case was pending for 2 months. Assets Abandoned (without deducting any secured claims): $ 155809.00, Assets Exempt: Not Available, Claims Scheduled: $ 318903.42, Claims Asserted: Not Applicable, Claims scheduled to be discharged without payment (without deducting the value of collateral or debts excepted from discharge): $ 318903.42.

*See* Docket Report, *In re: Suzanne J. Barber*, No. 6-10-bk-14338-ABB (Bankr. M.D. Fla.) (Entered Oct. 2, 2010) (Ex. K).

Based upon the information provided by Ms. Barber, the bankruptcy court entered an Order on December 1, 2010 approving the Chapter 7 Trustee's report granting a discharge of Ms. Barber's debts.  *See* Order Approving Trustee's Report of No Distribution, *In re: Suzanne J. Barber*, No. 6-10-bk-14338-ABB (Bankr. M.D. Fla.) (Dec 1, 2010) (Ex. L).  Pursuant to that Order, the Chapter 7 Trustee was discharged and relieved of his duties and the bankruptcy estate was deemed closed. *Id.*

### C.    Mr. Barber's January 12, 2012 Bankruptcy Filing, and His Failure to Disclose His Engle Claims

On January 12, 2012, more than 4 years after filing this *Engle* lawsuit, Mr. Barber filed his Voluntary Petition for relief under Chapter 7 of Bankruptcy Code in the United States

Bankruptcy Court for the Middle District of Florida.  Mr. Barber's bankruptcy schedules indicated that he was seeking protection from creditors holding more than $200,000 in claims. Voluntary Petition, *In re: Donald P. Barber*, No. 6-12-bk-00408-KSJ (Bankr. M.D. Fla.) (Filed Jan 12, 2012) (Ex. M).  Like Ms. Barber's bankruptcy filings, Mr. Barber's Schedule of Assets And Statement of Financial Affairs failed to disclose his *Engle* claims.  *See, Id.,* at Schedule B, Numbers 21 and 35, and Statement of Financial Affairs, at p. 3, Number 4.  Like Ms. Barber, Mr. Barber also swore twice under penalty of perjury that those responses were "true and correct to the best of [his] knowledge, information and belief."  *Id.*, at Declaration Concerning Debtor's Schedules and Declaration Regarding Statement of Financial Affairs.[2]

Mr. Barber's Chapter 7 Trustee issued a Report of No Distribution on February 16, 2012. The Chapter 7 Trustee's report makes clear that he relied upon the disclosures in Mr. Barber's schedules.  *See* Docket Report, *In re: Donald P. Barber*, No. 6-12-bk-00408-KSJ (Bankr. M.D. Fla.) (Entered Feb. 16, 2012) (Ex. N).

Based upon the information provided by Mr. Barber, the bankruptcy court entered an Order on April 17, 2012 approving the Chapter 7 Trustee's report granting a discharge of Mr. Barber's debts.  *See* Order Discharging Debtor, *In re: Donald P. Barber*, No. 6-12-bk-00408-KSJ (Bankr. M.D. Fla.) (April 17, 2012) (Ex. O).  On May 15, 2012, the bankruptcy court entered a further Order discharging and relieving the trustee of his duties and closing the bankruptcy estate.  *See* Order Approving Trustee's Report of No Distribution, *In re: Donald P. Barber*, No. 6-12-bk-00408-KSJ (Bankr. M.D. Fla.) (May 15, 2012) (Ex. P).

---

[2] Ms. Barber signed Mr. Barber's Schedules in her capacity as "Non-Attorney Bankruptcy Petition Preparer," a position which subjects her to fines for fraudulent, unfair or deceptive conduct. *See* 11 U.S.C. §110 (j)(2).

**D.    Plaintiff Has Settled Claims, And Received Settlement Funds, That Rightfully Belonged to The Bankruptcy Estates**

Notwithstanding that Mr. and Ms. Barber have not owned their *Engle* claims since their 2010 and 2012 bankruptcy filings, they have continuously managed this action.  Indeed, Plaintiff testified at her recent deposition that after Mr. Barber's passing she entered into a settlement in which she received a sum of money (the amount of which she refused to disclose) in exchange for dismissing defendant Liggett & Myers from this action.  *See* Suzanne Barber Deposition, at 256-260 (Ex. Q).  But the decision to dismiss defendant Liggett & Myers from this case did not belong to Plaintiff, but was owned by the respective bankruptcy trustees.  Further, the settlement monies paid to Plaintiff are in actuality property of the bankruptcy estates.

**E.    Defendants' Will Provide Notice To The Former Chapter 7 Trustee's Regarding the Plaintiff's Engle Claims and This Motion**

Defendants will provide both former Chapter 7 Trustee's with a copy of this Motion and the Notice of Hearing.

**ARGUMENT**

"Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law." *Volusia County v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000); Fla. R. Civ. P. 1.150(c).

**I.    Plaintiff Lacks Standing To Bring This Lawsuit Because It Is Property Of The Respective Bankruptcy Estates.**

Defendants are entitled to summary judgment in this case because – as a matter of law – Plaintiff lacks standing to pursue this action.  *See, e.g., Peace River/Manasota Reg'l Water Supply Auth. v. IMC Phosphates Co.*, 18 So. 3d 1079, 1084 (Fla. 2d DCA 2009) ("[T]he proof

8

required is proof of the elements of *standing,* not proof directed to the elements of the case or to the ultimate merits of the case.") (emphasis in original); *Gascue v. HSBC Bank, U.S.A.*, 97 So. 3d 263, 264 (Fla. 4th DCA 2012) ("[A] party must have standing to file suit at its inception and may not remedy this defect by subsequently obtaining standing."). "Standing is a legal concept that requires a would-be litigant to demonstrate that he or she reasonably expects to be affected by the outcome of the proceedings, either directly or indirectly." *Peace River/Manasota Reg'l Water Supply Auth.*, 18 So. 3d at 1082-83 (citation omitted). When a plaintiff lacks standing to pursue her claims, dismissal of those claims on summary judgment is the appropriate remedy. *Daytona Beach Kennel Club, Inc. v. Dep't of Bus.*, 33 So. 3d 799, 799 (Fla. 5th DCA 2010) ("The issue of standing is normally a question of law, as it was in this case. Dismissal is appropriate where undisputed facts demonstrate that a party lacks standing.").

"The question whether an interest claimed by the debtor is 'property of the estate' is a federal question to be decided by federal law." *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). Under federal bankruptcy law, when a debtor files a bankruptcy petition, all of the debtor's property, including the debtor's causes of action that have accrued as of the filing of the bankruptcy petition, becomes property of the estate. *See* 11 U.S.C. § 541(a)(1) (stating that the commencement of a bankruptcy case creates an estate which is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."); *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004) ("[V]irtually all of debtor's assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of a bankruptcy petition."). This includes causes of action grounded in state law. *Losacano v. Deaf & Hearing Connection of Tampa Bay, Inc.*, 988 So. 2d 66, 68 (Fla. 2d DCA 2008) (holding that when plaintiff filed bankruptcy, her action then pending against defendants became an asset of the bankruptcy estate);

9

*Hadden v. State Farm Fire & Cas. Co.*, 37 So. 3d 918, 920 (Fla. 5th DCA 2010) ("Once [Plaintiff] filed his bankruptcy petition, the State Farm Lawsuit became property of the bankruptcy estate **subject to the trustee's exclusive control**.") (emphasis added).

In another *Engle* action, *Root v. R.J. Reynolds*, Case No. 08-CA-0706 (Hillsborough County), faced with a similar standing based summary judgment motion, the Gary law firm (Plaintiff's counsel in this case) expressly acknowledged that where a civil lawsuit is filed before a bankruptcy, the bankruptcy estate owns the civil claim. *See* Plaintiff James Root's Response to Defendant R.J. Reynolds Tobacco Company's Motion for Summary Judgment, at 4. (Ex. R). In attempting to distinguish the *Root* case from the *very circumstances we have here*, the Gary firm argued:

> This was not a case of a typical plaintiff who brings a lawsuit against an individual and during the litigation is forced to file for bankruptcy. In that situation the pending litigation would be owned by the bankruptcy trustee. Actual or constructive knowledge would not be an issue because it would be assumed that the party bringing or defending the lawsuit was aware of the lawsuit that was filed on his behalf.

*Id.*

This case is just such a "case of a typical plaintiff who brings a lawsuit against an individual and during the litigation is forced to file for bankruptcy." As the Gary firm conceded previously, under the circumstances we have here, there can be no serious dispute that Mr. and Ms. Barber's *Engle* claims became property of their respective bankruptcy estates the moment they filed their Voluntary Petitions. This *Engle* lawsuit was filed in 2008, and the claims clearly

belonged to the debtors (Mr. and Ms. Barber) on the date each filed for bankruptcy in 2010 and

2012 respectively.[3]

When a debtor does not include her cause of action as an asset on her bankruptcy petition,

the cause of action becomes unadministered property of the bankruptcy estate. *See Losacano*,

988 So. 2d at 68; *Parker v. Wendy's Intern., Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004) ("Failure

to list an interest on a bankruptcy schedule leaves that interest in the bankruptcy estate.");

*Hutchins v. I.R.S.*, 67 F.3d 40, 43 (3d Cir. 1995) ("It is equally clear that since the bankruptcy

estate retains unscheduled assets, only the bankruptcy trustee has the authority to control them.").

Once a cause of action becomes property of the bankruptcy estate, a debtor loses standing

to pursue the claim and the bankruptcy trustee becomes the only party in interest with standing to

pursue those claims. *See* 11 U.S.C. § 323; *Barger v. City of Cartersville, Ga.*, 348 F.3d 1289,

1292 (11th Cir. 2003) (holding because cause of action existed at time of bankruptcy, "the

*Trustee is the real party in interest and has exclusive standing to assert any [claims]*."); *Hadden*,

37 So. 3d at 920 ("It goes without saying that [Plaintiff] has no standing to pursue the lawsuit

while it belongs to the bankruptcy estate."). Until a cause of action is abandoned or administered,

the right to commence, continue, or settle claims, "[including] claims for personal injuries,"

belongs exclusively to the estate. *Waggoner v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-10367-

J-37-JBT (M.D. Fla.) (entered June 1, 2012) (Doc. 137) (recognizing, in an *Engle* progeny case

in federal court, that "[f]ailure to list an interest on a bankruptcy schedule causes that interest to

---

[3] The Court is not being asked to determine whether upon filing for bankruptcy Mr. and Ms. Barber possessed unasserted claims which had already accrued. Here, there can be no dispute that the debtor's asserted and filed their claims in 2008, several years prior to their bankruptcy filings.

Nor is the Court being asked to determine whether Mr. and Ms. Barber were aware that their attorneys were litigating their *Engle* claims prior to the bankruptcy filings. Their awareness is legally irrelevant to the question of standing. In any event, the undisputed facts show that in 2009, before their bankruptcy filings, Mr. and Ms. Barber both actively participated in their *Engle* lawsuit. *See supra*, at 4 (verifying interrogatory responses and directly writing to the Court).

remain in the bankruptcy estate. Consequently, [Mr. Waggoner's] claims in this Court were, and

remain, property of the bankruptcy estate and Ms. Waggoner does not have standing.") (Ex. S);

*Jones v. Harrell*, 858 F.2d 667, 669 (11th Cir. 1988) (holding debtor had no power or authority

to sign a settlement and release in pre-petition negligence action because the action was property

of the estate and belonged to the Trustee); *see also Miller v. Shallowford Cmty. Hosp., Inc.*, 767

F.2d 1556, 1559 (11th Cir. 1985) ("It is clear, then, that the trustee in bankruptcy succeeds to all

causes of action held by the debtor at the time the bankruptcy petition is filed.")

Plaintiff's *Engle* claims became the property of Mr. and Ms. Barber's respective

bankruptcy estates when they filed their Voluntary Petitions in 2010 and 2012. In addition,

because Mr. and Ms. Barber failed to disclose their claims in their Bankruptcy Schedules or

Statement of Financial Affairs, their bankruptcy trustees were prevented from deciding whether

to retain or abandon the *Engle* claims. Because the *Engle* claims were never formally abandoned,

they remain part of the bankruptcy estate as unadministered estate property at discharge, upon

closing of the bankruptcy case, up to and including today, and Plaintiff lacks standing to

prosecute her suit against Defendants. Moreover, allowing Plaintiff to proceed to trial without

standing will only result in error and inevitable reversal because any judgment obtained would be

void. *Alvarez v. Royal Atl. Developers, Inc.*, 854 F. Supp. 2d 1219, 1226 (S.D. Fla. 2011) ("As a

result, the Court finds the judgment is void. Neither Alvarez nor her estate possessed standing to

prosecute this action once she filed for bankruptcy . . . ."). Therefore, Plaintiff's claims should

be dismissed by this Court as a matter of law.

## II.    Even If Plaintiff's Claims Were No Longer Property Of The Bankruptcy Estate, The Doctrine Of Judicial Estoppel Bars Plaintiff's Claims.

While Plaintiff lacks standing to bring these claims as explained above, Plaintiff could

not maintain this action even if she had standing because they are barred by the doctrine of

judicial estoppel.    "Judicial estoppel is an equitable doctrine that precludes a party from 'asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'"    *Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1293 (11th Cir. 2003) (*quoting Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 (11th Cir. 2002)); *see also Hadden*, 37 So. 3d at 919.    The purpose of the doctrine is to "prevent[] parties from 'making a mockery of justice by inconsistent pleadings . . . .'"    *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1066 (Fla. 2001) (*quoting American Nat'l Bank v. Federal Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983).    The application of judicial estoppel generally turns on two factors: "'First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding.    Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system.'"    *Robinson*, 595 F.3d at 1273 (*quoting Burnes*, 291 F.3d at 1285).[4]

This doctrine has been invoked to prevent debtors from improperly benefiting from a bankruptcy discharge by denying the existence of potential pre-petition legal claims belonging to the debtor that could be available as an asset of the bankruptcy estate to help satisfy the claims of creditors, and then bringing those supposedly non-existent claims following discharge.    *See Hadden*, 37 So. 3d at 919; *De Leon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003) ("[W]e hold that the rule established in *Burnes,* that judicial estoppel bars a plaintiff from asserting claims previously undisclosed to the bankruptcy court where the plaintiff both knew about the undisclosed claims and had a motive to conceal them from the bankruptcy court, applies equally in Chapter 13 bankruptcy cases.").    This is because both creditors and the

---

[4] The elements which are necessary to apply judicial estoppel to causes of action that were not disclosed in bankruptcy have been well established by the Eleventh Circuit and applied in Florida state courts post *Blumberg*. *See Losacano*, 988 So. 2d at 69 (*citing Barger*, 348 F.3d 1289 (11th Cir. 2003), and progeny); *Hadden*, 37 So. 3d at 919 (same).

bankruptcy court rely on a debtor's disclosure of statements.   Creditors rely on the disclosure statements in determining whether to contest or consent to the bankruptcy discharge.  *See Burnes*, 291 F.3d at 1286.   Additionally, a bankruptcy court looks to a debtor's financial disclosures when determining whether debtor's plan is in the best interest of creditors.  *In re Nott*, 269 B.R. 250, 254-55 (Bankr. M.D. Fla. 2000).  Where it is undisputed that a debtor had knowledge of his or her claims, motive to make a mockery of the judicial system can be inferred where, at the time of the non-disclosure, the debtor could have fared better in bankruptcy as a result of the non-disclosure.  *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1275 (11th Cir. 2010); *Burnes*, 291 F.3d at 1287.

Here, Mr. and Ms. Barber have unquestionably taken inconsistent positions regarding the claims against Defendants, and done so under oath.   They both had an affirmative duty to disclose all assets – including "suits" and "contingent and unliquidated claims of every nature" – in their Voluntary Petitions in 2010 and 2012.  *See* 11 U.S.C. §§ 521(a) and 541(a)(7).  Instead, Mr. and Ms. Barber chose not merely to conceal, but to affirmatively misrepresent the existence of their claims against Defendants during their bankruptcy by responding "None," and signing their Verified Petitions under oath.  *See supra*, at 5-7.

Additionally, at the time of filing their Voluntary Petitions, Mr. and Ms. Barber had a motive to conceal their claims.  Had they disclosed their claims when they filed their Voluntary Petitions, the Chapter 7 trustees could have valued the claims and utilized such value when determining whether discharge of their respective debts was in the best interest of creditors.  This could have resulted in a higher amount required to be repaid under their bankruptcy plans, or leaving the bankruptcy estates open.

14

Now, Plaintiff seeks to recover in this Court on the <u>very claims</u> she and Mr. Barber denied existed when seeking bankruptcy protection. This is precisely the type of misconduct that the doctrine of judicial estoppel was designed to prevent and, this Court should find that Plaintiff is estopped from bringing this claim for her benefit as a matter of law.

## III.    Alternatively, The Court Should Stay This Proceeding To Allow The Bankruptcy Trustees An Opportunity To Protect Their Respective Interests

For the reasons already articulated, Defendants assert that the immediate entry of summary judgment is appropriate. Nonetheless, Defendants recognize that the Court may prefer not to determine the summary judgment motion until the bankruptcy trustees have a full opportunity to evaluate how to administer the *Engle* claims, and the bankruptcy estate creditors have an opportunity to be heard. Should it be so inclined, Defendants respectfully request that the Court grant a stay of all proceedings until further order of the Court.

In *Root v. R.J. Reynolds*, the court deferred ruling on the tobacco defendants' motion for summary judgment based upon a lack of standing, ordered the action abated without any activity until further order of the court and struck the case from the trial docket. *See Root v. R.J. Reynolds, Case No. 08-CA-0706 (Hillsborough County)*, July 10, 2013 Order (Ex. T) and December 9, 2013 Order (Ex. U). The *Root* case remains abated today, the *Root* Court having denied without prejudice a motion by plaintiff to lift the stay based upon inadequate evidence that the bankruptcy court had ruled that the smoker maintained ownership of the cause of action.[5]

---

[5] Respectfully, this Court does not need guidance from the bankruptcy court to determine the present owner of the *Engle* claims. As the cases cited *supra* uniformly demonstrate, and as the Gary firm itself acknowledged in the *Root* case briefing, where a debtor has actually filed a civil claim prior to its bankruptcy, the civil claim belongs to the bankruptcy estate. And where the claim is not disclosed in the bankruptcy, it remains with the bankruptcy estate. The undisputed facts demonstrate that is what happened here and that Plaintiff does not own her claims.

By comparison, *Root* presented the trial court with a more complicated set of facts than those presented here. In *Root*, plaintiff filed his *Engle* civil lawsuit in 2008, several years after the closing of his bankruptcy estate in 2005. Defendants argued that Mr. Root's prospective *Engle* claim should nonetheless have been disclosed to the bankruptcy court between 2002 and 2005 because Mr. Root's position in the *Engle* case was that his claims first

15

*See also, Palmieri v. R.J. Reynolds,* Case No. 08-80000(19) (Broward County Jan. 26, 2011) Order on Defendants' Motion for Summary Judgment Based on Lack of Standing and Judicial Estoppel (Ex. V) ("This case is abated and no activity shall occur unless and until the Court orders otherwise.") *Id.*

If the Court declines to grant summary judgment in favor of Defendants, at a minimum, the Court should similarly stay this action.

## CONCLUSION

For the reasons set for above, Defendants respectfully request that the Court grant Defendants' motion for summary judgment on all counts in Plaintiff's Second Amended Complaint. In the alternative, the case should be stayed indefinitely.

Respectfully submitted,

s/ Troy A. Fuhrman
Troy A. Fuhrman
Florida Bar No. 985211
HILL WARD HENDERSON
101 East Kennedy Boulevard, Suite 3700
Post Office Box 2231
Tampa, FL 33601
(813) 221-3900
FAX: (813) 221-2900
troy.fuhrman@hwhlaw.com
reynolds@hwhlaw.com

---

accrued in 1992, making the claims a personal asset of his at the time of the bankruptcy filing. Mr. Root argued that he had no knowledge of the *Engle* claims during his bankruptcy proceeding and therefore he was not obligated to disclose the claims. Even under such circumstances, the *Root* court had serious reservations about the smoker's standing, and accordingly ordered the action abated and the case stricken from the trial calendar until the bankruptcy court ordered that Mr. Root may proceed. Three years later, Mr. Root still has not come forward with sufficient evidence to demonstrate he has standing, and his action remains abated.

Stephanie E. Parker
Florida Bar No. 0688355
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, GA  30309-3053
(404) 521-3939
FAX:  (404) 581-8330
sberesheim@jonesday.com

**Attorneys for Defendant**
**R. J. REYNOLDS TOBACCO COMPANY,**
**individually and as successor-by-merger to**
**Lorillard Tobacco Company**


## CERTIFICATE OF SERVICE

I HEREBY certify that on March 24, 2016, I electronically filed the foregoing with the

Clerk of the Court by using the Florida Courts E-Filing Portal.

I HEREBY FURTHER CERTIFY that a true and correct copy of the foregoing was

served by E-Mail on Plaintiff's counsel and Defendant's counsel listed below this 24th day of

March, 2016.

| **Attorneys for Plaintiff:** | **Attorney for Defendant Philip Morris USA Inc.:** |
|---|---|
| Willie E. Gary, Esq. | Jennifer M. Voss, Esq. |
| Donald N. Watson, Esq. | SHOOK, HARDY & BACON, LLP |
| Glenn Crickenberger, Esq. | 100 North Tampa Street, Suite 2900 |
| GARY, WILLIAMS, PARENTI, | Tampa, FL  33602 |
|   WATSON & GARY, P.L. | PH: 813-202-7100 |
| 221 E. Osceola Street | FAX:  813-221-8837 |
| Stuart, FL  34994 | jvoss@shb.com |
| PH:  772-283-8260 | SHBPMAttyVolusia@shb.com |
| FAX: 772-463-1766 | |
| weg@williegary.com | |
| dnw@williegary.com | |
| cscott@williegary.com | |
| eva@williegary.com | |
| tobacco.efile@williegary.com | |

**Attorney for Defendant Philip Morris USA Inc.:**
Frank Cruz-Alvarez, Esq.
SHOOK, HARDY & BACON, LLP
201 South Biscayne Blvd., Suite 2400
Miami, FL  33131
PH: 305-358-5171
FAX: 305-358-7470
falvarez@shb.com
SHBPMAttyVolusia@shb.com

s/ Troy A. Fuhrman
Troy A. Fuhrman
**Attorney for R. J. Reynolds Tobacco Company, individually and as successor-by-merger to Lorillard Tobacco Company**

18

# Exhibit Q

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA
CIVIL DIVISION

IN RE: *ENGLE* PROGENY
TOBACCO LITIGATION

Case No.: 2008-CA-15000
Division: Tobacco

*Pertains To:*

MICHAEL SERMONS, as Personal Representative
of the Estate of Myra Sermons,

                    *Plaintiff,*

v.

PHILIP MORRIS USA, INC., and R.J. REYNOLDS
TOBACCO COMPANY,

*Case No. 16-2008-CA-000397-GXXX-MA*
_____/



FILED

JUL 0 1 2016

CLERK CIRCUIT COURT

## VERDICT FORM

We, the Jury, return the following verdict:

## Question No. 1

### Class Membership

Was Myra Sermons addicted to cigarettes containing nicotine, and if so, was such addiction a legal cause of her lung cancer and/or emphysema?

YES ✓          NO ____

***If your answer to Question 1 was YES, please proceed to Question 2. If your answer to Question 1 was NO, please proceed no further except to sign and date this verdict form and return it to the courtroom.***

## Question No. 2

### Negligence and Strict Liability

Was smoking cigarettes because of addiction to each Defendant's cigarettes a legal cause of Myra Sermons' lung cancer and/or emphysema?

| | | | |
|---|---|---|---|
| PHILIP MORRIS USA, INC. | YES | ✓ | NO ___ |
| R.J. REYNOLDS TOBACCO COMPANY | YES | ✓ | NO ___ |

*Please proceed to Question 3.*


## Question No. 3

### Comparative Fault

Please state for each party the percentage of any fault that was a legal cause of Myra Sermons' lung cancer and/or emphysema that you charge to:

| | |
|---|---|
| PHILIP MORRIS USA, INC. | 15 % |
| R.J. REYNOLDS TOBACCO COMPANY | 5 % |
| MYRA SERMONS | 80 % |

*The total must be 100%.*

*If you answered NO for a Defendant in Question 2, enter zero for that Defendant above and skip Question 4 for that Defendant. If you answered YES for a Defendant in Question 2, please proceed to Question 4 for that Defendant.*

## Question No. 4

### Fraudulent Concealment

Did Myra Sermons reasonably rely to her detriment on statements by each Defendant that omitted material information concerning the health effects of cigarettes, their addictive nature, or both, and was such reliance a legal cause of Myra Sermons' lung cancer and/or emphysema?

| | | | |
|---|---|---|---|
| PHILIP MORRIS USA, INC. | YES | ___ | NO ✓ |
| R.J. REYNOLDS TOBACCO COMPANY | YES | ___ | NO ✓ |

*Please proceed to Question 5.*

## Question No. 5

### Civil Conspiracy to Fraudulently Conceal

Did Myra Sermons reasonably rely on statements by either Defendant or any of the other companies involved in the conspiracy that omitted material information concerning the health effects of cigarettes, their addictive nature, or both, made at any time during or after December 1953, and was such reliance a legal cause of Myra Sermons' lung cancer and/or emphysema?

YES ___          NO _✓_

*If you answered NO to all of Questions 2, 4, and 5, your verdict is for the Defendants, and you should not proceed further except to sign and date this verdict form and return it to the courtroom.*

*If you answered YES to any of Questions 2, 4, or 5, please proceed to Question 6.*

## Question No. 6

### Damages

What is the total amount (100%) of any damages sustained by Myra Sermons?

$ __65,000.00__

*In determining the total amount of damages, you should not make any reduction because of the fault you charge to Myra Sermons. The Court will enter a judgment based on your verdict and will reduce the total amount of damages by the percentage of fault which you charge to Myra Sermons if legally appropriate.*

*Please proceed to Question 7.*

## Question No. 7

### Punitive Damages

Under the circumstances of this case, are punitive damages warranted against each Defendant by clear and convincing evidence?

PHILIP MORRIS USA, INC.                    YES _✓_          NO ___

R.J. REYNOLDS TOBACCO COMPANY      YES _✓_          NO ___

*(Please sign and date the verdict).*

SO SAY WE ALL, THIS 1st DAY OF ___July___, 2016.

FOREP█████ ███

F██████ SPENCER

FOREPERSON'S PRINTED NAME

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA
CIVIL DIVISION

IN RE: *ENGLE* PROGENY
TOBACCO LITIGATION

Case No.: 2008-CA-15000
Division: Tobacco

*Pertains To:*

MICHAEL SERMONS, as Personal Representative
of the Estate of Myra Sermons,

*Plaintiff,*

v.

PHILIP MORRIS USA, INC., and R.J. REYNOLDS
TOBACCO COMPANY,

*Case No. 16-2008-CA-000397-GXXX-MA*

FILED

JUL 0 6 2016

CLERK CIRCUIT COURT

## VERDICT FORM – PHASE 2

We, the Jury, return the following verdict:

What is the total amount of punitive damages, if any, which you find, by the greater weight of the evidence, should be assessed against each Defendant?

PHILIP MORRIS USA, INC.                     $ 51,225.°°

R.J. REYNOLDS TOBACCO COMPANY      $ 17,475.°°

If you elect not to assess punitive damages, you should enter a zero (0) as the amount of punitive damages.

*(Please sign and date the verdict).*

SO SAY WE ALL, THIS 6 DAY OF _July_, 2016.

FOREPERSON                SPENCER

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

LESIA MOONEY, as Personal
Representative of the Estate of
BARBARA JUNE MEACHAM, *et al.*,

      Plaintiff,              CASE NO.: 11-40815 CA 23

         v.

R.J. REYNOLDS TOBACCO COMPANY,
*et al.*,

      Defendants.

_____/

## VERDICT

1.    Was Barbara Meacham addicted to cigarettes containing nicotine?

                         Yes  X  No _____

*If your answer to Question 1 was NO, you should proceed no further except to sign and date the verdict form and return it to the courtroom. If your answer to Question 1 was YES, please proceed to Question 2.*

2.    Was an addiction to cigarettes containing nicotine a legal cause of Barbara Meacham's small cell lung cancer and death?

                         Yes _____ No  X 

*If your answer to Question 2 was NO, you should proceed no further except to sign and date the verdict form and return it to the courtroom. If your answer to Question 2 was YES, please proceed to Question 3.*

3.  Please state, as to each Defendant, whether smoking cigarettes manufactured by that Defendant was a legal cause of Barbara Meacham's small cell lung cancer and death.

> Philip Morris USA Inc.              Yes _____  No _____
>
> R.J. Reynolds Tobacco Company   Yes _____  No _____

*If your answer to Question 3 was NO for both Defendants, please proceed no further except to sign and date this verdict form and return it to the courtroom.*

*If your answer to Question 3 was NO for a Defendant, please proceed no further as to that Defendant.*

*If your answer to Question 3 was YES for one or both Defendant(s), you should proceed to Question 4 for that or those Defendant(s).*

4.  Please state the percentage of any fault for Barbara Meacham's small cell lung cancer and death that you charge to:

> Philip Morris USA Inc.                    _____ %
>
> R.J. Reynolds Tobacco Company      _____ %
>
> Barbara Meacham                          _____ %

### TOTAL MUST BE 100%

*If you did not charge either Defendant with any percentage of fault, please proceed no further except to sign and this verdict form and return it to the courtroom.  If you did charge one or both Defendants with some percentage of fault, please proceed to Question 5.*

5.  What is the total amount of damages, if any, sustained by Don Meacham for the loss of Barbara Meacham's companionship and protection and for his pain and suffering as a result of Barbara Meacham's small cell lung cancer and death?

> $ _____

*In determining the total amount of any damages, you should not make any reduction because of the fault you charge to Barbara Meacham.  The Court will enter a judgment based on your verdict and will reduce the total amount of damages by the percentage of fault which you charge to Barbara Meacham.*

*Only answer Question 6 for a Defendant if you answered "Yes" to Question 3 as to that Defendant and assigned some percentage of fault to that Defendant in Question 4.*

6. If you answered "Yes" to Question 3 as to a Defendant, please state whether you find by clear and convincing evidence that punitive damages are warranted against that Defendant for negligence and/or selling or supplying cigarettes that were defective.

Philip Morris USA Inc.          Yes _____  No _____

R.J. Reynolds Tobacco Company   Yes _____  No _____

SO SAY WE ALL, this 21 day of ____, 2016,

_____
                    Foreperson

Jason Lee

# Exhibit R

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN VOLUSIA COUNTY, FLORIDA
CIVIL DIVISION

JANICE L. ROUNDS, as Personal Representative
of the Estate of TERRENCE ROUNDS,

      Plaintiff,

                                     CASE NO. 2013-32607-CICI

v.

R.J. REYNOLDS TOBACCO COMPANY,

      Defendant.

_____/

## VERDICT

1.    **Was Terrence Rounds addicted to smoking cigarettes containing nicotine that were manufactured and sold by R.J. Reynolds Tobacco Company and, if so, was his addiction a legal cause of Mr. Rounds' lung cancer and death?**

                        Yes _____    No _X__

*If your answer to Question 1 was NO, you should proceed no further except to sign and date the verdict form and return it to the courtroom. If your answer to Question 1 was YES, please proceed to Questions 2 through 4.*

2.    **Did Terrence Rounds reasonably rely to his detriment on the concealment or omission of material information, not otherwise known or available, concerning the health risks or addictive nature of cigarette smoking, or both, by R.J. Reynolds Tobacco Company, and if so, was such reliance a legal cause of Mr. Rounds' lung cancer and death?**

                        Yes _____    No _____

3.  Did Terrence Rounds reasonably rely to his detriment on a statement or omission by any party to the agreement made in furtherance of the agreement to conceal material information about the health risks or addictive nature of cigarette smoking, or both, and if so, was such reliance a legal cause of Mr. Rounds' lung cancer and death?

Yes _____ No _____

4.  Please state the percentage of any responsibility for Terrence Rounds' lung cancer and death that you charge to:

R. J. Reynolds Tobacco Company  _____ %

Terrence Rounds  _____ %

TOTAL  _____ %

**TOTAL MUST BE 100%**

*If you did not charge R. J. Reynolds Tobacco Company with any percentage of responsibility, please proceed no further except to date and sign this verdict form and return it to the courtroom. If you did charge R. J. Reynolds Tobacco Company with some percentage of responsibility, please proceed to Question 5.*

5a.  What is the total amount of any damages to the estate for the loss of Terrence Rounds' support and services?

$ _____

5b.  What is the total amount of any damages sustained by Janice Rounds for the loss of spousal companionship and protection, and her mental pain and suffering as a result of Terrence Rounds' death?

$ _____

2

5e.    **What is the total amount of any damages sustained by the following for the loss of parental companionship, instruction, and guidance, and mental pain and suffering as a result of Terrence Rounds' death?**

Nicole Allen          $ _____

Meagen Rounds     $ _____

Shelby Rounds      $ _____

*In determining the total amount of any damages, you should not make any reduction because of the responsibility you charge to Mr. Rounds. The Court will enter a judgment based on your verdict and will make any appropriate reduction to the total amount of damages you award.*

*If you answered YES to Question 2 or Question 3 and you also awarded some amount of damages in Question 5, please proceed to Question 6. If you answered NO to Question 2 and Question 3, you should proceed no further except to sign and date the verdict form, and return it to the courtroom.*

6.    **Under the circumstances of this case, state whether by clear and convincing evidence punitive damages are warranted against R.J. Reynolds Tobacco Company.**

Yes _____    No _____

SO SAY WE ALL, this 26 day of January , 2016.

_____
Foreperson

3

# Exhibit S

```
        IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
         OF THE STATE OF FLORIDA, IN AND FOR VOLUSIA COUNTY
                        CIVIL DIVISION



    Suzanne Barber, Individually
    and as Personal
    representative of the Estate
    of DONALD BARBER,

          Plaintiffs,           Case No.
                                2008-30102-CICI
    vs.

    R. J. REYNOLDS TOBACCO
    COMPANY, et al,

          Defendants.
    _____/




       HEARING BEFORE THE HONORABLE ROBERT K. ROUSE, JR.




     DATE:                   April 29, 2016


     TIME:                   10:53 a.m. to 11:35 a.m.


     PLACE:                  Volusia County Courthouse
                             125 East Orange Avenue
                             Courtroom 7
                             Daytona Beach, Florida


     BEFORE:                 Aaron T. Perkins, RPR
                             Notary Public, State of
                             Florida at Large


                             Pages 1 to 46
```

```
 1    APPEARANCES:

 2      WILLIE E. GARY, ESQUIRE
        GLENN A. CRICKENBERGER, ESQUIRE
 3      Gary, Williams, Parenti, Watson & Gary, P.L.L.C.
        Waterside Professional Building
 4      221 S.E. Osceola Street
        Stuart, Florida 34994
 5           Attorney for Plaintiffs

 6      STEPHANIE E. PARKER, ESQUIRE
        Jones Day
 7      1420 Peachtree Street, N.E., Suite 800
        Atlanta, Georgia  30309-3053
 8    and
        TIMOTHY J. FIORTA, ESQUIRE
 9      BRADLEY W. HARRISON, ESQUIRE
        Jones Day
10      North Point
        901 Lakeside Avenue
11      Cleveland, Ohio  44114-1190
      and
12      MARK R. SEIDEN, ESQUIRE
        Jones Day
13      222 East 41st Street
        New York, New York 10017-6702
14    and
        TROY A. FURHMAN, ESQUIRE
15      Hill Ward Henderson
        101 East Kennedy Boulevard, Suite 3700
16      Tampa, Florida  33602
             Attorneys for Defendant R. J. Reynolds, et al
17
        JENNIFER M. VOSS, ESQUIRE
18      Shook, Hardy & Bacon, L.L.P.
        100 North Tampa Street
19      Suite 2900
        Tampa, Florida 33602
20           Attorney for Defendant Philip Morris USA Inc.

21
      ALSO PRESENT:    SUZANNE BARBER
22

23

24

25
```

1      judgment because our position was and continues to

2      be that Ms. Barber lost standing when she filed

3      for bankruptcy and did not disclose that.  Judge

4      Craig then recognized that, in order to move

5      forward, the bankruptcy trustees needed to be

6      substituted.  So that was our expectation after

7      the April 5th hearing.

8           THE COURT:  But -- and I will have to pull it

9      back up here.  I haven't even had time since we

10     started this discussion.  But the motion was -- do

11     I misremember this?  Wasn't it plaintiff's motion,

12     written?

13          MS. PARKER:  Yes, Your Honor.  The

14     plaintiff's motion was to substitute in the

15     trustees.

16          MS. BARBER:  No, it was not.

17          THE COURT:  Well, let's --

18          MR. SEIDEN:  And, Your Honor, Mark Seiden.

19     If I may just be heard on this issue of the

20     ethics.

21          The trustees were reappointed by the

22     Bankruptcy Court in early April.  And I have had

23     discussions with the trustees.  And each and every

24     time I spoke to them, I asked, "Are you

25     represented by counsel in connection with these

1    claims?"

2         They said, "No."

3         I said, "Are you comfortable speaking to us

4    about the claims?"

5         And they said, "Yes."

6         And they're both not only professional

7    trustees appointed by the U.S. Trustee, but

8    they're also both attorneys.

9         MS. PARKER:  Your Honor, here is a copy of

10   the motion, if I might.

11        THE COURT:  I think I just found it.  She

12   actually just made a copy for me.  It's dated the

13   26th of April?

14        MS. PARKER:  Yes, Your Honor.

15        THE COURT:  And signed by Mr. Crickenberger?

16        MR. GARY:  Your Honor, they had no business

17   talking to our clients.

18        MS. PARKER:  We haven't talked to their

19   clients.

20        MR. GARY:  Yes, you have.  You've settled

21   with them.  You had to talk to them.  That's

22   unethical.  They had no business talking to our

23   clients.

24        MS. VOSS:  Your Honor, if I may.  During my

25   conversation with the trustee, he advised that he

1    had not yet retained the Willie Gary firm and that

2    he didn't know if he was going to do that.  I

3    don't know if that has since happened.

4         MR. SEIDEN:  No.  I talked to them about it

5    Tuesday, Your Honor.  I can point out that as of

6    the Tuesday, they had not retained the Gary

7    Williams firm, didn't intend to, and in

8    addition -- or hadn't committed to, and in

9    addition, pursuant to 11 USC 327 of the Bankruptcy

10   Code, which is section on employment of

11   professional persons, before a Chapter 7 trustee

12   may retain counsel, they must seek an order of the

13   Bankruptcy Court.

14        No such application was ever made.  There is

15   no retention agreement.  There is no Bankruptcy

16   Court order.  There are no clients of the Gary

17   Williams firm that are Chapter 7 trustees.

18        MR. GARY:  Your Honor --

19        THE COURT:  Well, can you -- let me just --

20   just a moment, Mr. Gary.  I just need to take this

21   step by step.  I'm not trying to --

22        I want to make sure that, first of all, what

23   I have done, I haven't done improvidently.

24        I'm looking -- and I want someone to hand

25   this to Ms. Barber.  I'm looking at a motion,

# Exhibit T

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT
 OF THE STATE OF FLORIDA, IN AND FOR VOLUSIA COUNTY

- - - - - - - - - - - - - - - - - - -
SUZANNE BARBER, individually and
as Personal Representative of the
Estate of DONALD BARBER, deceased,


        Plaintiff,
                                    No. 2008-30102 CICI
vs.
                                    Division 31
R.J. REYNOLDS TOBACCO COMPANY,
et al.,

        Defendants.
- - - - - - - - - - - - - - - - - -/




     HEARING BEFORE THE HONORABLE DENNIS CRAIG


   DATE:              May 9, 2016

   TIME:              9:41 a.m. to 10:52 a.m.

   PLACE:             125 North Orange Avenue
                      Courtroom 7
                      Daytona Beach, Florida

   REPORTED BY:       Susan C. Riesdorph, RPR, CRR
                      Notary Public, State of

                      Florida



                      Pages 1 - 70

2

```
1    APPEARANCES:

2        WILLIE GARY, ESQUIRE
         GLENN CRICKENBERGER, ESQUIRE
3        DONALD WATSON, ESQUIRE (by telephone)
         NATASHA HARRISON, ESQUIRE (by telephone)
4        LARRY STRAUSS, ESQUIRE (by telephone)
         221 East Osceola Street
5        Stuart, Florida 34994
             Attorneys for Plaintiff
6

7        BRADLEY W. HARRISON, ESQUIRE
         Jones Day
8        901 Lakeside Avenue
         Cleveland, Ohio 44114
9            - and -
         MARK SEIDEN, ESQUIRE
10       Jones Day
         222 East 41st Street
11       New York, New York 10017
             - and -
12       TROY A. FUHRMAN, ESQUIRE
         Hill Ward Henderson
13       101 East Kennedy Boulevard
         Suite 3700
14       Tampa, Florida 33602
             Attorneys for Defendant R.J. Reynolds
15           Tobacco Company

16

17       JENNIFER M. VOSS, ESQUIRE
         Shook, Hardy & Bacon, LLP
18       100 North Tampa Street
         Suite 2900
19       Tampa, Florida 33602
             - and -
20       DAVID THORNE, ESQUIRE (by telephone)
         Shook, Hardy & Bacon, LLP
21       2555 Grand Boulevard
         Kansas City, Missouri 64108
22           Attorneys for Defendant Philip Morris USA, Inc.

23

24

25
```

1          MR. WEBBER:  This is Trustee Webber.  I agree
2     with Trustee Chambers' statement.
3          THE COURT:  All right.  So did you tell them
4     that you were negotiating with the defendant the
5     case in which they were the attorneys of record?
6     That's a yes or no answer.
7          MR. WEBBER:  I think they knew that Friday.
8     And so that's a yes.
9          THE COURT:  Okay.  But as you were
10    negotiating, the answer would be no?
11         MR. WEBBER:  Well, no.  I think it's what we
12    said before.
13         THE COURT:  Was it already a fait accompli by
14    the time you told them on Friday?
15         MR. WEBBER:  We signed settlement papers
16    Friday -- Trustee Webber.  As far as the
17    substitution of plaintiffs --
18         THE COURT:  Well, all I can say is wow.
19         What did defense counsel know as far as
20    whether or not the Gary firm was in or out of the
21    loop while they were negotiating?  And then I want
22    to know whether any pro hac vice attorneys were
23    involved in this from the defense side.
24         MR. SEIDEN:  I can tell you that I was
25    involved with discussions, Your Honor.  I was

1       admitted pro hac.

2           THE COURT:  You were?

3           MR. SEIDEN:  Yes, sir.

4           THE COURT:  Okay.

5           MS. VOSS:  Your Honor, Jennifer --

6           THE COURT:  I'm going to be looking -- look,

7       I'm going to be looking into this.

8           MR. SEIDEN:  I can also tell you, as I made

9       clear on the record on April 29th, that every

10      conversation I had with the trustees was initiated

11      with, have you retained counsel?  You understand

12      we're adverse to the trust --

13          THE COURT:  There was a plaintiff in the case

14      and there was an attorney in the case who had

15      their appearance in the case, and you cut them

16      out.  Is that a fair statement?

17          MR. SEIDEN:  I don't believe so.

18          THE COURT:  Now is the time to tell me you

19      didn't cut them out.

20          MR. SEIDEN:  I don't believe so.  I don't --

21          THE COURT:  How is it that you didn't cut

22      them out?

23          MR. SEIDEN:  I don't believe when I'm talking

24      to the trustees that I have an obligation to talk

25      to the debtor.  I think that's a -- respectfully,

1   I think you're fundamentally not understanding the

2   Bankruptcy Code and the process.

3        THE COURT:  All right.  Well, I understand it

4   completely.

5        MR. SEIDEN:  Okay.

6        THE COURT:  But at the time you were doing

7   this, there was a case in my division with an

8   attorney of record who had filed affidavits

9   indicating that these trustees were fully

10  intendant on hiring them as lawyers, and based on

11  that, they filed a motion to substitute -- to

12  substitute parties, all along knowing exactly what

13  they were going to do on that Friday and not

14  informing the attorneys.  Were you a party to

15  that?

16       MR. SEIDEN:  I had no idea what

17  communications were taking place --

18       THE COURT:  Okay.

19       MR. SEIDEN:  -- if any, between the trustees

20  and the Gary firm.  Never asked and didn't know.

21       THE COURT:  Okay.  So you were not a party to

22  that.  All right.  Good.

23       I need to know if any other pro hac vice

24  attorneys were a party to this.  Was there any

25  other pro hac vice attorneys involved in these

1    negotiations?

2        MR. SEIDEN:  Your Honor, may I say one more

3    thing, please?

4        THE COURT:  Go ahead.

5        MR. SEIDEN:  I just want to make clear that

6    at any time that I had communications --

7        THE COURT:  I want to have a clear record

8    here.

9        MR. SEIDEN:  I understand.

10       THE COURT:  I have a court reporter here.  I

11   want a completely clear record.  I want to know

12   exactly what happened.

13       MR. SEIDEN:  Okay.  I just want to make

14   clear, any time that I had communications with the

15   trustees, I had asked them whether they had

16   retained the plaintiff's firm, Ms. Barber's firm.

17   I was told they had not.  I also checked the

18   bankruptcy docket myself or had my firm do it to

19   see whether any applications had been filed.  It

20   had not.  I also made clear that they understood

21   that Reynolds' interests might --

22       THE COURT:  Did you believe or disbelieve

23   that Ms. Barber might have an interest in this

24   lawsuit?

25       MR. SEIDEN:  Under the Bankruptcy Code, no.

1        THE COURT:  No.  I mean, does she have an
2  interest?
3        MR. SEIDEN:  I don't believe she does.
4        THE COURT:  Can she potentially recover as a
5  result of this lawsuit?
6        MR. SEIDEN:  She could potentially in the
7  Bankruptcy Code -- in the bankruptcy court have a
8  claim the way creditors could.
9        THE COURT:  That's right.  So she had an
10  interest in this lawsuit.  Do you think it was
11  wise to cut her out?  Do you think it was wise of
12  the trustees not to advise somebody interested in
13  this lawsuit before they negotiated her claim
14  away?
15        MR. SEIDEN:  Respectfully, Your Honor, I
16  think that happens in the bankruptcy court every
17  day.
18        THE COURT:  I'm sure that it does.
19        MR. SEIDEN:  I think it's completely
20  appropriate conduct.  And I'm sure -- Ms. Chambers
21  has been a trustee for over 25 years, since the
22  1990s.
23        THE COURT:  So it's appropriate to do it
24  without advising people?
25        MR. SEIDEN:  I don't believe that the

# Exhibit U

IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT,
IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE:          2008 30102 CICI
DIVISION:      31

SUZANNE BARBER, Individually
and as Personal Representative of
the Estate of DONALD BARBER,
deceased,

     Plaintiffs,

vs

R.J. REYNOLDS TOBACCO
COMPANY, INC. et al,
     Defendants,

## ORDER OF RECUSAL

    This court having determined that he should disqualify himself from further participation in this cause pursuant to Rule 2.330, Florida Rules of Judicial Administration,

    **IT IS ORDERED and ADJUDGED** that the undersigned does hereby recuse himself upon his own Motion for reasons best known to the court from further participation in this cause and refers this cause to the Chief Judge of the Seventh Judicial Circuit for reassignment.

    DONE and ORDERED this _12th_ day of May, 2016, in Volusia County, Florida.

                         **DENNIS CRAIG**
                         CIRCUIT COURT JUDGE

## ORDER OF REASSIGNMENT

    The judge to whom the above styled cause was assigned, having disqualified himself, therefore,

    I, **Terence R. Perkins**, Chief Judge of the Seventh Judicial Circuit of Florida, hereby reassign said cause to Division _____ (Judge _____ ), to determine said cause and dispose of all matters considered by him/her therein.

    DONE and ORDERED this _____ day of _____, 2016, in Volusia County, Florida.

                         **TERENCE R. PERKINS**
                         **CHIEF JUDGE**

Copies to:
Court Administration
Newly Assigned Judge
Parties